**TS&H**  Senior Housing and Healthcare Valuations, Market Studies and Consulting Services

# Tellatin, Short & Hansen, Inc.

**St. Louis, Missouri**
**Salem, Oregon**
**Boston, Massachusetts**
**Edwardsville, Illinois**

**www.tellatin.com**

**An Appraisal**
Presented in a
**Self-Contained Report**

# Kentuckiana Medical Center

4601 Medical Plaza Way
Clarksville, Clark County, Indiana
TS&H File Reference:  1118575

Prepared for
Kozyak Tropin & Throckmorton, P.A.

Effective Date of the Appraisal
As Is Value                                        May 11, 2011

Copyright 2011

# Tellatin, Short & Hansen, Inc.
### www.tellatin.com

| **Western** | **Central** | **Eastern** |
|---|---|---|
| C. Mark Hansen, CGA, Principal | James K. Tellatin, MAI, Principal | Melanie J. Kosich |
| | Sterling E. Short, MAI, Principal | |
| 130 Salem Heights Avenue, Suite 130 | 15455 Conway Road, Suite 355 | 40 Sedgemeadow Road |
| Salem, Oregon 97302 | Chesterfield, Missouri 63017 | Wayland, Massachusetts 01778 |
| T 503.485.5118   F 503.485.5120 | T 636.530.0009   F 636.530.0046 | T 508.358.7387   F 508.358.2819 |

Illinois:  A. Chantay Betts
T 618.655.1292    F 815.572.5040

June 21, 2011


Mr. David Rosendorf
Kozyak Tropin & Throckmorton, P.A.
2525 Ponce de Leon, 9th Floor
Coral Gables, Florida  33134

RE:    Kentuckiana Medical Center
        4601 Medical Plaza Way
        Clarksville, Clark County, Indiana  47129
        TS&H File Reference:  1118575

Dear Mr. Rosendorf:

In accordance with the signed engagement contract  dated April 7, 2011  (shown as Exhibit A in this report), I have appraised Kentuckiana Medical Center, an existing 46-bed surgical hospital facility.

The purpose of the appraisal is to develop an opinion of the "as is" market value for the fee simple interest in the real estate. A description of the property, together with information providing a basis for our opinions, is presented in the accompanying self-contained report.

It is our understanding that the intended use of this appraisal is to assist the client and Rialto Capital with collateral evaluation and for presentation to the United States Bankruptcy Court This report and its contents are solely for the intended use, and it should not be relied upon for any other purpose. Otherwise, neither the whole nor any part of this appraisal or any reference thereto may be included in any document, statement, appraisal, or circular without our explicit, prior written approval of the form and context in which it appears.

Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with:  the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation, and the requirements of the Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute;  Title XI of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA).

This appraisal is not based upon a requested minimum valuation, a specific valuation, or the approval of a loan.

Based on the data, analyses and conclusions presented in the attached report, it is our opinion that the "as is" market value of the fee simple interest in the real property is:

**$16,000,000**        as of        **May 11, 2011**

The date of this report is June 21, 2011.

A copy of this report, together with the field data from which it was prepared, is retained in our files. These data are available for your inspection upon request.

Respectfully submitted,

# Tellatin, Short & Hansen, Inc.

By:   Victor D. Cremeens, MAI
      Senior Associate Appraiser
      Indiana Certified General Real Estate Appraiser
        # CG40300285

# TABLE OF CONTENTS

Type of Report ------------------------------------------------------------------------- 5
Standard Appraiser-Client Contractual Agreements ------------------------------------ 6
Profile of Salient Data ---------------------------------------------------------------- 7
Competency Rule ---------------------------------------------------------------------- 8
Prior Assignments Involving the Subject Property --------------------------------------- 8
Scope of Work ------------------------------------------------------------------------ 8
    Problem Identification ------------------------------------------------------------- 9
        Client ----------------------------------------------------------------------- 9
        Intended User(s) of the Appraisal Report -------------------------------------- 9
        Intended Use of the Appraisal Report ----------------------------------------- 9
        Type of Value ----------------------------------------------------------------- 9
        Identification of the Subject Property ----------------------------------------- 10
        Interest Appraised ----------------------------------------------------------- 10
        Effective Date of the Appraisal----------------------------------------------- 10
        Date of Report --------------------------------------------------------------- 10
        Property Inspection ---------------------------------------------------------- 10
    Assumptions --------------------------------------------------------------------- 10
    Extraordinary Assumptions ------------------------------------------------------- 12
    Hypothetical Conditions ---------------------------------------------------------- 13
    Data Research and Analysis ------------------------------------------------------- 13
History of the Ownership and Enterprise ----------------------------------------------- 15
Exposure Time ----------------------------------------------------------------------- 16
Micro-Economic Analysis -------------------------------------------------------------- 19
    Regional Analysis ----------------------------------------------------------------- 19
        Physical Data ---------------------------------------------------------------- 19
        Demographic Data----------------------------------------------------------- 20
        Economic Data -------------------------------------------------------------- 24
        Conclusion------------------------------------------------------------------- 25
    Neighborhood Analysis ------------------------------------------------------------ 29
        Physical Data ---------------------------------------------------------------- 29
        Demographic Data----------------------------------------------------------- 30
        Conclusion ------------------------------------------------------------------- 33
Subject Property Description ---------------------------------------------------------- 38
    Site Description -------------------------------------------------------------------- 38
    Improvement Description----------------------------------------------------------- 39
        Hospital Building ------------------------------------------------------------- 39
        Functional Assessment------------------------------------------------------- 41
        Condition Assessment ------------------------------------------------------- 44
        Economic Life Expectancy, Effective Age and Remaining Economic Life ------------- 44
    Furniture, Fixtures and Equipment (FF&E) ------------------------------------------- 46
    Real Estate Taxes ----------------------------------------------------------------- 46
Market Analysis----------------------------------------------------------------------- 47
    Patient Protection and Affordable Care Act (PPACA)----------------------------------- 47
    Healthcare and Education Affordability Reconciliation Act (HCEAA)---------------------- 47
    Overview of Hospital Industry Trends----------------------------------------------- 57
    Subject Hospital Overview --------------------------------------------------------- 61
        Licensure, Certifications and Subprovider Units--------------------------------- 61
        Physician Ownership -------------------------------------------------------- 62
        Market Service Area--------------------------------------------------------- 62
    Identification of Competitors ------------------------------------------------------- 66
    Healthcare Service Area Evaluation------------------------------------------------- 93

# TABLE OF CONTENTS

Base Hospital Service Demand ---------------------------------------------- 93
Certificate of Need (CON) Program ----------------------------------------- 94
Bed Supply ----------------------------------------------------------------- 94
Payer Mix ------------------------------------------------------------------ 96
Conclusion ----------------------------------------------------------------- 97
Highest and Best Use Analysis ------------------------------------------------ 100
Highest and Best Use - As If Vacant ---------------------------------------- 100
Highest and Best Use - As Improved ---------------------------------------- 100
Valuation Procedures ------------------------------------------------------- 104
Cost Approach -------------------------------------------------------------- 105
Land Valuation------------------------------------------------------------- 105
Elements of Comparison -------------------------------------------------- 105
Site Value Conclusion ---------------------------------------------------- 111
Improvement Valuation ------------------------------------------------------ 112
Entrepreneurial Profit---------------------------------------------------- 114
Replacement Cost Summary ---------------------------------------------- 115
Accrued Depreciation --------------------------------------------------- 116
Summation ----------------------------------------------------------------- 119
Direct Sales Comparison Approach ------------------------------------------- 120
Sale Data Information----------------------------------------------------- 120
Elements of Comparison - Quantitative----------------------------------- 129
Elements of Comparison - Qualitative ----------------------------------- 130
Sales Comparison Approach Conclusion --------------------------------- 133
Reconciliation and Final Conclusion of Market Value ------------------------- 134
Certification ----------------------------------------------------------------- 135

## EXHIBIT SECTION

- Exhibit A -- Engagement Letter
- Exhibit B -- Legal Description
- Exhibit C -- Photographs of the Subject Facility
- Exhibit D -- Site and Improvement Description Exhibits
    Site Survey
    Property Assessment Parcel Identification Map
    Aerial Photograph
    Flood Plain Map
    Zoning Map
    Zoning Regulations
    Floor Plans
- Exhibit E -- Qualifications

## Type of Report

According to the Uniform Standards of Professional Appraisal Practice (USPAP), the following chart distinguishes the three types of appraisal reports: self-contained, summary, and restricted. In this case, the assignment involves a **self-contained appraisal report**.

| a) **Self-Contained Appraisal Report** | b) **Summary Appraisal Report** | c) **Restricted Use Appraisal Report** |
|---|---|---|
| i.   state the identity of the client and any intended users, by name or type; | i.   state the identity of the client and any intended users, by name or type; | i.   state the identity of the client by name or type; and state a prominent use restriction that limits use of the report to the client and warns that the appraiser's opinions and conclusions set forth in the report may not be understood properly without additional information in the appraiser's workfile; |
| ii.   state the intended use of the appraisal; | ii.   state the intended use of the appraisal; | ii.   state the intended use of the appraisal; |
| iii.   describe information sufficient to identify the real estate or personal property involved in the appraisal, including the physical and economic property characteristics relevant to the assignment; | iii.   summarize information sufficient to identify the real estate or personal property involved in the appraisal, including the physical and economic property characteristics relevant to the assignment; | iii.   state information sufficient to identify the real estate or personal property involved in the appraisal; |
| iv.   state the property interest appraised; | iv.   state the property interest appraised; | iv.   state the property interest appraised; |
| v.   state the type and definition of value and cite the source of the definition; | v.   state the type and definition of value and cite the source of the definition; | v.   state the type and definition of value and cite the source of the definition; |
| vi.   state the effective date of the appraisal and the date of the report; | vi.   state the effective date of the appraisal and the date of the report; | vi.   state the effective date of the appraisal and the date of the report; |
| vii.   describe the scope of work used to develop the appraisal; | vii.   summarize the scope of work used to develop the appraisal; | vii.   state the scope of work used to develop the appraisal; |
| viii.   describe the information analyzed, the appraisal methods and techniques employed, and the reasoning that supports the analyses, opinions, and conclusions; exclusion of the sales comparison approach, cost approach, or income approach must be explained; | viii.   summarize the information analyzed, the appraisal methods and techniques employed, and the reasoning that supports the analyses, opinions, and conclusions; exclusion of the sales comparison approach, cost approach, or income approach must be explained; | viii.   state the appraisal methods and techniques employed, state the value opinion(s) and conclusion(s) reached and reference the workfile; exclusion of the sales comparison approach, cost approach, or income approach must be explained; |
| ix.   state the use of the property existing as of the date of value and the use of the real estate or personal property reflected in the appraisal; and, when an opinion of highest and best use was developed by the appraiser, describe the support and rationale for that opinion; | ix.   state the use of the property existing as of the date of value and the use of the real estate or personal property reflected in the appraisal; and, when an opinion of highest and best use was developed by the appraiser, summarize the support and rationale for that opinion; | ix.   state the use of the property existing as of the date of value and the use of the real estate or personal property reflected in the appraisal; and, when an opinion of highest and best use was developed by the appraiser, state that opinion; |
| x.   clearly and conspicuously state all extraordinary assumptions and hypothetical conditions; and that their use might have affected the assignment results; and | x.   clearly and conspicuously state all extraordinary assumptions and hypothetical conditions; and that their use might have affected the assignment results; and | x.   clearly and conspicuously state all extraordinary assumptions and hypothetical conditions; and that their use might have affected the assignment results; and |
| xi.   include a signed certification in accordance with Standards Rule 2-3 or 8-3. | xi.   include a signed certification in accordance with Standards Rule 2-3 or 8-3. | xi.   include a signed certification in accordance with Standards Rule 2-3 or 8-3. |
| Comments have not been included in this chart | | |

5

## <u>Standard Appraiser-Client Contractual Agreements</u>

**Advertising**
Neither all nor any part of the contents of this appraisal report shall be conveyed to the public through advertising, public relations, news, sales or other media without the written consent and approval of Tellatin, Short & Hansen, Inc.

**Public Dissemination**
Neither the report nor any portions thereof (especially any conclusions as to value, the identity of the appraisers, or Tellatin, Short & Hansen, Inc.) or any reference to the Appraisal Institute, American Society of Appraisers or their relative professional designations, shall be disseminated to the public through public relations media, news media, sales media or any other public means of communication without the prior written consent and approval of the appraisers and Tellatin, Short & Hansen, Inc.

**Plagiarism**
Neither all nor any part of the contents of this appraisal report shall be plagiarized for any purpose by the client or anyone else who obtains a copy of the report directly, or indirectly without the written approval of an officer of Tellatin, Short & Hansen, Inc.

**Court Testimony**
Testimony or attendance in court by reason of this appraisal shall not be required unless arrangements for such services are subsequently made between the client and appraiser.

**Financial Information**
The concluded opinion of value and prospective financial analyses in the report are intended for the information of the person or persons to whom they are addressed, solely for the purposes stated therein, and should not be relied upon for any other purpose. Neither our report, nor its contents, nor any reference to the appraisers or Tellatin, Short & Hansen, Inc. may be included or quoted in any offering circular or registration statement, prospectus, sales brochure, other appraisal, loan, or other agreement or document without our prior written permission. Permission will be granted only upon meeting certain conditions.

## Profile of Salient Data

| | |
|---|---|
| Name | Kentuckiana Medical Center |
| Address | 4601 Medical Plaza Way<br>Clarksville, Clark County, Indiana, 47129 |
| Current Title Holder | KMC Real Estate Investors, LLC |
| Ownership Interest Appraised | The tangible and intangible assets of the going concern including the fee simple ownership in the real estate |
| Property Type | Surgical hospital facility |
| Land Area (Hospital Parcel) | 10.03 acres, or 437,023 square feet |
| Zoning (Hospital Parcel) | "VPCZ, Veterans Parkway Corridor Zone" |
| Flood Plain Designation (Hospital Parcel) | Zone C (area of minimal flooding) |
| Building Improvements | |
|     General Description | One-story, steel-frame structure with tilt-up concrete exterior walls; 76,929 square feet;  designed for use as a 46-bed surgical hospital facility;  erected in 2009. |
|     Construction Quality | Average |
|     Condition | Good |
|     Estimated Deferred Maintenance | $0 |
|     Estimated Effective Age | 25 years |
|     Estimated Remaining Economic Life | 30 years |
| Inspected By | Victor D. Cremeens, MAI on May 11, 2011 |
| Client | Kozyak Tropin & Throckmorton, P.A.<br>Mr. David Rosendorf, Esq. |
| Intended User(s) | Kozyak Tropin & Throckmorton, P.A., Rialto Capital, and the United States Bankruptcy Court |
| Intended Use | To assist the client and Rialto Capital with collateral evaluation and for |
| Highest and Best Use (Hospital Parcel) | |
|     As If Vacant | Commercial |
|     As Improved | Surgical hospital, ambulatory surgical center, or similar medical use |
| Indicated Value by Sales Comparison Approach | $16,200,000 |
| Indicated Value by Cost Approach | $15,900,000 |
| As Is Market Value Conclusion | $16,000,000 |
| Effective Date of the Appraisal | |
|     As Is Value | May 11, 2011 |

7

## Competency Rule

Definition:    "Prior to accepting an assignment or entering into an agreement to perform any assignment, an appraiser must properly identify the problem to be addressed and have the knowledge and experience to complete the assignment competently; or alternatively, must:

1. disclose the lack of knowledge and/or experience to the client before accepting the assignment;
2. take all steps necessary or appropriate to complete the assignment competently; and
3. describe the lack of knowledge and/or experience and the steps take to complete the assignment competently in the report.

Tellatin, Short & Hansen, Inc. exclusively specializes in appraisals and consulting assignments involving seniors housing and healthcare facilities, including surgical hospital facilities. As a specialist, our strengths are analyzing industry-specific macroeconomic data as well as local markets.

I regularly perform assignments throughout the nation that necessitate familiarizing ourselves with local markets as part of the scope of work. Based on the general practices of our peers, I believe that I satisfy the industry norms relative to establishing competency relative to local markets.

Based upon our knowledge and experience, the appraisers who participated in this appraisal assignment are collectively competent.

## Prior Assignments Involving the Subject Property

Prior to accepting this assignment, any services regarding the subject property performed by Tellatin, Short & Hansen, Inc. within the last three years, as an appraiser or in any other capacity, were disclosed to the client.

Victor D. Cremeens, MAI has not provided services pertaining to the subject property during this time frame. Victor D. Cremeens, MAI does not have any current or prospective interest in the subject property or the parties involved.

## Scope of Work

Definition:    "For each appraisal, appraisal review, and appraisal consulting assignment, an appraiser must:

1. identify the problem to be solved;
2. determine and perform the scope of work necessary to develop credible assignment results; and
3. disclose the scope of work in the report.

An appraiser must properly identify the problem to be solved in order to determine the appropriate scope of work. The appraiser must be prepared to demonstrate that the scope of work is sufficient to produce credible assignment results." (USPAP)

8

The scope of work is the primary mechanism for tailoring an appraisal to the circumstances related to the assignment. The following sections detail the scope of work for this assignment.

## Problem Identification

### Client

Kozyak Tropin & Throckmorton, P.A. is the client; specifically, Mr. David Rosendorf engaged the assignment.

### Intended User(s) of the Appraisal Report

The intended users of the appraisal report are Kozyak Tropin & Throckmorton, P.A., Rialto Capital, and the United States Bankruptcy Court.

### Intended Use of the Appraisal Report

It is our understanding that the appraisal will be used to assist the client and Rialto Capital with collateral evaluation and for presentation to the United States Bankruptcy Court

### Type of Value

The type of value for this assignment is market value.

Market Value

In accordance with **Federal Reserve System 12 CFR Part 225**, **Federal Deposit Insurance Corporation (12 CFR Part 323), The Office of the Comptroller of Currency (12 CFR Part 34)**, "Market Value" is defined as follows:

The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition are the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

- Buyer and seller are typically motivated;
- Both parties are well-informed or well-advised and each is acting in what they consider their own best interests;
- A reasonable time is allowed for exposure in the open market;
- Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
- The price represents a normal consideration for the property sold unaffected by special or creative financing, or sales concessions granted by anyone associated with the sale.

This appraisal addresses the market value of the real estate, not the market value of the going concern.

9

**Identification of the Subject Property**

The subject property is an existing 46-bed surgical hospital facility known as Kentuckiana Medical Center. The hospital building is located at 4601 Medical Plaza Way, Clarksville, Clark County, Indiana.

The legal description is presented in the Addenda as Exhibit B.

**Interest Appraised**

Title to the real estate is held by KMC Real Estate Investors, LLC, and the appraisal values the fee simple interest of the real estate. Although the facility was leased to a closely related operating entity, it is our understanding that the lease is no longer in effect.

The fee simple estate is defined by the ***Dictionary of Real Estate Appraisal*** as: "Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat."

**Effective Date of the Appraisal**

The following effective date applies for this appraisal:  "as is," May 11, 2011.

**Date of Report**

The date of this report is June 21, 2011.

**Property Inspection**

The inspection is viewed as an important step in the appraisal process. The complexity of this property type, along with the client's needs, warranted conducting an inspection.

The subject property was inspected by Victor D. Cremeens, MAI on May 11, 2011.

During the inspection, Tim Donahue, the appointed chief restricting officer for the Hospital, was interviewed regarding operational aspects of the facility. Mr. Donahue also guided a tour of the facility.

## Assumptions

Definition:  "that which is taken to be true." (USPAP)

The following subsections are considered as assumptions.

**Title to Real Estate**

No investigation of legal title has been made, and I render no opinion as to ownership of the property or condition of the title. I assume that:

- The title of the property is marketable;
- Unless otherwise indicated in this report, the property is free and clear of all liens, encumbrances, easements and restrictions;
- The property does not exist in violation of any applicable codes, ordinances, statutes or other government regulations;
- The property is under responsible ownership and competent management, and is available for its highest and best use.

10

**Sketches and Maps**

Sketches and maps in this report are for aiding the reader in visualizing the property and are based on field investigations. Dimensions and descriptions are based on public records and information furnished by others. These sketches and maps should not be used as references in matters of survey. I assume the basic information that I have gleaned from the sketches and maps is sufficiently accurate.

**Information and Data**

Information supplied by others is from sources believed to be reliable and is considered to be reasonable, but no further responsibility is assumed for its accuracy. I reserve the right to make such adjustments to the concluded value as may be required by a consideration of additional or more reliable data that may become available.

**Unexpected Conditions**

I assume that the property has no hidden or unexpected conditions that would adversely affect value.

**Legal or Specialized Expertise**

It is our intention that I express no opinions regarding matters requiring legal expertise, specialized investigation or knowledge beyond that customarily used by appraisers.

**Sale or Purchase**

All opinions of value are presented as Tellatin, Short & Hansen, Inc.'s considered opinion, based on the facts and data appearing in the report. I assume no responsibility for changes in market conditions or for the inability of the owner to locate a purchaser at the concluded value.

**Effective Date of the Appraisal and Currency**

The effective date of the appraisal, to which the conclusions and opinions expressed in this report apply, is set forth in the letter of transmittal. The dollar amount of any value opinion herein rendered is based on the purchasing power of the U.S. currency as of that date. Our value conclusions reflect consideration of typical financing conditions as of the effective date of the appraisal. The appraiser assumes no responsibility for economic or physical factors occurring subsequent to the effective date of the appraisal that may affect the opinions stated herein.

**Mineral Rights**

The value of mineral rights, if any, has not been considered in this appraisal unless otherwise noted.

**Structural Deficiencies**

The appraiser found no obvious evidence of structural deficiencies. However, no responsibility for structural soundness or conformity to city or county building and safety codes can be assumed without an independent structural engineering report.

**Termite Damage**

The appraiser found no obvious evidence of termite damage or infestation. However, a thorough inspection by a competent termite inspector has not been performed for the appraiser.

**Tellatin, Short & Hansen, Inc.**

Neither the appraiser nor Tellatin, Short & Hansen, Inc. has expertise in environmental inspections. The appraiser has provided an opinion of value but does not guarantee that the property is free of defects or environmental problems. The appraiser performs a limited inspection of visible and accessible area only. Attic and crawl space areas were not inspected unless otherwise noted. Mold may be present in areas that are not visible or that were not inspected by the appraiser. The presence or absence of mold can only be accurately determined by an inspection by persons with specific expertise in such services.

**Soil Conditions**

No detailed soil studies of the subject property are available to the appraiser. Therefore, statements in this report regarding soil qualities are not conclusive, but are considered consistent with information available to us. There are experts in this special field who can conduct such investigations and provide guidance regarding the impact of soil conditions.

**Financial Data Limitation**

Tellatin, Short & Hansen, Inc. does not, as part of this assignment, perform an audit, review or examination (as defined by the AICPA) of any of the historical or prospective financial information, and therefore does not express any opinion with regard to this information.

**Tax Law Changes**

Unless otherwise stated, Tellatin, Short & Hansen, Inc. assumes that there will be no changes in tax regulations.

**Hazardous Substances**

Hazardous substances, if present in the property, can introduce an actual or potential liability that will adversely affect its marketability and value. Such liabilities may be in the form of immediate recognition of existing hazardous conditions. Future liability could stem from the release of contaminants such as asbestos fibers, toxic vapors from urea formaldehyde foam insulation, or radon gases, through aging or building renovations.

In the development of our opinion of value, it is not known if the property is free of environmental contamination, and no consideration has been given to such a potential liability or its impact on value. The professional staff of Tellatin, Short & Hansen, Inc. is not qualified to make an investigation to determine the possible presence of toxic materials requiring either immediate or future correction. There are experts in this special field who can conduct such investigations and provide guidance regarding the impact of toxic materials that may be present in the subject property.

## Extraordinary Assumptions

Definition:  "an assumption, directly related to a specific assignment, which, if found to be false, could alter the appraiser's opinions or conclusions." (USPAP)

Comment:  "Extraordinary assumptions **presume as fact otherwise uncertain information** about physical, legal, or economic characteristics of the subject property or about conditions external to the property, such as market conditions or trends, or the integrity of data used in an analysis." (USPAP)

There are no extraordinary assumptions.

_____  12

**Tellatin, Short & Hansen, Inc.**

## Hypothetical Conditions

Definition:  "that which is contrary to what exists, but is supposed for the purpose of the appraisal." (USPAP)

Comment:  "Hypothetical conditions **assume conditions contrary to known facts** about the physical, legal, or economic characteristics of the subject property or about conditions external to the property, such as market conditions or trends, or the integrity of data used in an analysis." (USPAP)

There are no hypothetical conditions.

## Data Research and Analysis

In the performance of the appraisal, the type and extent of data researched and analyzed are profiled as follows.

- **Inspection**
  - Tour and interview(s) of the chief restructuring officer
  - Physical plant
    - Review building plans
    - Building components:  identification of major building components for descriptive purposes
    - Evaluate functional characteristics
    - Evaluate general condition
      - Recent capital expenditures
      - Deferred maintenance
  - Operational characteristics
    - Competitive market
- **Analysis of Sales History and/or Pending Transactions**
- **Regional and Neighborhood Analyses**
  - Physical data
  - Demographic data
    - Total population trends
    - Population trends by age cohorts
    - Socioeconomic data
    - Economic data
- **Property Description and Analysis**
  - Site description
    - Excess and/or surplus land
    - Flood plain zone
    - Zoning:  relative to allowable uses and compliance
  - Improvement description
    - Building components
    - Functional assessment
    - Condition assessment
  - Real estate taxation
- **Market Analysis**

13

- Healthcare reform analysis
- Overview of the hospital industry
- Subject license(s) and certifications
- Overview of the market service area
- Inventory of hospitals for market area
- Profiles of primary competitors
- Supply and demand analysis
- **Highest and Best Use Analysis**
- **Cost Approach**
  - Land valuation
  - Improvement valuation
    - Reproduction or replacement cost new
    - Accrued depreciation
- **Sales Comparison Approach**
  - Sale data
  - Comparison grid
  - Analysis of unit price indicators
- **Reconciliation**
  - Analysis to conclude opinion of market value
- **Allocation of Value**

It is our opinion that the data research and analysis is sufficient to produce a credible assignment result.

**Tellatin, Short & Hansen, Inc.**

## History of the Ownership and Enterprise

The subject property is currently owned by KMC Real Estate Investors, LLC, an Indiana limited liability company. The real estate ownership entity is reportedly made up of a majority interest held among 33 physician investors, and a minority interest held by Cardiovascular Hospitals of America, LLC (now known as CHA, LLC). The owner was the developer of the property. To our knowledge there have not been any transfers of ownership during the last three years.

Development of the hospital was spearheaded by two physicians, one a New Albany family practitioner, and the other a Louisville cardiologist. CHA, LLC is a privately owned company headquartered in Wichita, Kansas that forms partnerships with local physician investors to develop and operate hospitals. The predecessor company, Cardiovascular Hospitals of America, LLC, was founded in 2002.

The operating entity for the hospital, Kentuckiana Medical Center, LLC, is also comprised of the same physician and corporate investors. However, the physician investors reportedly have a minority interest in the operating company, while CHA, LLC holds the majority interest. A lease agreement for the subject property existed between the ownership and operating entities. It is our understanding that the operating entity (tenant) has defaulted on the lease agreement and that both the operating and real estate ownership entities are in bankruptcy.

Kentuckiana Medical Center opened in mid 2009 after a lengthy development process. The project was stalled by zoning issues, a moratorium on the construction of hospitals, and financing for the project. Due to the credit crisis that began in the latter half of 2008, the commitment for equipment financing for the hospital reportedly fell through. The developer eventually obtained additional financing, but not enough to complete the build-out of some space or to fully equip the hospital. Thus, the hospital has never been operated at its designed capacity. Another factor that reportedly contributed to a weak start for the operator was the timeliness of obtaining a Medicare provider agreement. The operator reportedly provided services to Medicare patients for a period of time in which they were not certified and ultimately were never paid for by the Centers for Medicare and Medicaid Services (CMS). Additionally, based upon admission statistics supplied to the appraisers, it appears that a limited number of the physician investors have been making significant referral activity to the hospital. Per a physician analysis supplied to the appraisers for YTD through September 30, 2010, the top eight physician owners accounted for 83.7 percent of the gross revenue. There were eight other physician owners that did not provide any admissions during that period.

The actual development costs for the facility were not supplied to the appraisers. Total project costs have been reported as $43.8 million in the media, but I assume that this figure represented an estimate that would have included the build-out and equipment for the entire facility. According to information supplied to the appraisers via an appraisal performed by Cushman Wakefield in early 2007, a "cursory budget" for the development of the real estate was as follows:

| | |
|---|---|
| General Conditions: | $21,180,000 |
| Development Fees: | 3,328,000 |
| Contingencies: | 3,000,000 |
| Total: | $27,508,000 |

15

## **Exposure Time**

Exposure time is the estimated length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal -- a retrospective estimate based upon an analysis of past events assuming a competitive and open market. This reasonable exposure time, intrinsic to the value estimate, is presumed to precede the effective date of the appraisal.

To estimate the reasonable exposure time for a property, three primary information sources provide the foundation of the analysis and conclusion.

1. Statistical information about days on the market for similar property types.
2. Information gathered through the sales verification process, assuming typical buyers and sellers of this property type.
3. Interviews of market participants involved with the marketing, management, buying and selling of the particular property category.

The market analysis section of the property discusses general trends in the healthcare industry, particularly as it relates to hospitals. That activity is tied integrally to the mergers and acquisitions market for hospital properties.

A hospital's location is very important to its marketability, as are the physical and functional utility characteristics of the physical plant. Encompassed within the location factor are: the competitive landscape within the market service area; demographic and employment variables that influence reimbursement, payer mix, and service line economics; and physician staffing opportunities. The subject property is located within the Jeffersonville Hospital Service Area. Poverty levels in the service area are moderate, with the short-term acute care hospital in closest proximity to the subject having a relatively high Medicaid census mix. Hospital occupancy levels in the subject's metro area are normal and do not suggest oversupply conditions.

The interest appraised in the subject property does not include all of the components of a going concern. Rather, the appraised property includes real estate only. However, with a reasonable likelihood that this property will be used for healthcare purposes in the future, I have included a marketing discussion for hospital going concerns.

The current market for hospital **going concern** acquisitions is substantially comprised of: (1) public and private hospital operating companies buying facilities that fit into their areas of geographic and community (rural, urban and suburban) concentration; and, (2) regional healthcare systems, most of which are non-profit, seeking to expand market share, improve economies of scale, and improve their leverage with managed care companies. The sellers are frequently independent hospitals or small healthcare systems that have not been profitable and/or lack the access to capital that is necessary to remain competitive. Some independent hospitals, even if financially strong, are seeking to affiliate with larger systems where they can assure more predictable access to capital. Most of these acquisitions are made as going concerns, and in many instances the buyers are agreeing to a significant future capital commitment as a part of the purchase agreement.

16

Public companies that are active in the acquisition market include:  Health Management Associates NYSE (HMA), LifePoint Hospitals, Inc. NASDAQ (LPNT), and Community Health Systems NYSE (CYH). Private hospital operating companies that are active in the acquisition market include:  Hospital Corporation of America (HCA), Vanguard Health Systems, Inc., Regional Care Hospital Partners, and LifePoint Hospitals, Inc.

According to a Moody's Investors Service report <u>M&A Activity Accelerates Among For-Profit Hospitals</u>, for-profit hospitals increased their acquisition activity significantly in 2010 due to clarity over healthcare reform, a build-up of cash among many for-profit hospitals and more certainty over access to the capital markets. Moody's expects U.S. healthcare reform to continue spurring M&A activity, since the new healthcare law stresses efficiencies, poses increased administrative burdens, and will likely result in additional pressure on business with managed-care payers. Moody's also notes that acquisition targets during the ongoing wave of acquisitions fit into a broader range than usual, such as ones in markets which have large populations of uninsured and could benefit the most from healthcare reform's increased access to health insurance.

Private equity funds are in an acquisition mode and they are partnering with hospital operating companies to make healthcare investments. Because banks pulled back from their lending activity during and after the credit crunch, there is a need for private equity to invest in IT and prepare for healthcare reform. Private equity is benefiting larger merger and acquisition deals. Private equity has longer investment time horizons and the resources to develop the best management teams. These factors contribute to their willingness to undertake turnarounds and bankruptcies, or to operate properties in underserved markets. Private equity is pushing the hospital industry toward greater privatization in the near term.

On the not-for-profit side, hospital systems with strong balance sheets are positioned to make strategic acquisitions, often through noncash mergers where minimal upfront cash is necessary. Some non-profit systems can also access private equity funds.

The subject property is not leased, but it is suitable to future healthcare use and, at its size and non-campus location, could be utilized as a specialty hospital. Many operators choose to lease properties for this use rather than owning the real estate. As such, I believe it is appropriate to provide some discussion regarding the market for net leased healthcare property.

The market for **net leased** healthcare properties is substantially comprised of real estate investment trusts (REITs), tenants in common (TIC) investment structures, real estate syndicates, private equity firms, and institutional investors. Healthcare properties are viewed as recession-proof or at least recession-resistant assets due to the demographic trends driving the growing demand for healthcare services. What's more, many healthcare services that Were once performed in general acute care hospitals are now being performed in specialty hospitals and medical office buildings. Specialty hospitals often are leased to healthcare systems that have credit ratings. Medical office buildings typically experience higher occupancy rates, low tenant turnover, and more consistent rent increases than other investment real estate classes.

Sales activity for net leased healthcare properties slowed considerably following the lending crisis in the latter part of 2008. At that time, limited availability of investment capital, an increase in the cost of capital, and lower REIT stock prices sidelined the investment activity of many prospective buyers. During the last year, however, sale activity has picked up considerably, particularly among REITs. Investors in these

properties evaluate opportunities on a case by case basis, placing emphasis on property locations (on-campus versus off-campus), credit worthiness of the tenant, and net operating income coverage of rent.

The subject property has not been valued as a going concern because the hospital business is a separate entity of which the appraisal client is not vested. Importantly, the hospital operating entity has not been profitable; thus, there is no significant history of positive cash flow from the business upon which an appraisal of the going concern could be made. The subject property is not subject to a performing lease agreement, and does not therefore currently produce income as a real estate investment. The market for hospital real estate only, particularly where the physical plant is newer, is not well established. The marketability and market value of these properties is typically determined by the level of interest that exists from other hospitals and systems serving the same or a proximate market service area. The motivations of prospective buyers may be complex, including not only the ability to expand services or outreach, but also to prevent another competitor from making or improving inroads in the market. The financial strength and business posturing of potential buyers can also be of influence. In some instances I have witnessed short periods of market exposure prior to a sale, while in others a hospital property can languish on the market for more than a couple of years.

Given the considerations noted, along with the market and property specific factors discussed throughout the report, I are inclined to believe that a market exposure of 12 months would have been necessary to market the subject property prior to the effective appraisal date. Furthermore, it seems reasonable and prudent to believe that a marketing period of 12 months would be necessary to market the subject property following the effective appraisal date.

18

## Micro-Economic Analysis

### Regional Analysis

The regional analysis focuses primarily on the socioeconomic trends. Population data best explain current socioeconomic conditions. Demographic factors most relevant to the valuation analysis include changes in the elderly population, levels of income and poverty, and employment composition.

The optimum market area for an acute care hospital has a growing population, especially among the elderly, with high levels of income and wealth, and also containing sufficient labor at reasonable wages. Income and wealth levels directly relate to the current and historical economic conditions of the region. Conversely, hospitals that serve market areas with declining population, and have low income and employment levels, will typically achieve higher levels of uninsured cases and bad debt, and may experience a declining demand for services. Additionally, they may experience greater difficulty attracting qualified professional staff. Hospitals in market service areas with greater numbers of poor people tend to experience more emergency department activity and provide a proportionately higher amount of healthcare services to people with chronic disease.

### Physical Data

Kentuckiana Medical Center is located in Clarksville, Clark County, Indiana in the southeastern portion of the state. Clark County is within the Louisville MSA. The MSA includes Clark, Floyd, Harrison, and Scott Counties in Indiana and Bullitt, Jefferson, and Oldham Counties in Kentucky. The county seat of Clark County is Jeffersonville, which is also the largest city in the county. The Ohio River forms the state line between Indiana and Kentucky, creating a substantial physical and political boundary. The Indiana portion of the Louisville MSA has its own unique identity and micro-economy, although there is considerably commuting into the larger and more densely populated MSA area in Kentucky.

The region is located on the very southern limits of the North American glacial till plains. This area has a gently rolling terrain with native prairie and woodland cover. The region has a humid continental climate with moderate winters and warm, humid summers.

The region is served by three Interstate Highways:  64, 65 and 71. I-65, a north-south route which runs between Nashville and Indianapolis, traverses Jeffersonville and Clarksville.  I-64, an east-west route connecting St. Louis with Lexington and points east, runs through the southern portion of Indiana and crosses into Louisville at New Albany. I-71 begins in Louisville and continues northeastward towards Cincinnati and Cleveland. A beltway system comprised of Interstates 264 and 265 ring the metropolitan area. Currently, the I-265 beltway ring is unclosed on the Indiana side of the metropolitan area. A proposal has been put forth for the extension of Highway 265 from State Road 62 to the I-265 leg in Kentucky. This highway extension would include the construction of a bridge spanning the Ohio River. Another bridge is proposed to supplement the existing I-65 John F. Kennedy Bridge which connects Clarksville with Louisville.

## Demographic Data

The trends for the total population are profiled as follows.

| Table R-1  Region, Total Population Trends | | | | |
|---|---|---|---|---|
| | National | Indiana | Louisville-Jefferson CBSA | Clark County |
| Total Population 2000 | 281,421,906 | 6,080,485 | 1,161,975 | 96,472 |
| Total Population 2010 | 311,212,863 | 6,479,832 | 1,273,611 | 109,822 |
| Total Population 2015 | 323,209,391 | 6,634,107 | 1,323,841 | 115,938 |
| Annual Total Population Growth Rate | | | | |
| 2000 to 2010 | 1.01% | 0.64% | 0.92% | 1.30% |
| 2010 to 2015 | 0.76% | 0.47% | 0.78% | 1.09% |
| Source: ESRI, 2010 | | | | |

The national population increased 1.01 percent annually from 2000 to 2010, and it is forecast to continue increasing at an annual rate of 0.76 percent from 2010 to 2015. The Indiana demographic trend lagged behind the national trend from 2000 to 2010; it is forecasted to increase at 0.47 percent annually from 2010 to 2015 -- still lagging behind the national trend. The population within the Louisville-Jefferson County, KY Core Based Statistical Area (CBSA) increased at 0.92 percent from 2000 to 2010, and it is forecast to increase at 0.78 percent from 2010 to 2015. The population within Clark County increased at an annual rate of 1.30 percent from 2000 to 2010, and it is forecast to increase at 1.09 percent annually from 2010 to 2015. Major factors influencing the population trends include the region's moderate four-season climate, a stable and diverse economy, and a modest cost of living.

Age demographics are important to isolate and analyze relative to bed demand and staffing forecasts for the industry. The following table illustrates the distribution of U.S. population and hospital discharges by age (note the data only reflects inpatient volumes). There are two periods shown – 1997 and 2007. This table is sourced from: *HCUP Facts and Figures:  Statistics on Hospital-Based Care in the United States, 2007.*



Note: Bar segments representing 2 percent or less have not been labeled. Excludes less than 41,000 discharges (0.1 percent) with missing age.
Source: AHRQ, Center for Delivery, Organization, and Markets, Healthcare Cost and Utilization Project, Nationwide Inpatient Sample, 1997 and 2007.

This table illustrates that older people accounted for a disproportionately larger share of hospitalizations compared to their proportion in the population. While people 65 years and older represented 13 percent of the population in 1997 and 2007, they comprised 36 and 33 percent of all inpatient hospitalizations in those years. Patients 18-64 years of age, at 61 and 63 percent of the population, accounted for 46 and 49 percent of hospitalizations. Similarly, those under age 18, at roughly a quarter of the population, accounted for 18 percent or less of the hospital stays. For most hospitals, growth of the elderly population should provide the best correlation to growth in medical service demand. The population trends, according to age group, are profiled in the following table.

**Table R-2  Region, Population Trends By Age Group**

| | National | Indiana | Louisville-Jefferson CBSA | Clark County |
|---|---|---|---|---|
| **Total Population Ages 25 to 34** | | | | |
| 2010 | 41,369,310 | 833,775 | 164,173 | 14,471 |
| 2015 | 43,952,666 | 847,091 | 167,135 | 14,254 |
| Annual Change | 1.22% | 0.32% | 0.36% | -0.30% |
| | | | | |
| **Total Population Ages 35 to 44** | | | | |
| 2010 | 41,763,599 | 863,918 | 174,466 | 15,348 |
| 2015 | 41,091,612 | 853,511 | 174,847 | 15,958 |
| Annual Change | -0.32% | -0.24% | 0.04% | 0.78% |
| | | | | |
| **Total Population Ages 45 to 54** | | | | |
| 2010 | 45,479,384 | 949,352 | 198,092 | 16,690 |
| 2015 | 43,013,507 | 876,450 | 185,484 | 16,014 |
| Annual Change | -1.11% | -1.59% | -1.31% | -0.82% |
| | | | | |
| **Total Population Ages 55 to 64** | | | | |
| 2010 | 36,286,991 | 764,770 | 158,606 | 14,062 |
| 2015 | 40,215,118 | 841,668 | 176,821 | 15,717 |
| Annual Change | 2.08% | 1.93% | 2.20% | 2.25% |
| | | | | |
| **Total Population Ages 65 to 74** | | | | |
| 2010 | 21,114,775 | 439,001 | 88,556 | 8,140 |
| 2015 | 26,827,364 | 548,733 | 115,325 | 10,676 |
| Annual Change | 4.91% | 4.56% | 5.42% | 5.57% |
| | | | | |
| **Total Population Ages 75 to 84** | | | | |
| 2010 | 13,286,479 | 273,151 | 54,899 | 4,808 |
| 2015 | 13,547,115 | 275,692 | 55,831 | 5,137 |
| Annual Change | 0.39% | 0.19% | 0.34% | 1.33% |
| | | | | |
| **Total Population 85 and Over** | | | | |
| 2010 | 6,070,110 | 123,161 | 23,760 | 1,994 |
| 2015 | 6,284,235 | 125,727 | 25,098 | 2,148 |
| Annual Change | 0.70% | 0.41% | 1.10% | 1.50% |

Source: ESRI, 2010

Hospital values are influenced significantly by the overall economic condition of the community or region served.  High levels of poverty result in elevated levels of Medicaid census, bad debt and charity health care.  All other things being equal, facilities located in market areas that have high-income levels and property values typically achieve higher commercial payer census mixes than hospitals located in poorer areas.

- Household and/or per capita income levels
- Home values
- Percentage of owner-occupied dwelling units
- Educational attainment

Demographic data providing insight as to the socioeconomic status of the region are profiled as follows.

| Table R-3 Region, Socioeconomic Indicators | | | | |
|---|---|---|---|---|
| | National | Indiana | Louisville-Jefferson CBSA | Clark County |
| Average Household Income, 2010 | $70,173 | 64,526 | 66,505 | 60,416 |
| Per Capita Income, 2010 | $26,739 | 25,499 | 27,084 | 25,333 |
| Number of Households with Income Between | | | | |
| $0 and $14,999 | 13,324,537 | 250,601 | 58,458 | 4,412 |
| $15,000 and $24,999 | 10,943,687 | 241,866 | 46,797 | 4,335 |
| $25,000 and $34,999 | 11,375,270 | 260,518 | 54,074 | 5,473 |
| $35,000 and $49,999 | 17,500,292 | 413,323 | 77,307 | 7,522 |
| $50,000 and $74,999 | 25,175,713 | 583,707 | 113,317 | 10,865 |
| $75,000 and $99,999 | 16,451,401 | 380,794 | 79,226 | 7,338 |
| $100,000 and $149,999 | 13,940,570 | 282,744 | 59,074 | 4,386 |
| $150,000 and Over | 8,048,519 | 108,103 | 26,125 | 1,330 |
| Percent of Households with Income Between | | | | |
| $0 and $14,999 | 11.4% | 9.9% | 11.4% | 9.7% |
| $15,000 and $24,999 | 9.4% | 9.6% | 9.1% | 9.5% |
| $25,000 and $34,999 | 9.7% | 10.3% | 10.5% | 12.0% |
| $35,000 and $49,999 | 15.0% | 16.4% | 15.0% | 16.5% |
| $50,000 and $74,999 | 21.6% | 23.1% | 22.0% | 23.8% |
| $75,000 and $99,999 | 14.1% | 15.1% | 15.4% | 16.1% |
| $100,000 and $149,999 | 11.9% | 11.2% | 11.5% | 9.6% |
| $150,000 and Over | 6.9% | 4.3% | 5.1% | 2.9% |
| Median Home Value, 2010 | $157,913 | $108,946 | $129,685 | $117,410 |
| Bachelor Degree or Higher | 28.0% | 22.9% | 24.2% | 17.4% |
| Source: ESRI, 2010 | | | | |

Most metropolitan areas have higher cost-of-living indices limiting the benefit of the higher income levels, especially for the "working poor," and income disparity typically ranges from poor inner urban areas to affluent suburban bedroom communities. The Louisville-Jefferson County, KY MSA fits this description. The average household income for Clark County is 93.6 percent of the state average -- indicative of a moderate standard of living. Clark County's average household income is also lower than the CBSA average. In comparison to the CBSA, Clark County has a comparable percentage of low-income households (under $15,000), and a lower percentage of high-income households (over $100,000). Real estate values play an important role in measuring the level of wealth in an area because homes represent a primary asset for most people. Thus, home values and historical appreciation are important considerations. Home values in Clark County are relatively low; having a median value of $117,410 (the national weighted median equals $157,913). The average home value in the county is moderately priced compared to the state average of $108,946. The county population is less educated than the state based on college graduates.

Most of these demographic data suggest that the regional population has a moderate level of affluence as compared to the statewide population, and that Medicaid utilization in acute-care hospitals in the region should be comparable to the statewide average. Generally, Medicaid reimbursement levels for healthcare services are substantially lower than those for Medicare or commercial payers.

**Economic Data**

The following table provides a breakdown of employment by industry sectors.

| Employment Sector | United States | Indiana | Louisville-Jefferson CBSA | Clark County |
|---|---|---|---|---|
| **Table R-4   Region, Employment By Industry** | | | | |
| Total | 136,013,961 | 2,870,407 | 561,567 | 50,028 |
| White Collar | 61.6% | 56.1% | 60.1% | 55.6% |
| Management/Business/Financial | 13.9% | 11.6% | 13.7% | 10.8% |
| Professional | 22.6% | 20.8% | 20.5% | 18.6% |
| Sales | 11.4% | 10.7% | 10.8% | 10.2% |
| Administrative Support | 13.6% | 13.0% | 15.1% | 16.0% |
| Services | 17.3% | 16.9% | 16.1% | 17.5% |
| Blue Collar | 21.1% | 27.0% | 23.9% | 27.0% |
| Farming/Forestry/Fishing | 0.6% | 0.5% | 0.3% | 0.2% |
| Construction/Extraction | 5.4% | 5.5% | 5.3% | 5.6% |
| Installation/Maintenance/Repair | 3.6% | 4.1% | 3.7% | 4.2% |
| Production | 5.7% | 9.6% | 7.4% | 8.9% |
| Transportation/Material Moving | 5.7% | 7.3% | 7.2% | 8.0% |

Source: ESRI, 2010

The employment mix by sector for Clark County is reasonably similar to that of the state. In comparison the CBSA, however, Clark County has a greater ratio of blue collar employment.

Since the national economic recession began in the latter part of 2008, the Louisville metro has experienced slower growth, elevated rates of unemployment and consumer retrenchment. Some of the most severely impacted sectors have been construction, manufacturing, retail, and transportation and warehousing. For 2011, the Indiana Business Review, a publication of the Indiana Business Research Center at IU's Kelley School of Business, if forecasting stability in the labor markets in Southern Indiana. New and continuing claims for unemployment have declined considerably from recession level highs. Their forecast suggests that the consumer will continue to emerge, but frugality will continue to dominate in general. Regional retail will continue to be impacted by these consumer trends, and hence the region's commercial real estate will see continued challenges. Manufacturing will continue to recover, but significant gains in employment growth are doubtful. Housing will continue recovering, but only at a slow pace.

As of March 2011, the unemployment in Clark County was 9.0 percent -- representing a decrease over the March 2010 unemployment rate, which was 9.8 percent (national unemployment rate is 8.8 percent; Indiana rate is 8.8 percent).

**Louisville MSA Major Employers**

| | | |
|---|---|---|
| United Parcel Service Inc | Transportation and distribution of goods | 20,513 |
| Humana Inc | Health benefits, life, dental insurance | 10,096 |
| Norton Healthcare | Health care | 8,142 |
| Jewish Hospital & St. Mary's HealthCare Inc | Health care | 6,500 |
| Ford Motor Co | Auto Manufacturer | 5,624 |
| The Kroger Co | Retail Grocer | 5,263 |
| GE Appliances | Manufacturer | 4,000 |
| Wal-Mart Stores Inc | Retailer | 3,608 |
| Baptist Healthcare System Inc | Health care | 3,305 |
| University of Louisville Hospital | Nonprofit Health care | 2,573 |
| Catholic Archdiocese of Louisville | Churches, agencies, schools, newspapers, cemeteries | 2,343 |
| Kindred Healthcare Inc | Health care | 2,153 |
| Yum Brands Inc | Restaurant company | 2,076 |
| E.On U.S. LLC | Utility | 1,902 |
| AT&T Inc | Telecommunications | 1,700 |
| Horseshoe Southern Indiana | Gaming and entertainment | 1,697 |
| Publishers Printing Co. LLC | Manufacturer | 1,600 |
| Papa John's International Inc | Quick-service restaurants | 1,530 |
| Anthem Blue Cross and Blue Shield of Kentucky | Health benefits | 1,358 |
| JBS Swift & Co | Manufacturer | 1,350 |
| SHPS Inc | Health management and benefits administration | 1,349 |
| Floyd Memorial Hospital & Health Services | Health care | 1,338 |
| ResCare Inc | Health and human services | 1,314 |
| Clark Memorial Hospital | Health care | 1,270 |
| Securitas Security Services USA Inc | Security services | 1,150 |
| Seven Counties Services Inc | Health care | 1,118 |
| Brown-Forman Corp. | Manufacturer | 1,081 |
| Al J. Schneider Co | Hospitality, commercial offices, wholesale lumber/building supplies | 900 |
| JPMorgan Chase & Co | Financial services, investment, banking | 890 |
| Citi | Financial services | 880 |
| Texas Roadhouse Inc | Restaurants and food service | 805 |
| Accent Marketing Services | Customer life cycle management provider, integrated marketing | 733 |
| Sam Swope Auto Group LLC | Automotive sales and service | 731 |
| Sullivan University System Inc | Post-secondary education | 689 |
| The Courier-Journal | Publishing | 575 |
| Tyson Foods Inc | Food processing | 652 |
| YMCA of Greater Louisville | Nonprofit organization | 650 |
| Republic Bank & Trust Co | Financial services, banking | 622 |
| B.F. South Inc. dba Wendy's | Quick-service restaurants | 600 |
| GSI Commerce Solutions | E-commerce fulfillment | 550 |

<u>**Conclusion**</u>

The population within the Louisville-Jefferson County, KY CBSA increased at 0.92 percent from 2000 to 2010, and it is forecast to increase at 0.78 percent annually from 2010 to 2015. The population within Clark County increased at an annual rate of 1.30 percent from 2000 to 2010, and it is forecast to increase at 1.09 percent annually from 2010 to 2015. The 75-plus-age group within the CBSA is forecast to increase 0.57 percent annually, and the 75-plus-age group within Clark County is forecast to increase 1.38 percent annually – relatively moderate compared to national growth. The average household income for Clark County is 93.6 percent of the state average -- indicative of a moderate standard of living. That figure is  lower than the CBSA average. Overall, the regional population has a moderate level of affluence as compared to the statewide population. Based on these main demographic indicators, the region should provide average economic prospects for surgical hospital facility operations. However, given the size of the CBSA, the Neighborhood Analysis presents a demographic overview that correlates more closely to the primary market service area for the Hospital.

# REGIONAL MAP



**Tellatin, Short & Hansen, Inc.**

# REGIONAL MAP



**Tellatin, Short & Hansen, Inc.**

## COUNTIES MAP

N↑



**Tellatin, Short & Hansen, Inc.**

## Neighborhood Analysis

The Neighborhood Analysis identifies an area of surrounding properties that are influenced by the same or similar market forces. A neighborhood analysis determines the principal characteristics of an area and provides insight into land use and value trends. This analysis also includes a demographic profile for the Hospital's market service area.

### Physical Data

The subject is located in the eastern portion of Clarksville, near the boundary with Jeffersonville. I have defined the neighborhood as a four-mile ring centered on the subject property. The neighborhood is characterized as being a majority of the urban area in the Indiana portion of the Louisville-Jefferson County, KY CBSA.

I have also profiled the market service area for Kentuckiana Medical Center. Data supporting our conclusion for the market service area boundaries is included in subsequent sections of the appraisal. I have defined the market service area by ZIP codes; specifically, 47126, 47129, 47130, 47143, 47163, and 47172.

Access to the neighborhood and market service area is achieved via the nearby highways – I-65, I-265 and U.S. Highway 31. I-65 forms the western property line for the subject site, and the building has good exposure to the traffic on that roadway. Per the traffic volume map noted below, I-65 carries about 85,000 vehicles daily along this section of the highway. I-265 is located about one mile to the north of the subject property. Medical Plaza Way connects to U.S. Highway 31 about 500 feet east of the subject property. U.S. Highway 31 intersects with Veterans Parkway just to the south of Medical Plaza Way. An interchange exists at Veterans Parkway and I-65. Veterans Parkway is an east-west oriented arterial route. The greatest concentration of retail space in the southern Indiana portion of the Louisville MSA is located along the west side of I-65, along Veterans Parkway and to the south of the roadway towards SR 131.

29



**Demographic Data**

The following table presents population data.

| Table N-1   Neighborhood and Market Service Area, Total Population Trends | | | |
|---|---|---|---|
| | Clark County | 4.0-Mile Radius Neighborhood | Healthcare Service Area |
| Total Population 2000 | 96,472 | 83,553 | 78,435 |
| Total Population 2010 | 109,822 | 91,631 | 89,117 |
| Total Population 2015 | 115,938 | 95,590 | 93,810 |
| Annual Total Population Growth Rate | | | |
| 2000 to 2010 | 1.30% | 0.93% | 1.28% |
| 2010 to 2015 | 1.09% | 0.85% | 1.03% |
| Source: ESRI, 2010 | | | |

The population within the neighborhood increased at an annual rate of 0.93 percent from 2000 to 2010, and it is forecast to increase at 0.85 percent annually from 2010 to 2015 -- the forecasts indicate a lower growth rate compared to  the county. For the market service area, the population increased at an annual rate of 1.28 from 2000 to 2010, and it is forecast to increase at 1.03 percent annually from 2010 to 2015. In general, population growth is higher at the periphery of the cities in this area due to greater land availability and highway infrastructure that encourages commuting.

The population trends, according to age group, are profiled as follows.

| Table N-2   Neighborhood and Market Service Area, Population Trends By Age Group | | | |
|---|---|---|---|
| | Clark County | 4.0-Mile Radius Neighborhood | Healthcare Service Area |
| **Total Population Ages 25 to 34** | | | |
| 2010 | 14,471 | 12,760 | 11,960 |
| 2015 | 14,254 | 12,817 | 11,953 |
| Annual Change | -0.30% | 0.09% | -0.01% |
| **Total Population Ages 35 to 44** | | | |
| 2010 | 15,348 | 12,557 | 12,321 |
| 2015 | 15,958 | 13,080 | 12,771 |
| Annual Change | 0.78% | 0.82% | 0.72% |
| **Total Population Ages 45 to 54** | | | |
| 2010 | 16,690 | 13,276 | 13,330 |
| 2015 | 16,014 | 12,477 | 12,732 |
| Annual Change | -0.82% | -1.23% | -0.91% |
| **Total Population Ages 55 to 64** | | | |
| 2010 | 14,062 | 11,223 | 11,393 |
| 2015 | 15,717 | 12,207 | 12,552 |
| Annual Change | 2.25% | 1.70% | 1.96% |
| **Total Population Ages 65 to 74** | | | |
| 2010 | 8,140 | 6,600 | 6,657 |
| 2015 | 10,676 | 8,565 | 8,746 |
| Annual Change | 5.57% | 5.35% | 5.61% |
| **Total Population Ages 75 to 84** | | | |
| 2010 | 4,808 | 4,292 | 4,064 |
| 2015 | 5,137 | 4,379 | 4,285 |
| Annual Change | 1.33% | 0.40% | 1.06% |
| **Total Population 85 and Over** | | | |
| 2010 | 1,994 | 1,953 | 1,753 |
| 2015 | 2,148 | 2,054 | 1,887 |
| Annual Change | 1.50% | 1.01% | 1.48% |
| Source: ESRI, 2010 | | | |

Demographic data providing insight as to the socioeconomic status are profiled as follows.

| Table N-3   Neighborhood and Market Service Area, Socioeconomic Indicators | | | |
|---|---|---|---|
| | Clark County | 4.0-Mile Radius Neighborhood | Healthcare Service Area |
| Average Household Income, 2010 | 60,416 | 62,136 | 61,063 |
| Per Capita Income, 2010 | 25,333 | 26,503 | 26,111 |
| **Number of Households with Income Between** | | | |
| $0 and $14,999 | 4,412 | 3,533 | 3,514 |
| $15,000 and $24,999 | 4,335 | 3,734 | 3,545 |
| $25,000 and $34,999 | 5,473 | 4,397 | 4,489 |
| $35,000 and $49,999 | 7,522 | 6,331 | 6,117 |
| $50,000 and $74,999 | 10,865 | 9,232 | 8,801 |
| $75,000 and $99,999 | 7,338 | 6,295 | 6,245 |
| $100,000 and $149,999 | 4,386 | 3,858 | 3,733 |
| $150,000 and Over | 1,330 | 1,324 | 1,189 |
| **Percent of Households with Income Between** | | | |
| $0 and $14,999 | 9.7% | 9.1% | 9.3% |
| $15,000 and $24,999 | 9.5% | 9.6% | 9.4% |
| $25,000 and $34,999 | 12.0% | 11.4% | 11.9% |
| $35,000 and $49,999 | 16.5% | 16.4% | 16.3% |
| $50,000 and $74,999 | 23.8% | 23.9% | 23.4% |
| $75,000 and $99,999 | 16.1% | 16.3% | 16.6% |
| $100,000 and $149,999 | 9.6% | 10.0% | 9.9% |
| $150,000 and Over | 2.9% | 3.4% | 3.2% |
| Median Home Value, 2010 | $117,410 | $117,142 | $119,253 |
| Bachelor Degree or Higher | 17.4% | 20.2% | 18.1% |
| Employment Sector | | | |
| Total | 50,028 | 41,934 | 40,953 |
| White Collar | 55.6% | 58.6% | 56.9% |
| Management/Business/Financial | 10.8% | 11.1% | 10.8% |
| Professional | 18.6% | 20.1% | 19.4% |
| Sales | 10.2% | 11.0% | 10.5% |
| Administrative Support | 16.0% | 16.5% | 16.2% |
| Services | 17.5% | 17.0% | 17.5% |
| Blue Collar | 27.0% | 24.4% | 25.6% |
| Farming/Forestry/Fishing | 0.2% | 0.2% | 0.2% |
| Construction/Extraction | 5.6% | 4.7% | 5.3% |
| Installation/Maintenance/Repair | 4.2% | 4.0% | 4.1% |
| Production | 8.9% | 8.2% | 8.3% |
| Transportation/Material Moving | 8.0% | 7.3% | 7.7% |

Source: ESRI, 2010

The average household income within the market service area compares closely to the county, and it is 94.6 percent of the state average -- indicative of a moderate standard of living. In comparison to the county, the market service area has a comparable percentage of low-income households (under $15,000), and a comparable percentage of high-income households (over $100,000). The average household income for the neighborhood is 96.3 percent of the state average -- indicative of a moderate standard of living. In comparison to the county, the neighborhood has a comparable percentage of low-income households (under $15,000), and a comparable percentage of high-income households (over $100,000). Within the market service area, home values are moderately priced having a median value of $119,253. This figure is in comparison to the Indiana median of $108,946. The population within the neighborhood attains a comparable level of educational achievement as the county based on college graduates.

The greatest concentration of employment is within the retail sector. In comparison to the neighborhood, the market service area has a greater level of affluence based on all the socioeconomic indicators. Most of these demographic data suggest that the population within the market service area has a moderate level of affluence compared to the county population.

The subject property is situated in a growing suburban neighborhood that offers ample opportunities for further development based upon the availability of vacant land. This is a mixed-use neighborhood that is changing in character and composition. Historical land use was weighted more heavily with residential and light-industrial use, but commercial use is the driving component for new development activity. Green Tree Mall, located about one mile to the southwest of the subject property, was the original focal point for retail use in the neighborhood. Other big box retailers that have located in the area in the last decade include Walmart, Sam's Club, Lowes, Target, Bass Pro Shops and Best Buy.

Within the last few years considerable improvements in street infrastructure have been made in the area, including the expansion of Veterans Parkway, which opened in 2005 and features an interchange at I-65. I-65 was also expanded from four to eight lanes.

Located on the east side of U.S. Route 31, and bisected by Veterans Parkway, is a 153-acre development project known as Jeffersonville Town Center. This is a mixed-use project that will feature retail, office, and medium density residential use. At present there are a couple of smaller retail properties that have been developed. The broker for the project indicated that he has letters of intent for a couple more small lot properties and for a 15.1-acre parcel for retail use. Future development activity in this project will further enhance the appeal of this location for medical use.

## Conclusion

In summary, the population within the neighborhood increased at an annual rate of 0.93 percent from 2000 to 2010, and it is forecasted to increase at 0.85 percent annually from 2010 to 2015 -- the forecasts indicate a lower growth rate compared to the county. The 75-plus-age group is forecasted to increase 0.59 percent annually -- lower than the county growth rate of 1.38 percent. The average household income compares closely to the county, and it is 96.3 percent of the state average -- indicative of a moderate standard of living. Overall, the neighborhood population has a similar level of affluence compared to the county. The subject property is well located in the southern Indiana portion of the Louisville MSA. Good exposure, convenient access and a large and growing retail sector add to the appeal of the subject property's location for healthcare service use.

# NEIGHBORHOOD MAP



Note:  Ring shown at 4-mile radius.

# NEIGHBORHOOD LAND USE MAP



**Tellatin, Short & Hansen, Inc.**

# AERIAL PHOTOGRAPH OF IMMEDIATE NEIGHBORHOOD



**Tellatin, Short & Hansen, Inc.**

# HEALTHCARE SERVICE AREA MAP

N↑



37

## Subject Property Description

### Site Description

| | |
|---|---|
| Size: | 10.03 acres, or 437,023 square feet |
|     Surplus Land: | None |
| Site Plan/Survey: | See Exhibit D in Addenda |
| Number of Parcels: | One contiguous |
| Shape: | Irregular |
| Average Depth: | 600+/- feet |
| Average Width: | 725+/- feet |
| Primary Frontage: | 445 feet on Medical Plaza Way |
|     Street Improvements: | Public street with two lanes, sidewalks, curbs, storm sewers, and fire hydrants |
| Secondary Frontage: | 751 feet on Interstate 65 |
|     Street Improvements: | Two-way interstate highway with limited access right-of-way; no visual barriers between the highway and the subject site |
| Accessibility from Major Regional Highway(s): | Good; the site is approximately 500 off State Route 31, which provides a convenient connection to the interstate highway interchange at Veterans Parkway |
| Visibility from Major Regional Highway(s): | Good |
| Ingress/Egress Restrictions: | None for Medical Plaza Way |
| Topography: | Level; near street and highway grade |
| Soil Conditions: | Appear suitable for existing improvements based on surface evidence and existing development |
| Utility services: | Electricity, public water, sanitary sewer, natural gas, and telephone |
| Adverse or Atypical Easements: | No adverse easements were identified; there is square-shaped area in the northwest section of the site that is shown on the subdivision plat as being reserved for billboard use; no references to an easement is made for the billboard area, but one may exist |
| Adverse Encroachments: | None |
| Flood Plain: | See Exhibit D in Addenda for Flood Plain Map |
|     Community Panel Number | 180026 0005 B |
|     Date | August 3, 1981 |
|     Zone | Zone "C" which is defined as "areas of minimal flooding." |
| Land-to-Building Ratio: | 5.68:1 |
| On-site Parking Spaces: | 210 spaces |
| Additional Parking: | None |
| Zoning: | "VPCZ, Veterans Parkway Corridor Zone" See Map in Addenda |
|     Permitted Uses: | See Exhibit D in Addenda |
|     Current Use Compliance: | Yes |
| Environmental Issues: | Tellatin, Short & Hansen, Inc. has no expertise in the evaluation of environmental hazards and therefore expresses no independent opinion as to the existence or absence thereof. |

<u>Additional Comments</u>: As noted, there is an area reserved for a billboard on the site, and a billboard sign is situated there now.

The City of Clarksville is currently in the process of attempting to rezone some portions of the city. The subject property lays within an area (represented by Veteran's Village subdivision) that city officials would like to rezone to a medical district. The rezoning proposal has not yet been brought before the Planning & Zoning Commission. If the rezoning is ultimately approved by the City Council, I do not believe it will have any material impact upon the subject property.

## Improvement Description

*The following improvement descriptions are based in part on field observations made on the date of our inspection, and more significantly, from our review of the site, architectural and mechanical plans.*

### <u>Hospital Building</u>

The surgical hospital facility is a one-story structure with approximately 76,929 square feet of area. Approximately 69,368 square feet of building area is finished, and 7,561 square feet is unfinished and in "shell" status. The building was constructed in 2008 and 2009.

Details of the hospital building components are profiled as follows.

> <u>Class of Construction per Marshall Valuation Service</u>
> - Class C – Masonry or concrete exterior walls, and wood or steel roof and floor structures

**Structural Features**

> <u>Site Preparation & Excavation</u>
> - General site preparation and grading

> <u>Foundation</u>
> - Concrete spread or strip footings with poured concrete foundation walls (T-shaped) and a reinforced concrete slab on compacted fill

> <u>Exterior Wall Construction</u>
> - Structural steel frame
> - Tilt-up concrete and metal wall panels

> <u>Floor Structure</u>
> - Site-cast reinforced concrete slab

> <u>Roof Style</u>
> - Flat -- horizontal roofing with no or very slight inclination (usually 10 degrees or less)

> <u>Roof Framing</u>
> - Open-web (bar) joists supporting a steel roof deck

**Tellatin, Short & Hansen, Inc.**

**Envelope -- Façade and Cladding**

Exterior Walls
- Precast, non-bearing, tilt-up concrete panels and an insulated, metal stud back-up wall assembly
- Limited use of windows and metal panels as accents
- Primarily 20' wall height

Windows
- Natural finish aluminum
- Picture/fixed style / operation
- 1" green, insulated, tempered glass
- Storefront glazing system in a window wall at entrance and lobby

Doors
- Hollow metal doors in metal frames
- Glass storefront door system

Roof Cover
- EPDM synthetic rubber membrane
- Rigid insulation below the cover

Fascia, Soffit and Guttering
- Internal gutter system

**Interior – Partitioning, Finishes and Built-ins**

Walls
- Metal stud framing with gypsum board
- Painted wall finishes
- Wallpaper wall finishes
- Ceramic tiled wall finishes

Doors, Trim, Handrails & Cabinetry
- Solid wood in metal frames
- Vinyl / rubber wall base trim
- Vinyl covered handrails
- Built-in cabinetry and shelving in nurse stations and treatment rooms
- Laminate counter tops

Floor Coverings
- Carpeting squares; vinyl sheet; vinyl composition tile (VCT); porcelain tile; quarry tile, and sealed concrete

Ceilings
- Suspended grid (exposed) with lay-in acoustical tiles
- Suspended channels with finished gypsum board

Patient Room Built-ins
- Built-in wardrobes and vanities

---

**Mechanical and Environmental**

Heating, Ventilation and Air Conditioning (HVAC)
- Hydronic, four-pipe system for heating and cooling -- gas–fired boilers, screw chillers, circulating pumps and piping, and variable air volume terminal units
- Ten air handling units

Electrical and Lighting
- Fluorescent and incandescent light fixtures
- Wiring in conduit
- 1,500-KW emergency generator, diesel fired

Plumbing, Laundry and Bathroom Fixtures
- Patient room bathrooms have sinks, toilets and showers
- Sinks in the patient rooms
- Reverse osmosis filtration system
- Medical gas and vacuum systems

Fire Protection
- Fully sprinklered; It pipe–type system
- Fire alarm system with a control panel and smoke and heat detectors

**Other Improvements**

Attached Construction
- Canopies at the main entrance and emergency room entrance

Site Improvements
- Concrete sidewalks, curbs and loading areas
- Asphalt-paved parking lots
- Parking lot lighting
- Signage
- Landscape irrigation system
- Trash dumpster enclosure
- Mechanical equipment enclosure

**Functional Assessment**

The Whole Building Design Guide (http://www.wbdg.org/design/hospital.php), a website hosted by the National Institute of Building Sciences, provides the following insight into good hospital design.

*Good hospital design integrates functional requirements with the human needs of its varied users. Ideally, the basic form of a hospital is based on its functions, and the physical relationships between these functions determine the configuration of the physical plant. The basic functions include:*

- *bed-related inpatient functions*
- *outpatient-related functions*
- *diagnostic and treatment functions*
- *administrative functions*
- *service functions (food, supply)*
- *research and teaching functions*

41

*An efficient hospital layout should:*

- *Promote staff efficiency by minimizing distance of necessary travel between frequently used spaces*
- *Allow easy visual supervision of patients by limited staff*
- *Include all needed spaces, but no redundant ones*
- *Provide an efficient logistics system, which might include elevators, pneumatic tubes, box conveyors, manual or automated carts, and gravity or pneumatic chutes, for the efficient handling of food and clean supplies and the removal of waste, recyclables, and soiled material*
- *Make efficient use of space by locating support spaces so that they may be shared by adjacent functional areas, and by making prudent use of multi-purpose spaces*
- *Consolidate outpatient functions for more efficient operation—on first floor, if possible— for direct access by outpatients*
- *Group or combine functional areas with similar system requirements*
- *Provide optimal functional adjacencies, such as locating the surgical intensive care unit adjacent to the operating suite. These adjacencies should be based on a detailed functional program which describes the hospital's intended operations from the standpoint of patients, staff, and supplies.*

Many hospitals are adopting elements of evidence-based design in new constructions, expansions or remodeling. Evidence-based design (EBD) is an approach to healthcare facility design that strives to improve patient outcomes, safety, and satisfaction, as well as staff retention and service efficiency. An evidence-based designer, together with an informed client, makes decisions based on the best information available from research, from project evaluations, and from evidence gathered from the operations of the client. The Evidence Based Design Accreditation and Certification (EDAC) program was introduced by The Center for Health Design in 2009. Examples of evidence-based design in a hospital renovation include:

- Eliminating double-occupancy rooms and providing patients with private rooms that are acuity adaptable in order to meet their medical needs as they change during their stays. This helps to reduce infections and medical errors.
- Improve indoor air quality with well-designed ventilation systems and air filters to prevent nosocomial infection.
- Use sound-absorbing ceiling tiles and carpeting to reduce noise, which will lower stress for patients and staff alike.
- Provide better lighting and access to natural light to reduce stress and improve patient safety.
- Create pleasant, comfortable, and informative environments to relieve stress and promote satisfaction among patients, their families, and staff.
- Make hospitals easier and less stressful for patients and their families to navigate.
- Design improvements that help staff do their jobs.

Other examples of evidence-based design include:

- The placement of bathrooms on headwalls (patient head orientation) for prevention of falls.
- The canting of the headwall for greater visibility toward nature and family.
- Use of expansive windows – patients in rooms with natural sunlight are known to require less pain medication than ones in interior rooms.
- Utilization of wireless communication systems to keep the environment quiet.

- Utilization of paperless records systems, which improves patient care by increasing the speed of information transfer and reducing errors. A digital medical records system can also allow the hospital to do away with traditional nurses' station, instead utilizing mini stations.
- Use of "same-handed" walls, whereby headwalls – and the equipment and systems built into them – face the same direction in each room. Same-handed rooms limit noise and enhance sleep and privacy, leading to less pain and discomfort and quicker healing.

The subject facility is specifically designed for use as a surgical type acute care hospital. One principal physician owner/developer of the facility is a cardiologist. Additionally, the corporate partner in the development and ownership promoted themselves as heart hospital specialists, having developed and operated the Wichita Heart Hospital. The subject facility was reportedly designed like the Wichita Heart Hospital.

As a surgical hospital there is limited building area devoted to emergency room services and a disproportionately large amount of building area devoted to surgery. Additionally, this facility has limited space devoted to outpatient services. The building has a partial "pod" design for patient rooms (designed to have nine patient room pods of four beds each, for 36 total med/surge beds). There is also a 10-bed ICU unit. Therefore, as designed, the facility has a 46-bed capacity. All patient rooms are private and have private bathrooms.

Presently, there is one patient room wing that remains in "shell" condition (without interior partitions, mechanical subsystems and interior finishes). The unfinished area in this wing consists of approximately 7,561 square feet of building area. According to the acting chief restructuring officer for the operating entity, the cost to finish out this space is expected to be approximately $1.3 million. Details for what is included in that figure were unspecified. That cost figure equates to approximately $172 per square foot of the unfinished building area. This wing would accommodate 12 of the 36 med/surge beds. Therefore, as presently finished, the building has 26 med/surge beds and a total of 36 beds (26 med/surge plus 10 ICU).

The allocation of space for diagnostics, consultation, patient rooms, family areas, etc. is somewhat less-than-ideal. Administration pointed out that some rooms in radiology and the emergency department are undersized or do/would not function ideally. The design flow does not appear to be fully functional. The operating rooms effectively divide the admissions area from the building area devoted to diagnostics, emergent care and special procedures. The single admissions area is for inpatient and outpatient services. There is very little area devoted to outpatient services. The pod design for med/surge patient rooms lends to a 4:1 patient-nurse ratio, which is appropriate for a surgical hospital. The nursing station and layout of the ICU seem less ideal. There is a primary nurse station at one end of the ICU, plus a small substation in the middle of the unit. Nurse staffing ratios in ICUs are more intense (2:1 to 1:1 patient to nurse); thus, the subject layout seems less-than-ideal to accommodate that staffing and workflow. The design ratio of ICU to med/surge beds in this facility (1.0 to 3.6) is relatively high. The layout also effectively separates the patient rooms into two distinct sections of the building. The 16 patient rooms at the south end of the building are only accessible from the main lobby and admissions area via a hallway which is used to transport patients from surgery, special procedures and diagnostics to the patient rooms.

43

The quality of the construction materials and workmanship are average. Tilt-up type construction is relatively uncommon in the healthcare industry, but it provides adequate aesthetic appeal, particularly for a physician owned hospital whereby most patient cases result from referrals made at the medical office practices of physicians with an ownership interest in the property. Some aspects of the interior color scheme (main lobby colors and black interior doors) are unusual and not particularly appealing.

## Condition Assessment

Physical wear and tear of the hospital building is limited. Hospitals are typically well maintained; thus, it tends to be the functional aspects of the design that drive their effective age. The subject facility has only been in operation since mid 2009, so the improvements are relatively new. There is normal deterioration in the short-lived interior finishes and mechanical systems. The property maintenance appears to be good. Overall, physical deterioration appears to be normal relative to the building's age.

## Economic Life Expectancy, Effective Age and Remaining Economic Life

It is important to understand the following concepts.

> Effective Age:  The age of property that is based on the amount of observed deterioration and obsolescence it has sustained, which may be different from its chronological age. (The Dictionary of Real Estate Appraisal, 4th Edition)

>> Comment:  As indicated, the effective age may be different from the chronological age. A reduced effective age is achieved by replacing short-lived components and possibly some long-lived components. An increased effective age is caused by neglecting to replace fully deteriorated building components.

> Economic Life:  The period over which improvement to real property contributes to the property value. (The Dictionary of Real Estate Appraisal, 4th Edition)

> Remaining Economic Life:  The estimated period during which improvements will continue to contribute to property value; an estimate of the number of years remaining in the economic life of the structure or structural components as of the date of the appraisal; used in age-life method of estimating depreciation. (The Dictionary of Real Estate Appraisal, 4th Edition)

According to Marshall Valuation Service, Section 97, Page 8, the economic life expectancy for a general hospital is as follows:

| Economic Life Expectancy for General Hospitals | | | | |
|---|---|---|---|---|
| | Class A | Class B | Class C | Class D |
| Good and Excellent | 50 | 50 | 45 | 40 |
| Low Cost and Average | 45 | 45 | 40 | 35 |
| Source:  Marshall & Swift | | | | |

In summary, the hospital building is relatively new and shows limited wear and tear. However, I believe there is functional obsolescence resulting from below-average functionality of the floor plan. To a significant degree, certain functional aspects of the building, such as the amount of space devoted to inpatient and outpatient services, will

---

44

**Tellatin, Short & Hansen, Inc.**

be buyer specific with respect to suitability. The fact that there is significant shell space in the building does lend to greater flexibility of use for that building area. Prospective buyers that envision more outpatient business activity than the current operator could utilize it for outpatient services instead of completing the inpatient build-out. I believe it is reasonable to believe that most prospective future users of the building for hospital or related healthcare use would identify some floor plan modifications that they deemed necessary in order for the building to better serve their specific use of the facility.

Special purpose improvements of this type sometimes suffer from obsolescence as a result of the lack of a competitive market (limited prospective buyers) for the property. There are a variety of subject property and market considerations that serve to influence the number of prospective buyers and their level of motivation to make an acquisition of this type. Among these factors are:

- the existing market service providers and their need for additional plant capacity;
- the location of the subject property and its ability to serve the potential needs for expanded service capacity by existing providers;
- strategic motivations by existing providers to gain efficiencies or to prevent another competitor from gaining market share;
- joint venture opportunities for existing providers looking to expand their scope of services;
- the financial strength of prospective buyers and their ability to raise capital for a new acquisition;
- the age and capital needs of existing physical plants in the market service area;
- site constraints that may exist at existing physical plants in the market service area;
- opportunities seen by tertiary providers to make inroads into a new market;
- market service area characteristics that influence the profitability of healthcare ventures;
- merger or acquisition activity that may be occurring among market service area providers and which could serve to distract those participants and/or utilize their financial resources for a larger, more significant transaction;
- the prevailing relationships between hospitals and physicians in the market service area;
- government regulations controlling the supply of new healthcare facilities;
- provider reimbursement issues that may serve to alter the financial feasibility of certain healthcare services; and
- other regulations that serve to restrict certain types of ownership models for healthcare properties.

These influences are discussed throughout the appraisal report. On the whole, I believe there is some potential for existing healthcare providers in the market service area to have an interest in acquiring the subject property. The competitor in closest proximity to the subject, Clark Memorial Hospital, has the most to lose if the subject continues to be used as a hospital. They may pursue the subject solely to protect market share.

Importantly, the hospital operating entity has a recent history of unprofitable operations. The underlying value of real estate in a special purpose, real estate intensive business operation such as a hospital going concern is frequently influenced by the profitability of operations. In build-to-suit and other healthcare properties that area leased, the rent that a tenant can afford to pay is largely a function of business profits. Conversely, the lessor will look to the rent coverage by the operator's net operating income as a measure of

_____  45

investment risk. Healthcare real estate investors typically don't venture into acquisitions of real estate without lease agreements. Rather, they focus on buying properties with long term leases in place, and which have strong positive coverage of the rent payment.

Based upon these considerations and others discussed in greater detail in other sections of the report, I believe there is obsolescence resulting from a narrow marketing window for the property. This is particularly true in conjunction with the acute care, surgical specialty design of the building. None of the potential buyers may be interested in using the facility for this specific purpose. Therefore, I believe the average effective age of the building improvements is significantly greater than their actual age.

I have estimated that the hospital building improvements have an effective age and remaining economic life as illustrated in the following table.

| | |
|---|---|
| Economic Life | 55 |
| Effective Age | 25 |
| Remaining Economic Life | 30 |

## Furniture, Fixtures and Equipment (FF&E)

The appraisal does not address the market value of any major moveable equipment.

## Real Estate Taxes

The current property tax assessment for the subject property is provided in the following table. In Clark County, the assessed valuation of the real estate is calculated at 100.0 percent of the assessor's market value.

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Table T-1  Real Estate Taxes** | | | | | | | | | |
| **Real Estate Taxes** | | | | | | | | | |
| | | Assessor's Appraised Value(s) | | | Applicable Ratio | Assessed | | Real Estate | |
| # | Parcel ID | Land | Improvements | Total | of Assessment | Value | Tax Rate | Taxes | Tax Exempt |
| 1 | 14-03-300-547.000-011 | $852,800 | $13,635,400 | $14,488,200 | 100.0% | $14,488,200 | 2.79521% | $404,976 | No |
| | Totals | $852,800 | $13,635,400 | $14,488,200 | | $14,488,200 | | $404,976 | |
| Note:  Adjustments represent special assesments or exemptions.  Exempt amounts are shown as negative figures. | | | | | | | | | |

## <u>Market Analysis</u>

This section will cover the following:

- Review the Affordable Care Act.
- Provide an overview of current trends in the hospital industry.
- Provide a subject hospital overview, including licenses and certifications.
- Identification of subject primary market service area based on source of discharges by ZIP codes.
- Identification of subject's primary competitors and their primary market service areas.

### Patient Protection and Affordable Care Act (PPACA)

and

### Healthcare and Education Affordability Reconciliation Act (HCEAA)

Comprehensive healthcare reform legislation was signed into law on March 25, 2010 via HR 4872, the Patient Protection and Affordable Care Act (PPACA). On March 30, 2010 HR 4872, the Healthcare and Education Affordability Reconciliation Act of 2010 (HCEAA), which is a negotiated set of changes to HR 3590, was also signed into law. These two public laws are collectively known as the Affordable Care Act. Together, it is expected that these two bills will provide healthcare coverage to an additional thirty-two million people. Most of the changes take effect in 2014. Briefly, PPACA and HCEAA overhaul the healthcare insurance system by:

- Requiring most individuals to obtain health insurance coverage, either through their employer plans, through Medicare or Medicaid coverage, or through the new health insurance exchanges created by the bill.
- Creating state-run "exchanges" through which those without access to affordable insurance can purchase coverage.
- Creating state-run "exchanges" through which small businesses (100 or fewer employees) can purchase coverage.
- Offering subsidies to low-income and moderate-income families to purchase coverage.
- Creating penalties for employers with 50 or more employees who receive federal subsidies to purchase insurance in the exchanges.
- Placing new requirements on health insurance plans, including prohibiting insurers from denying coverage because of a pre-existing condition and prohibiting insurers from setting lifetime limits and annual spending limits on the dollar value of healthcare.
- Expanding Medicaid eligibility to those with incomes of up to 133 percent of the federal poverty level.

At the time of passage it is estimated that there are almost 50 million U.S. residents who lack health coverage. Resulting from the new legislation, the Congressional Budget Office (CBO) has estimated that from 2010 through 2019, 24 million people will enroll in the new healthcare exchanges, an additional 16 million people will be enrolled in Medicaid or the Children's Health Insurance Program (CHIP), three million people will lose employer-sponsored insurance, and another five million people will no longer purchase insurance outside the exchanges. Combined, these figures equate to a net increase of 32 million new insureds – 50 percent Medicaid and 50 percent with insurance purchased directly or indirectly (healthcare exchange) from an insurer. The

_____ 47

2010 ratio of Medicaid & CHIP insureds to the total non-elderly population is 15 percent. As projected, this ratio would be 18.1 percent by 2019. The 2010 ratio of commercial insureds to the total non-elderly population is 66.3 percent. As projected this ratio would be 73.8 percent by 2019. This information is illustrated in a chart provided on a following page. These figures were stated in the March 20, 2010 letter from the CBO to Nancy Pelosi, Speaker of the U.S. House of Representatives, regarding HR 4872.

Noteworthy topics in the two bills that pertain to hospitals and long-term care are addressed as follows.

<u>Medicare</u>

- Beginning in 2014, the legislation creates an Independent Payment Advisory Board to draft legislative proposals to slow the growth rate in Medicare spending if spending is exceeding a certain target rate.
- Adding "productivity adjustments" – adjustments based on gains in productivity – into several market baskets used under Part A and Part B. These adjustments would reduce mandatory spending. The bill provides productivity cuts to the market basket update for inpatient hospitals, long-term care hospitals, inpatient rehabilitation facilities and inpatient psychiatric hospitals. The beginning of the productivity adjustment varies, depending upon provider type.
- Beginning in 2010, the annual market basket update for the hospital wage index will be reduced by a measure of productivity growth. The application of productivity cuts to the market basket update will affect inpatient hospitals, skilled nursing facilities, long-term care hospitals, inpatient rehabilitation facilities, psychiatric hospitals and outpatient hospitals.
- Medicare disproportionate share hospital (DSH) payments, which are made to hospitals treating a disproportionate share of low-income patients, are reduced substantially beginning in FY 2014 to reflect expected lower uncompensated care costs. After the initial reduction, payments increase based on the percentage of the population that is uninsured and the amount of care provided to uninsured patients.
- Reimbursements to hospitals with re-admissions of Medicare beneficiaries suffering from chronic conditions, if deemed preventable, will be reduced.
- Beginning on or after October 1, 2012, value-based incentive payments will be available to hospitals that meet specific performance standards – quality measures related to common and high-cost conditions. These incentive payments will be funded through a reduction to base operating DRG payments for each discharge (1.0 percent for FY 2013). This CMS program is known as Hospital Inpatient Value-Based Purchasing. CMS views value-based purchasing as an important step toward revamping how care and services are paid for, moving increasingly toward rewarding better value, outcomes, and innovations instead of merely volume.
- Beginning FY 2015, a hospital will receive a one percent Medicare payment penalty if they fall within the top 25 percent of all hospitals – relative to the national average – of hospital acquired conditions.
- The maximum period for submission of Medicare claims is reduced to twelve months.

Medicare Advantage

- Beginning in FY 2011, the legislation reduces payments under the Medicare Advantage program over a four-year period – eliminating the 114 percent subsidy. Payments will be based on the average plan bids in each market area -- re-formulated according to local costs.
- MA plans are required to spend at least 85 percent of their revenue on medical costs, essentially limiting administrative costs to 15 percent.

Physician Self-Referrals and Stark Law

- The "Stark law" prohibits physicians from referring Medicare or Medicaid patients for certain health services to hospitals in which physicians have a direct financial interest. However, the Stark law includes certain exceptions from this ban on so-called self referrals – allowing physicians to refer patients to hospitals in which they have a financial interest if the referring physician is authorized to perform medical services at the hospital, or if the financial interest of the referring physician is in the whole hospital, rather than a specific part or department. PPACA places new restrictions on the "whole hospital" exception, effectively closing what has been viewed by some as a loophole. PPACA permits physicians self-referrals to hospitals only if the hospitals meet the following new criteria:

  - A hospital must have physician ownership on March 23, 2010.
  - Physician-owned hospitals must have a Medicare provider agreement in effect on December 31, 2010.
  - Hospitals have to submit annual financial interest reports to HHS.
  - Hospitals have to disclose the referring physicians' financial interest to patients.
  - A hospital cannot condition any physician ownership or investment interests directly or indirectly on a physician making or influencing referrals to or generating other business for the hospital.
  - Such hospitals are not permitted to add operating rooms, procedure rooms or patient beds in the aggregate, although they may apply for an exception from this limitation. These hospitals are permitted to reduce or increase the number of beds, operating rooms or procedure rooms as long as the total number does not increase beyond the baseline number in effect on March 23, 2010. A procedure room is one in which catheterizations, angiographies, angiograms and endoscopies are performed.
  - Hospitals must disclose any physician ownership on their web sites, and in any advertising materials.
  - Hospitals must disclose certain patient safety information regarding physician availability, the capacity to provide treatment for all patients, and the ability to transfer patients to hospitals with the capability to treat the needs of the patient.

- PPACA caps the percentage of the total value of physician ownership or investment interests, in aggregate, to the percentage existing as of the law's enactment date. The defining term is total value, which does not correlate directly to the aggregate percentage of ownership shares.

49

- The Act also sets forth seven requirements that must be met to ensure bona fide investment as is required for exception to the physician self-referral law.

  1. The aggregate percentage physician ownership in physician-owned hospitals to the percentage existing as of the law's enactment date.
  2. Any ownership or investment interest that the hospital offers to a physician owner or investor must not be offered on more favorable terms than the terms offered to a person who is not a physician owner or investor.
  3. The hospital (or any owner or investor in the hospital) must not directly or indirectly provide loans or financing for any investment in the hospital by a physician owner or investor.
  4. The hospital (or any owner or investor in the hospital) must not directly or indirectly guarantee a loan, make a payment toward a loan, or otherwise subsidize a loan, for any individual physician owner or investor or group of physician owners or investors that is acquiring any ownership or investment in the hospital.
  5. Ownership or investment returns must be distributed to each owner or investor in the hospital in an amount that is directly proportional to the ownership or investment interest of such owner or investor in the hospital.
  6. Physician owners and investors must not receive, directly or indirectly, any guaranteed receipt of or right to purchase other business interests related to the hospital, including the purchase or lease of any property under the control of other owners or investors in the hospital or located near the premises of the hospital.
  7. The hospital must not offer a physician owner or investor the opportunity to purchase or lease any property under the control of the hospital or any other owner or investor in the hospital on more favorable terms than the terms offered to an individual who is not a physician owner or investor.

Medicaid & Children's Health Insurance Program (CHIP)

- Beginning in 2014, states are required to cover all adults under age 65 with incomes up to 133 percent of the federal poverty level (FPL). Federal law has only required states to cover certain populations – pregnant women and children age five or younger with family income of 133 percent of the FPL; children age six through 18 with household incomes of up to 100 percent of the FPL; and, elderly or disabled individuals who have very low incomes. However, many states have waivers in place to either expand income eligibility higher than the federal minimums for pregnant women and children, or to extend coverage to childless adults. In most states, non-disabled adults without custodial responsibilities for children are not eligible at any level of income.
- From 2014 to 2016, the federal government will pay 100 percent of the cost of Medicaid coverage for the newly eligible. The federal portion is then reduced to 95 percent for 2017, 94 percent for 2018, 93 percent for 2019, and 90 percent for 2020 and thereafter.
- The CHIP enhanced FMAP for states are increased by 23 points, not to exceed a total matching rate of 100 percent.

50

- States will be required to establish contracts with one or more Recovery Audit Contractors. Each RAC will identify underpayments and overpayments and will work to recoup overpayments made for services provided by Medicaid and State Plan waivers.
- Funding for Medicaid Disproportionate Share Hospital (DSH) program is reduced. States that direct the lowest percentage of DSH allotments to hospitals with high volumes of uninsured and Medicaid inpatients will be targeted.
- Prohibits Medicaid payment for services related to a "healthcare-acquired" condition.

Value-Based Purchasing

The concept of value-based healthcare purchasing is that buyers should hold providers of healthcare accountable for both cost and quality of care. Value-based purchasing brings together information on the quality of healthcare, including patient outcomes and health status, with data on the dollar outlays going towards health. It focuses on managing the use of the healthcare system to reduce inappropriate care and to identify and reward the best-performing providers.

- Beginning in FY 2014, Long-Term Care Hospitals (LTCH) and Inpatient Rehabilitation Hospitals will be required to submit a report on quality measures. Providers who do not submit quality measures are subject to a two percentage point reduction in the annual market basket update or federal discharge rate.
- Prior to October 1, 2011, the Secretary of HHS must report to Congress regarding the development of a plan to convert skilled nursing facilities and ambulatory surgical centers to a value-based purchasing program.

Long-Term Care Hospitals

- The moratorium on the establishment of new LTCH hospitals, satellite facilities and hospitals beds is extended from three to five years.
- The policy (referred to as the 25 percent rule) applicable to freestanding and grandfathered LTCH hospitals – limiting the proportion of patients who can be admitted from a co-located or host hospital during a cost reporting period and be paid under the LTCH Prospective Payment System – is extended from three to five years.

Charitable Hospitals

- Charitable hospitals will have their records reviewed by Treasury at least once every three years. Additionally, non-profits are required to develop a periodic community health needs assessment, to establish financial assistance policies, to create policies that limits charges for emergency or other medically necessary care for individuals qualifying for financial assistance, and to provide assurances that the hospital will not engage in extraordinary collection actions before making reasonable efforts to determine whether the a healthcare recipient is eligible for assistance. Effectively, charitable hospitals face more verification and accountability for the "community benefit" they provide in exchange for their tax-exempt status.

Increasing healthcare coverage, reducing the cost of care, and improving the quality of care rendered were the basic tenets of healthcare reform. Nevertheless, healthcare reform has been and will likely remain a politically contentious issue due to the costs involved, vested interests, philosophical differences and political posturing. While the basic structure of reform is no longer a complete unknown, there remains a great deal of uncertainty regarding the impact it will have on healthcare providers.

The CBO estimates that by 2019, the combined effects of HR 3590 and HR 4872 will be to reduce the number of nonelderly people who are uninsured by about 32 million, leaving about 23 million nonelderly residents uninsured (about one-third of whom would be unauthorized immigrants). However, there is clearly a substantial range of uncertainty surrounding those estimates due to the complexity of the changes involved and the range of possible responses by individuals, insurers, employers, and other key participants in the healthcare system.

Under the legislation, CBO expects that Medicare spending will increase at significantly slower rates during the next two decades than it has increased during the past two decades (per beneficiary, after adjusting for inflation). Increases in payment rates for many providers would be held below the rate of inflation (in expectation of ongoing productivity improvements in the delivery of healthcare). However, the long-term budgetary impact could be quite different if key provisions of the legislation are ultimately changed or not fully implemented.

The net effect of the Medicare Advantage program changes is that reimbursements will be lower in denser urban areas with larger Medicare populations and higher in more rural counties with few seniors and providers. These changes are expected to result in $132 billion worth of cuts to the program over 10 years. CBO estimates that Medicare Advantage enrollment would drop by 4.8 million members by 2019. Additionally, there are likely to be fewer MA programs offered by insurers.

If the CBO estimates for insurance coverage prove to be reasonably accurate, about one-half of the people gaining healthcare coverage will be insured under Medicaid. The following table suggests that as of 2010 there are about 40 million non-elderly with Medicaid and CHIP insurance coverage. If as projected there will be 51 million non-elderly with Medicaid and CHIP insurance coverage by 2019, this would represent a 27.5 percent increase. Most state Medicaid programs have traditionally paid hospitals and other healthcare providers' reimbursement rates that are below the costs incurred to provide services. There can still be a benefit to the provider if the reimbursement exceeds the variable portion of the costs incurred, but this is often not the case. The federal-state financing partnership that supports the current Medicaid program will continue under health reform. However, the cost of the new Medicaid coverage stemming from health reform will be fully financed by the federal government in the first three years of reform (2014-2016); in subsequent years, the federal government will continue to finance the lion's share, phasing down to 90% in 2020 and thereafter. Overall, federal funds will finance 96% of the cost of the Medicaid expansion over the first decade.

The CBO figures suggest that as of 2010 there were about 177 million non-elderly with employer provided, nongroup and other insurance coverage. If as projected there will be 208 million people with insurance coverage by 2019, this would represent a 17.5 percent increase. Commercial payers typically pay hospitals and other healthcare providers reimbursement rates that exceed those for government programs. Commercial payers have been the most profitable segment of the payer mix, and this relationship will

undoubtedly remain true going forward. Commercial payers have bared the brunt of "cost shifting" in the healthcare industry. Cost shifting is generally defined as when one payer picks up a smaller or larger share of their fixed costs compared to another. Hospitals and doctors may accept lower-than-average cost (but greater than incremental cost) payments from Medicaid and Medicare and charge higher-than-average cost for private insurance or patient self-payers. In other words, they've shifted a larger share of overhead to non-government payers.

With the federal government financing the cost of the new Medicaid coverage stemming from health reform the first three years of reform (2014-2016), and a large majority after that date, there is proportionately greater dependence upon the federal government for Medicaid program financing. As previously noted, with health reform there is an expectation that Medicare spending increases will occur at lower rates than those experienced in the last couple of decades. If Medicare becomes less profitable for providers, there could be more pressure to cost shift. However, there are contrasting dynamics and other ones with unknown consequences that will come into play, as well. Commercial payers will not be able to cap coverage or deny applicants based upon pre-existing conditions as they have been in the past; factors that will increase average costs incurred for the insured pool. An unknown factor is what will be the average healthcare need and cost of people entering the non-government insurance segment in comparison to those already in the system. Will they have greater needs that drive up the average cost, lesser needs that results in lower average costs, or basically be about on par with existing insureds. Furthermore, are the incentives and penalties for insurance coverage sufficient to drive the desired outcomes? If not, and healthy, younger individuals decide to pay the penalty as opposed to purchasing coverage, or if older individuals let policies lapse during periods when they do not need medical services, and purchase coverage only when they face a pending medical need, then average costs could rise.

In the past, large insurance carriers have been able to negotiate a preferred provider discount that is larger than those in which smaller insurance carriers and self-pay individuals can obtain. Under healthcare reform, individuals and small businesses will gain access to the purchase power of insurance exchanges. This should result in more people paying lower insurance rates than they otherwise would for equal coverage. For providers, however, a higher percentage of their patient cases under the commercial payee umbrella will effectively be insured by larger carriers. I do not believe the insurer size / discount dynamic will change; thus, the likelihood for downward pressure on commercial payee reimbursement seems reasonably strong.

Changing the current healthcare payment system is thought by many to be a key to achieving the nation's overall health goals of wellness, high-quality care, access to care, and financial stability. If the cost of reforms instituted prove to be significantly higher than projected, additional payment reform efforts are likely. Healthcare reform legislation stopped short of mandating specific, widespread payment reform, but it does move in the direction of more significant payment reform in the future via a series of minor adjustments and demonstration projects. The movement is towards restructuring payment to reduce fragmentation and counter volume-driven incentives of the current fee-for-service program. In the future it seems likely that payment will be tied more closely to quality of care and clinical outcomes. Clinical excellence will be the major determinant of future success for healthcare organizations. Collaboration among stakeholders across the care continuum, especially between physicians and hospitals, will be critical.

Payers, with the Centers for Medicare and Medicaid Services (CMS) leading the way, are moving towards a system that bundles payments to physicians and hospitals. By bundling payments there is an expectation that there will be more accountability for quality, better outcomes, less variation in costs, and better global cost control. This bundling concept will be facilitated by "physician integration," which involves changes in care practices to produce better coordination and overall outcomes via a closer relationship among providers. Physician integration contrasts with the alternative "physician alignment" model, which involves contractual relationships, limited employment of needed specialties, joint ventures, and similar relationships. Payment systems that could potentially foster more substantial alignment of hospital and physician interests include creating bundled payments across providers through such means as:  episode-based payments for hospitalized patients; episode-based payments for chronic care patients to accountable health entities; and, outcomes-based payments. Ultimately, payers are striving to hold down acute care spending by increasing their spending on preventive care, disease management and in-home treatment.

As the emphasis on preventive and wellness care unfolds, there is speculation that this shift will create additional need for medical office and healthcare facilities that are outpatient oriented. The legislation puts more inpatient cost controls in place than it does for outpatient services, which will serve to shape physical plant requirements. Having ample, conveniently accessible outpatient facilities located off-campus will be important. Some speculate that a large amount of the existing supply of medical office space does not meet the needs of a newer delivery model that must accommodate today's technology and demand for efficiencies. There is also the possibility that regional retail sites will become healthcare real estate locations because they provide an opportunity to offer patient services outside of traditional care models and enhance convenience and connectivity to healthcare systems.

With a larger insured population and greater emphasis on cost control, outpatient care will continue to become a larger piece of the combined inpatient / outpatient pie. Due to affordability matters, much of the uninsured population has not been receiving adequate preventive and wellness care. All too often their point of entry into the healthcare services arena has been the emergency room. Under the Emergency Medical Treatment & Labor Act, Medicare-participating hospitals are required to offer emergency services regardless of an individual's ability to pay. Hospitals are then required to provide stabilizing treatment for patients with EMCs. In addition to more outpatient eligibles, cost controls are being focused more on inpatient care.

Because emergency rooms treat so many patients that are uninsured and not in need emergency care but have no other access to healthcare, they are generally considered to be money-losers for hospitals. Emergency rooms have also become overburdened under this predicament. With healthcare reform and the smaller number of uninsured, hospitals should achieve a better balance between the cost of providing urgent care and the revenues realized in this department. Overutilization of the ER should drop and the wait times for patients should decrease.

A significant issue that will take time to equalize is the need for more physicians to accommodate the increase in service demand. The U.S. had a significant shortage of physicians prior to reform. The legislation does include various incentives to encourage more physician development, but it will take some time for these numbers to rise significantly.

The closing of the loophole in the Stark Law that has permitted physicians to make self-referrals will prevent the future development and expansion of physician-owned hospitals. These hospitals typically take only the better reimbursed cases that have fewer potential complications. As many of these specialty hospitals have focused on procedures offering the highest margin reimbursements from insurers, community hospitals in these markets have seen their ratio of low-margin or money-losing cases increase. Preventing new hospitals from allowing physician self-referrals will provide community hospitals with greater assurance that they can retain those business segments that help to underwrite their broader purpose of providing a complete spectrum of healthcare services. Existing physician-owned hospitals are grandfathered and physician investors can still make self-referrals, although the disclosure requirements and burdens are greater.

It is worth noting that PPACA faces legal and political challenges. A lawsuit that was filed in the U.S. District Court in Pensacola, Florida and joined by several states contended that PPACA violates Articles I and IV of the Constitution and the Tenth Amendment to the Constitution. Other states have attempted to nullify portions of the bill on the grounds that the federal government cannot force its citizens to purchase government-approved health insurance. Many constitutional scholars believe that these challenges are mostly for political purposes, but, there is a growing consensus that the legality of PPACA will be taken up by the Supreme Court. Some members of the Republican Party have also vowed to repeal or defund healthcare reform. Combined, these efforts to negate or otherwise undermine the law lend additional uncertainty to healthcare reform.

**Table 4. Estimated Effects of the Insurance Coverage Provisions of the Reconciliation Proposal Combined with H.R. 3590 as Passed by the Senate**

| EFFECTS ON INSURANCE COVERAGE /a (Millions of nonelderly people, by calendar year) | | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Current Law Coverage /b | Medicaid & CHIP | 40 | 39 | 39 | 38 | 35 | 34 | 35 | 35 | 35 | 35 |
| | Employer | 150 | 153 | 156 | 158 | 161 | 162 | 162 | 162 | 162 | 162 |
| | Nongroup & Other /c | 27 | 26 | 25 | 26 | 28 | 29 | 29 | 29 | 30 | 30 |
| | Uninsured /d | <u>50</u> | <u>51</u> | <u>51</u> | <u>51</u> | <u>51</u> | <u>51</u> | <u>52</u> | <u>53</u> | <u>53</u> | <u>54</u> |
| | TOTAL | 267 | 269 | 271 | 273 | 274 | 276 | 277 | 279 | 281 | 282 |
| Change (+/-) | Medicaid & CHIP | * | -1 | -2 | -3 | 10 | 15 | 17 | 16 | 16 | 16 |
| | Employer | * | 3 | 3 | 3 | 4 | 1 | -3 | -3 | -3 | -3 |
| | Nongroup & Other /c | * | * | * | * | -2 | -3 | -5 | -5 | -5 | -5 |
| | Exchanges | 0 | 0 | 0 | 0 | 8 | 13 | 21 | 23 | 24 | 24 |
| | Uninsured /d | * | * | -1 | -1 | -19 | -25 | -30 | -31 | -31 | -32 |
| _Post-Policy Uninsured Population_ | | | | | | | | | | | |
| Number of Nonelderly People /d | | 50 | 50 | 50 | 50 | 31 | 26 | 21 | 21 | 22 | 23 |
| Insured Share of the Nonelderly Population /a | | | | | | | | | | | |
| Including All Residents | | 81% | 82% | 82% | 82% | 89% | 91% | 92% | 92% | 92% | 92% |
| Excluding Unauthorized Immigrants | | 83% | 83% | 83% | 83% | 91% | 93% | 95% | 95% | 95% | 94% |
| _Memo: Exchange Enrollees and Subsidies_ | | | | | | | | | | | |
| _Number w/ Unaffordable Offer from Employer /e_ | | | | | | * | 1 | 1 | 1 | 1 | 1 |
| _Number of Unsubsidized Exchange Enrollees_ | | | | | | 1 | 2 | 4 | 5 | 5 | 5 |
| _Average Exchange Subsidy per Subsidized Enrollee_ | | | | | | | $5,200 | $5,300 | $5,500 | $5,700 | $6,000 |

Sources: Congressional Budget Office and the staff of the Joint Committee on Taxation.

Note: CHIP = Children's Health Insurance Program; * = between 0.5 million and -0.5 million people.

a. Figures for the nonelderly population include only residents of the 50 states and the District of Columbia.
b. Figures reflect average annual enrollment; individuals reporting multiple sources of coverage are assigned a primary source.
c. Other, which includes Medicare, accounts for about half of current-law coverage in this category; the effects of the proposal are almost entirely on nongroup coverage.
d. The count of uninsured people includes unauthorized immigrants as well as people who are eligible for, but not enrolled in, Medicaid.
e. Workers who would have to pay more than a specified share of their income (9.5 percent in 2014) for employment-based coverage could receive subsidies via an exchange.

3/20/2010
Page 1 of 2

**Tellatin, Short & Hansen, Inc.**

## Overview of Hospital Industry Trends

The medical industry is currently in a state of rapid change and evolution for the delivery of medical services. Among the factors influencing the change include the advancement of technology, changes in reimbursement policies, growth in outpatient services, the growing demand for healthcare services related to population growth and demographic changes, consumer demand preferences, rising operating costs, and business models that include physician ownership of the physical plants. Health systems are increasingly willing to monetize assets and businesses in order to acquire capital to upgrade and modernize existing hospital facilities. The greater availability of lower cost capital and alternative sources for that capital has also been influential. These factors have served to encourage considerable development of smaller, specialized use facilities and the replacement of aging physical plants that no longer satisfy the needs or preferences of the consumer or provider. The Medicare Payment Advisory Commission (MedPAC), an independent Congressional agency established to advise the U.S. Congress on issues affecting the Medicare program, reports in their 2009 Report to the Congress, that the overall level of hospital construction was at a record high in 2007.

The competitive landscape for not-for-profit hospitals and healthcare systems has changed dramatically in recent years. Although the intensity of competition varies by location, many organizations have faced threats for their most profitable services, such as orthopedics and cardiology, from physicians, regional healthcare providers and for-profit companies. Demographic growth occurring in some local or regional markets may support new nontraditional providers but, more often than not, general hospitals experience competitive pressure in key service areas. Among the most important trends for hospitals, and one that probably creates more planning uncertainty than any other factor, is their changing relationship with physicians.

Medical science is consistently coming up with new procedures to diagnose, treat, and prevent illness. New technology, particularly new diagnostic and treatment equipment, also influences the functional utility of existing space. Future hospital space needs will likely be more oriented towards critical/intensive care and less for medical-surgical purposes. Convertible floor plates and larger conduit lines make it possible for hospitals to convert rooms, floors or wings to alternate uses in case shifts in volume, acuity or technology warrant the change. Larger patient rooms are better suited to accommodating technology and changing levels of acuity, allowing patients to stay in their same room during their entire hospital stay. Just as importantly, patients desire private accommodations. Operational efficiencies, both labor and non-labor, can be gained in a new facility. Newer facilities are also an important tool in marketing with physicians and healthcare consumers. The need for modern plant and equipment makes access to capital a major issue for hospitals.

Mergers and joint ventures have become more prevalent, leading to the formation of regional and national hospital systems. As the hospital industry has become more competitive and experienced greater pressure for cost containment, the transfer of assets that occurs through conversions, mergers, and other forms of acquisitions and joint ventures has become more frequent and a more important source of operating efficiency. Greater efficiency through satellite locations, more specialized hospitals, and medical office buildings is also shaping the landscape.

While the smaller community-based and neighborhood hospitals can find it difficult to compete against nationally renowned and regional hospital and health systems, the overall industry trend is one of growth, specialization and new plant development. Convenience to consumers, along with providing a pleasing experience that is enhanced

by the layout and aesthetics of the physical plant, is a major focus. Similarly, there is a desire to provide favorable experiences for the physicians and other hospital staff. Nursing shortages are compelling better planning for the use of nursing resources. Incorporating these design considerations into new buildings is known as evidence-based and patient-centric design.

The use of third parties to develop and own new medical real estate projects is another growing trend. Third party ownership and management can provide an attractive alternative to hospital-owned and financed outpatient facilities and medical office buildings. The ownership options available to hospitals considering the development of new medical projects have expanded greatly over the past few years and are likely to continue to evolve in the foreseeable future. This changing environment, driven by new sources of institutional capital, has led to a more competitive market for hospitals seeking real estate capital partners. Hospitals and healthcare systems have begun to embrace third party ownership and management of real estate because it can preserve capital resources for core acute care hospital operations, eliminate the potential conflicts that arise in the landlord/tenant relationship between hospitals and referring physicians, and minimize the potential legal and regulatory challenges associated with leasing space to referring physicians.

Hospital operators, particularly not-for-profits, have various reasons for desiring to own their core assets. Among those reasons are: avoiding property tax expenses; access to a lower cost of capital in the tax exempt bond market; and, full control of the physical plant in case changes need to be made quickly in order to adapt to changes in medical service delivery. Conversely, there are various reasons why a hospital may desire to lease their non-core assets. Among those reasons are: preserving capital for patient care via medical services or equipment; keeping their debt-to-asset ratio down in order to enhance their ability to tap the bond market when capital is needed; and, for-profit entities operating in these non-core assets cannot use tax exempt financing nor avoid taxes. Tenants must pay market rents in order to participate in Medicare and Medicaid programs.

Changes in medical technology and its rapid deployment and widespread use are another driving force in the healthcare services industry. Examples of medical technology include medical and surgical procedures (angioplasty, joint replacements, organ transplants), diagnostic tests (laboratory tests, biopsies, imaging), drugs (biologic agents, pharmaceuticals, vaccines), medical devices (implantable defibrillators, stents), prosthetics (artificial body parts), and new support systems (electronic medical records, e-prescribing, and telemedicine). Healthcare technologies developed in the past two decades have greatly influenced medical practice and healthcare outcomes. As some technologies become easier to use and less expensive, as equipment becomes more transportable, and as recovery times for procedures are reduced, even complex technologies can diffuse out of hospitals and institutional settings and into ambulatory surgery centers, provider offices, outpatient facilities, imaging centers, and patients' homes. As an example of the growing use of medical technology, according to the CDC report titled Health, United States, 2009, the rate of magnetic resonance imaging, known as MRI, and computed and positron emission tomography or CT/PET scans, ordered or provided, tripled between 1996 and 2007.

Stark law, the common name for Federal Physician Self-Referral Law, governs physician self-referral for Medicare and Medicaid patients. Until the 2010 passage PPACA, the Stark Law has had an exception known as the "whole hospital exception." This exception permitted a physician to refer his Medicare or Medicaid patient for the provision of any of

11 designated health services to a hospital in which he has an ownership interest if the referring physician is authorized to perform services at the hospital and the physician's ownership is in the entire hospital and not merely a distinct part of department of the hospital. The "whole hospital" exception to the Stark law paved the way for the creation of specialty hospitals that focus on the more profitable hospital services. The development of specialty acute care hospitals such as those for heart care, orthopedics and rehabilitation therapy became commonplace. In many cases these hospitals were developed by smaller, non-local hospital operating companies that joint venture with local physicians, sharing control and ownership based on a negotiated arrangement between the parties.

In some cases the "whole hospital exception" allowed for-profit hospitals to offer key physicians an ownership interest in the hospital and to build physician loyalty. However, unlike for-profit hospitals, physicians cannot become co-owners of tax-exempt hospitals. Typically, nonprofit hospitals have offered their leading physicians more opportunities for "under arrangement" transactions or joint ventures in which the hospital accepts a diluted interest in a hospital service and the physicians agree to a strong noncompetition or liquidated damages provision. In an "under arrangement" transaction a hospital contracts with another entity (which may physician owned) to provide certain services for the hospital. The hospital bills inpatient payers for the services received, and the contracted entity, which cannot bill for its services independently, is compensated by the hospital. Those "under arrangement" services may include equipment, space, staff, management and supplies. Effectively, the physician entity is being paid by the hospital for technical services, thereby allowing it to share in the profitability of those cases. On October 1, 2009, CMS regulations changed with respect to "under arrangement" transactions. Specifically, if the contracted physician entity is construed to perform "designated health services" (DHS) pursuant to an "under arrangement" transaction, that entity will be considered a DSH entity and physicians are prohibited from making self-referrals in these circumstances.

The trend in specialty hospital construction was frequently criticized by the hospital industry because it is claimed that those facilities are "cherry picking" the most profitable segments of the industry, thereby leaving general acute care hospitals to provide care for lower paying procedures. CMS experimented with a physician self-referral moratorium and suspensions to the enrollment of new specialty hospitals into Medicare. However, PPACA finally puts an end to new physician owned hospitals, at least in their current context.

Long-term care hospitals (LTCH) have also expanded in number. In 1993 there were about 100 LTCHs, but the number increased steadily through about 2005 to a figure slightly over 350. Long-term care hospitals (LTCHs) furnish extended medical and rehabilitative care to individuals who are clinically complex and have multiple acute or chronic conditions. An LTCH must be certified as an acute care hospital that meets criteria to participate in the Medicare program and has an average inpatient length of stay greater than 25 days. Traditional hospitals paid under PPS are incentivized to discharge patients as quickly as possible. The Medicare, Medicaid and State Children's Health Insurance Program Extension Act (MMSEA) of 2007 placed a three-year moratorium on new LTCHs or new LTCH satellites and expansions in the number of beds in existing LTCHs (with certain exceptions), effective December 29, 2007. PPACA extended this moratorium to December 29, 2012.

**Tellatin, Short & Hansen, Inc.**

Another medical service delivery model that has grown in popularity is the ambulatory surgery center (ASC). Ambulatory or outpatient surgery refers to surgical procedures which are complex enough to require a dedicated operating room and specially trained staff, but generally do not require an overnight stay. New anesthetic agents and surgical techniques such as endoscopy, combined with the need for cost effectiveness, have contributed to the fast growth of ASCs. Patients often prefer ASCs because they are more convenient and less stressful than a hospital visit for medical service. In general, utilization rates for outpatient services continue to rise because they allow more care to be delivered quickly and efficiently. Physicians may also have an ownership interest in a freestanding ambulatory surgery center (ASC), refer Medicare patients to the ASC, and bill for the entire (technical and professional) Medicare payment for the ASC procedure. Physician ownership in these facilities has also contributed to their proliferation. According to research published in the April 2010 issue of Health Affairs, physicians with an ownership stake in an ASC perform, on average, twice as many procedures as physicians without an ownership stake. Reflecting this pattern, ASCs are increasingly the focus of attention at the state and federal level.

In response to the joint ventures pursued by smaller operating companies based outside the market, local hospitals have increasingly looked to joint venture projects with their staff specialty physicians. Physicians and hospitals are permitted under current law to form joint ventures to own and operate outpatient surgical centers under certain circumstances. Joint ventures are proliferating with respect to ambulatory surgery; outpatient imaging, such as with MRI's, CT's and PET scans; and cardiac catheterization ventures. As hospitals increasingly rely on specialist driven services to drive profitability, it is expected that these types of joint venture arrangements will continue to grow. Furthermore, as many physicians have expanded their practices in recent years to provide diagnostic imaging, clinical laboratory testing, physical therapy, and radiation therapy, joint ventures effectively permit hospitals to claw back some outpatient revenues.

Access to development capital broke down in the latter part of 2008 due to the freeze in capital markets. Many projects in planning stages were put on hold. Hospitals with good fundamentals have since been able to issue debt, but even the most financially sound hospital and healthcare systems are paying higher interest rates.

The economic downturn has also contributed to weaker operating performance. Job losses and layoffs have led to an increase in the number of uninsured, which have resulted in reductions in patient-elective volume and increasing charity care and bad debts. Many hospitals have been compelled to use various strategies to improve their revenues and expenses in order to improve liquidity and generate capital. On the operating side, hospital bad debt and charity cases have increased. Some employers are dropping the rich benefits of HMOs in favor of PPOs with high-deductable plans.

## Subject Hospital Overview



Kentuckiana Medical Center opened in mid 2009 after a lengthy development process. The project was stalled by zoning issues, a moratorium on the construction of hospitals, and financing for the project. Due to the credit crisis that began in the latter half of 2008, the commitment for equipment financing for the hospital reportedly fell through. The developer eventually obtained additional financing, but not enough to complete the build-out of some space or to fully equip the hospital. Thus, the hospital has never been operated at its designed capacity. Another factor that reportedly contributed to a weak start for the operator was the timeliness of obtaining a Medicare provider agreement. The operator reportedly provided services to Medicare patients for a period of time in which they were not certified and ultimately were never paid for by the Centers for Medicare and Medicaid Services (CMS). Additionally, based upon admission statistics supplied to the appraisers, it appears that a limited number of the physician investors have been making significant referral activity to the hospital. Per a physician analysis supplied to the appraisers for YTD through September 30, 2010, the top eight physician owners accounted for 83.7 percent of the gross revenue. There were eight other physician owners that did not provide any admissions during that period.

<u>**Licensure, Certifications and Subprovider Units**</u>
The subject is a hospital as defined under Indiana Code 16-18-2-179 and is licensed by the Indiana State Department of Health (ISDH) on an annual basis. The ISDH monitors the health care quality of hospitals through the licensure process. ISDH surveyors visit hospitals annually for licensure inspections or more often if complaints are filed about a hospital.

The subject facility was designed for 46 beds but, to our knowledge, only 34 have ever been in service.

---

61

In order to receive any payment from either the Medicare or Medicaid programs, a hospital must meet a set of basic standards for quality of care, called "conditions of participation". To our knowledge, all licensed beds at Kentuckiana Medical Center are certified by Medicare.

## Physician Ownership

Kentuckiana Medical Center presently has physician ownership interest in the operating entity and real estate. Under the Affordable Care Act, changes to the Stark Law were made whereby physicians may make self-referrals to hospitals only if those hospitals (operating entity, not real estate) have physician ownership as of March 23, 2010. Additionally, those hospitals must have a Medicare provider agreement in effect on December 31, 2010. The operating entity of the subject hospital presently meets these criteria; thus, the physician investors may make self-referrals subject to restrictions in place prior to the Affordable Care Act going into effect. The physician ownership interest of the operating entity is potentially transferable to other physician investors. An expansion of the physician ownership interest in the operating entity is not allowed.

Physician investors are not restricted by Stark Law or the Affordable Care Act from investing in hospital real estate. However, prior to the Affordable Care Act, the primary motivation for physicians to invest in hospital real estate was to facilitate their ownership of the hospital operating entity. Ownership in the operating entity allows them to participate in business profits, which is a function of patient cases generated by self-referral activity to the hospital.

As a hospital operating entity, other physician investors desiring to have ownership in a business of this type represent potential buyers for the subject real estate; again, as the real estate ownership would facilitate their business interest. If the hospital operating entity were to cease operating or otherwise lose its Medicare provider agreement, then the opportunity for physician self-referral activity would be lost, along with the principal motivation for other physicians to acquire the hospital real estate.

## Market Service Area

The Dartmouth Atlas Project uses Medicare data to provide comprehensive information and analysis about national, regional, and local markets, as well as individual hospitals and their affiliated physicians. The Medicare program maintains extensive records of hospitalizations, which makes it possible to define the patterns of use of hospital care.

The use of healthcare resources in the United States is highly localized. Most Americans use the services of physicians whose practices are nearby. Physicians, in turn, are usually affiliated with hospitals that are near their practices. As a result, when patients are admitted to hospitals, the admission generally takes place within a relatively short distance of where the patient lives.

The 1998 edition of the Dartmouth Atlas of Healthcare (DAHC) provides a comprehensive look at the geography of healthcare in the United States. Using Medicare records of hospitalizations, DAHC defines 3,436 geographically distinct hospital service areas in the United States. In each hospital service area, most of the care received by Medicare patients is provided in hospitals within the area. Based on the patterns of care for major cardiovascular surgery and neurosurgery, hospital service areas were also aggregated into 306 hospital referral regions.

Hospital service areas (HSAs) are local healthcare markets for hospital care. A HSA is a collection of ZIP codes whose residents receive most of their hospitalizations from the hospitals in that area. Many hospital service areas contain only one hospital. Kentuckiana Medical Center is located in the Jeffersonville HSA. There are six ZIP codes that comprise the Jeffersonville HSA:  47126, 47129, 47130, 47143, 47163, and 47172. These ZIP codes comprise Jeffersonville, Clarksville, Sellersburg, and more rural areas in the northern portion of Clark County, mostly along the I-64 corridor.

The following map illustrates the Jeffersonville HSA.

**Tellatin, Short & Hansen, Inc.**

# JEFFERSONVILLE HEALTH SERVICE AREA

N↑

**Tellatin, Short & Hansen, Inc.**

Hospital referral regions (HRRs) represent regional healthcare markets for tertiary medical care. Each HRR contains at least one hospital that performed major cardiovascular procedures and neurosurgery. In a similar fashion, HRRs were defined by assigning HSAs to the region where the greatest proportion of major cardiovascular procedures were performed, with minor modifications to achieve geographic contiguity, a minimum population size of 120,000, and a high localization index. Kentuckiana Medical Center is located in the Louisville HRR. The Louisville HRR is comprised of several HSAs in southern Indiana and north-central Kentucky.

The following map identifies Louisville Hospital Referral Region as published within the 1998 edition of the Dartmouth Atlas of Healthcare. The subject facility is located within the north-central portion of the HRR.



## Identification of Competitors

The following table notes all of the Louisville metro, short term acute care hospitals and/or systems that may provide a significant degree of competition for the subject property.

| | Competitive Short Term Acute Care Hospitals | | | |
|---|---|---|---|---|
| | **Hospital / Competitor** | **Acute Beds** | **Location** | **Direction** | **Distance (miles)** |
| | SUBJECT -- Kentuckiana Medical Center | 34 | Clarksville, IN | | |
| 1 | Physicians Medical Center | 12 | New Albany, IN | W | 4 |
| 2 | Clark Memorial Hospital | 169 | Jeffersonville, IN | S | 3.5 |
| 3 | Floyd Memorial Hospital and Health Services | 231 | New Albany, IN | SW | 5 |
| 4 | Baptist Hospital East | 468 | Louisville, KY | SE | 9 |
| 5 | Norton Hospital | 1080 | Louisville, KY | S | 6 |
| 6 | University of Louisville Hospital | 315 | Louisville, KY | S | 6 |
| 7 | Jewish Hospital | 673 | Louisville, KY | S | 6 |
| 8 | Saint Catherine Regional Hospital | 70 | Charlestown, IN | NE | 12 |

There are four Indiana-based hospitals included in the group, plus four Kentucky-based hospitals and/or health systems. The Indiana-based facilities are more direct competitors for the subject facility, while the Kentucky-based facilities are more indirect competitors.

66

**COMPETITOR NO. ONE**

| | |
|---|---|
| Name and Address: | **Physicians Medical Center** |
| | 4023 Reas Lane |
| | New Albany, IN  47150 |
| Telephone number: | (812) 206-7624 |
| Hospital Website: | www.pmcindiana.com |
| Provider Number: | 150172 |
| | |
| Type of Facility: | Short Term Acute Care |
| Type of Control: | Proprietary, Corporation |
| Health Care System: | Prexus Health |
| | Hamilton, OH |
| System Website: | www.prexushealth.com |
| | |
| General Med/Surg Beds: | 12 |
| Special Care Beds: | 0 |
| | |
| Total Employees: | 51 |
| Total Discharges: | 219 |
| Total Patient Days: | 521 |
| Total Patient Revenue: | $42,694,820 |
| | |
| County (FIPS code): | IN043 - Floyd, IN |
| CBSA (formerly MSA): | 31140 - Louisville/Jefferson County, KY-IN |
| Longitude / Latitude: | |
| | 86° E / 38° N |
| | |
| Fiscal Intermediary: | Blue Cross (Indiana) |
| Urban / Rural Designation: | Urban |
| Medicare Certified Beds: | 12 |



**Tellatin, Short & Hansen, Inc.**

The following chart, which is based upon Medicare utilization data, helps to demonstrate the primary market area for the Hospital. Only limited information was available from the data source. However, the appraisers have some familiarity with the facility, and a large majority of the admissions are believed to come from Indiana, as opposed to Kentucky.

| Medicare Market Service Area for Physicians Medical Center | | |
|---|---|---|
| City of Zip Code | % Admissions | Zip Code |
| New Albany, IN | 19.8% | 47150 |
| All Others | 80.2% | |
| *For calendar year 2009* | | |

The following chart provides summary information for the hospital's operations.

| Name and Address: | **Physicians Medical Center**<br>4023 Reas Lane<br>New Albany, IN  47150 | | | |
|---|---|---|---|---|
| Telephone number: | (812) 206-7624 | | | |
| Type of Facility: | Short Term Acute Care | | | |
| Acute Care (Sub-provider, Swing Bed, & NF/SNF Excluded) | Medicare | Medicaid | Other | Total |
| Discharges | 79 | 3 | 137 | 219 |
| Discharges to SNFs | | | | 0 |
| Average Length of Stay | 2.4 | 2.3 | 2.4 | 2.4 |
| Case Mix Index | 1.622 | N/A | N/A | N/A |

| Acute Care (Swing Bed - SNF Excluded) | # of Beds | Inpatient Days | | |
|---|---|---|---|---|
| Routine Services | 12 | 188 | 7 | 326 | 521 |
| Intensive Care Unit | | | | |
| Coronary Intensive Care | | | | |
| Burn Intensive Care | | | | |
| Surgical Intensive Care | | | | |
| Other Special Care | | | | |
| Nursery | | | | |
| Total Acute Inpatient | 12 | 188 | 7 | 326 | 521 |
| Total Acute Inpatient Average Daily Census | | | | 1.4 |
| Total Acute Inpatient Occupancy Rate | | | | 11.7% |

| Psychiatric Unit | | | | |
|---|---|---|---|---|
| Psychiatric Unit Average Daily Census | | | | 0.0 |
| Psychiatric Unit Occupancy Rate | | | | N/A |

| Rehabilitation Unit | | | | |
|---|---|---|---|---|
| Rehabilitation Unit Average Daily Census | | | | 0.0 |
| Rehabilitation Unit Occupancy Rate | | | | N/A |

| Nursing Unit or Swing Beds | | | | |
|---|---|---|---|---|
| Skilled Nursing (SNF) Unit | | | | |
| Nursing (NF) | | | | |
| Swing Beds - SNF | | | | |
| Swing Beds - NF | | | | |
| Total Nursing | 0 | 0 | 0 | 0 | 0 |
| Total Nursing Census Mix | | 0.0% | 0.0% | 0.0% | |
| Total Nursing Average Daily Census | | | | 0.0 |
| Total Nursing Occupancy Rate | | | | N/A |

| Total Hospital Beds | 12 |
|---|---|
| Total Hospital Average Daily Census | 1.4 |
| Total Hospital Occupancy Rate | 11.9% |

Note: Sub-provider Unit, Swing and NF/SNF discharges are not available from the data source:  American Hospital Directory

Physicians' Medical Center began operation on September 2, 2008. This is a physician owned surgical hospital with approximately 30 physician investors. Those 30 physician investors account for approximately 95 percent of the case volume handled by the

_____   68

Hospital. Physician practice specialty is weighted about one-third by urologists. Gynecology and orthopedics represents the other specialties with significant representation. The hospital focus is on outpatient surgery rather than inpatient surgery. This facility does not take cardiac or obstetric cases.

The shareholders of the ownership entity are comprised of local physician investors and an entity of Prexus Healthcare Partners, LLC. Prexus Health is a physician owned consulting firm specialized in the development and management of ambulatory surgery centers, surgical hospitals and imaging centers. The operating entity is still seeking new physician investors. The Hospital has a management agreement with Prexus Healthcare Partners, LLC to run the hospital.

The facility contains six operating rooms with a recovery area, a six-bed pre-op area, an eight-bed PACU (post operative care unit) and a six-bed stage II recovery area. The facility also contains 12 private inpatient rooms. The facility does not feature an emergency room or an intensive care unit. Limited diagnostic imaging and lab services are performed on site.

The hospital's location is somewhat odd in that it basically is within an industrial park, has circuitous access from the nearby highways, and otherwise lacks exposure to high volumes of traffic. As a physician owned hospital, whereby referrals originate from physician investors, the unusual location does not pose any significant detriment.

69

**COMPETITOR NO. TWO**

Name and Address: **Clark Memorial Hospital**
1220 Missouri Avenue
Jeffersonville, IN  47130
Telephone number: (812) 282-6631
Hospital Website: www.clarkmemorial.org
Provider Number: 150009

Type of Facility: Short Term Acute Care
Type of Control: Governmental, County

General Med/Surg Beds: 135
Special Care Beds: 34

Total Employees: 1,194
Total Discharges: 11,848
Total Patient Days: 50,883
Total Patient Revenue: $377,236,366

County (FIPS code): IN019 - Clark, IN
CBSA (formerly MSA): 31140 - Louisville/Jefferson County, KY-IN
Longitude / Latitude: 86° E / 38° N

Fiscal Intermediary: Blue Cross (Indiana)
Urban / Rural Designation:
Urban
Medicare Certified Beds: 241



The following chart, which is based upon Medicare utilization data, helps to demonstrate the primary market area for the Hospital.

70

**Medicare Market Service Area for**
**Clark Memorial Hospital**

| City of Zip Code | % Admissions | Zip Code |
|---|---|---|
| Jeffersonville, IN | 29.7% | 47130 |
| Clarksville, IN | 16.0% | 47129 |
| New Albany, IN | 6.8% | 47150 |
| Charlestown, IN | 6.0% | 47111 |
| Sellersburg, IN | 5.8% | 47172 |
| Scottsburg, IN | 5.4% | 47170 |
| Austin, IN | 2.8% | 47102 |
| Henryville, IN | 2.3% | 47126 |
| Madison, IN | 1.5% | 47250 |
| Salem, IN | 1.4% | 47167 |
| All Others | 22.3% | |

*For calendar year 2009*

The following chart provides summary information for the hospital's operations.

| Name and Address: | **Clark Memorial Hospital** | | | |
|---|---|---|---|---|
| | 1220 Missouri Avenue | | | |
| | Jeffersonville, IN  47130 | | | |
| Telephone number: | (812) 282-6631 | | | |
| Type of Facility: | Short Term Acute Care | | | |
| Acute Care (Sub-provider, Swing Bed, & NF/SNF Excluded) | Medicare | Medicaid | Other | Total |
| Discharges | 4,660 | 3,163 | 4,025 | 11,848 |
| Discharges to SNFs | | | | 988 |
| Average Length of Stay | 5.0 | 1.3 | 5.8 | 4.3 |
| Case Mix Index | 1.535 | N/A | N/A | N/A |
| Acute Care (Swing Bed - SNF Excluded) | # of Beds | Inpatient Days | | |
| Routine Services | 135 | 21,113 | 3,709 | 13,634 | 38,456 |
| Intensive Care Unit | 34 | 2,087 | 0 | 7,072 | 9,159 |
| Coronary Intensive Care | | | | |
| Burn Intensive Care | | | | |
| Surgical Intensive Care | | | | |
| Other Special Care | | | | |
| Nursery | 0 | N/A | 443 | 2,825 | 3,268 |
| Total Acute Inpatient | 169 | 23,200 | 4,152 | 23,531 | 50,883 |
| Total Acute Inpatient Average Daily Census | | | | 139.4 |
| Total Acute Inpatient Occupancy Rate | | | | 82.5% |
| Psychiatric Unit | 20 | 3,185 | 0 | 885 | 4,070 |
| Psychiatric Unit Average Daily Census | | | | 11.2 |
| Psychiatric Unit Occupancy Rate | | | | 55.8% |
| Rehabilitation Unit | | | | |
| Rehabilitation Unit Average Daily Census | | | | 0.0 |
| Rehabilitation Unit Occupancy Rate | | | | N/A |
| Nursing Unit or Swing Beds | | | | |
| Skilled Nursing (SNF) Unit | 0 | 110 | 0 | 57 | 167 |
| Nursing (NF) | | | | |
| Swing Beds - SNF | | | | |
| Swing Beds - NF | | | | |
| Total Nursing | 0 | 110 | 0 | 57 | 167 |
| Total Nursing Census Mix | | 65.9% | 0.0% | 34.1% | |
| Total Nursing Average Daily Census | | | | 0.5 |
| Total Nursing Occupancy Rate | | | | N/A |
| Total Hospital Beds | | | | 189 |
| Total Hospital Average Daily Census | | | | 151.0 |
| Total Hospital Occupancy Rate | | | | 79.9% |

Note: Sub-provider Unit, Swing and NF/SNF discharges are not available from the data source: American Hospital Directory

Clark Memorial Hospital has been in operation since 1922. The existing hospital has been constructed in various stages between 1941 and 1997. Clark Memorial owns a one-third interest in the Southern Indiana Rehab Hospital, located in New Albany.

71

**Tellatin, Short & Hansen, Inc.**

In 2009 Clark County backed a $52 million bond issue to refinance the hospital's bond debt of $32 million. Another $5.4 million was used to establish a debt-service reserve fund. Much of the remaining money was used to pay the balance on a $33 million IT upgrade (electronic medical records). That upgrade is expected to be complete by 2014. HVAC projects and various other capital improvement projects, including ongoing conversion of semi-private rooms to private ones, is also taking place.

In 2010 the Jeffersonville City Council approved an $18.5 million bond ordinance for Clark Memorial Hospital. This was a recovery zone bond authorized by the Stimulus Act. Clark Memorial was required to list possible used for the money prior to authorization, of which it listed the potential acquisition of the subject property (Kentuckiana Medical Center - KMC) as one potential use. According to a media report which quoted a KMC investor, discussions with Clark Memorial regarding an acquisition of the hospital did not last long. Ultimately, Clark Memorial used the $8 million it was allocated in the bond issue to replace an MRI scanner, for replacement of hospital beds, and for MOB renovations.

In November 2010 Clark Memorial announced that it was not renewing its management agreement with Jewish Hospital & St. Mary's HealthCare, Inc. Jewish had managed Clark Memorial for 18 years. Administration indicated that the hospital had become more self-sufficient, and that they would look for affiliations with other health systems located in Indiana.

**Tellatin, Short & Hansen, Inc.**

**COMPETITOR NO. THREE**

Name and Address: **Floyd Memorial Hospital and Health Services**
1850 State Street
New Albany, IN  47150
Telephone number: (812) 944-7701
Hospital Website: www.floydmemorial.com
Provider Number: 150044

Type of Facility: Short Term Acute Care
Type of Control: Governmental, County

General Med/Surg Beds: 215
Special Care Beds: 16

Total Employees: 1,300
Total Discharges: 14,597
Total Patient Days: 54,562
Total Patient Revenue: $557,571,719

County (FIPS code): IN043 - Floyd, IN
CBSA (formerly MSA): 31140 - Louisville/Jefferson County, KY-IN
Longitude / Latitude: 86° E / 38° N

Fiscal Intermediary: Blue Cross (Indiana)
Urban / Rural Designation:
Urban
Medicare Certified Beds: 199



The following chart, which is based upon Medicare utilization data, helps to demonstrate the primary market area for the Hospital.

73

**Medicare Market Service Area for**
**Floyd Memorial Hospital and Health Services**

| City of Zip Code | % Admissions | Zip Code |
|---|---|---|
| New Albany, IN | 35.3% | 47150 |
| Clarksville, IN | 6.4% | 47129 |
| Jeffersonville, IN | 4.7% | 47130 |
| Salem, IN | 4.5% | 47167 |
| Floyds Knobs, IN | 4.3% | 47119 |
| Corydon, IN | 4.2% | 47112 |
| Georgetown, IN | 3.9% | 47122 |
| Sellersburg, IN | 3.4% | 47172 |
| Pekin, IN | 2.3% | 47165 |
| Charlestown, IN | 2.3% | 47111 |
| All Others | 28.6% | |

*For calendar year 2009*

The following chart provides summary information for the hospital's operations.

| Name and Address: | **Floyd Memorial Hospital and Health Services** 1850 State Street New Albany, IN 47150 | | | |
|---|---|---|---|---|
| Telephone number: | (812) 944-7701 | | | |
| Type of Facility: | Short Term Acute Care | | | |

| Acute Care (Sub-provider, Swing Bed, & NF/SNF Excluded) | Medicare | Medicaid | Other | Total |
|---|---|---|---|---|
| Discharges | 5,998 | 501 | 8,098 | 14,597 |
| Discharges to SNFs | | | | 1,247 |
| Average Length of Stay | 4.8 | 6.7 | 2.8 | 3.7 |
| Case Mix Index | 1.595 | N/A | N/A | N/A |

| Acute Care (Swing Bed - SNF Excluded) | # of Beds | Inpatient Days | | |
|---|---|---|---|---|
| Routine Services | 215 | 25,611 | 3,360 | 20,710 | 49,681 |
| Intensive Care Unit | 16 | 2,903 | 0 | 1,978 | 4,881 |
| Coronary Intensive Care | | | | | |
| Burn Intensive Care | | | | | |
| Surgical Intensive Care | | | | | |
| Other Special Care | | | | | |
| Nursery | | | | | |
| Total Acute Inpatient | 231 | 28,514 | 3,360 | 22,688 | 54,562 |
| Total Acute Inpatient Average Daily Census | | | | 149.5 |
| Total Acute Inpatient Occupancy Rate | | | | 64.7% |

| Psychiatric Unit | | | | |
|---|---|---|---|---|
| Psychiatric Unit Average Daily Census | | | | 0.0 |
| Psychiatric Unit Occupancy Rate | | | | N/A |

| Rehabilitation Unit | | | | |
|---|---|---|---|---|
| Rehabilitation Unit Average Daily Census | | | | 0.0 |
| Rehabilitation Unit Occupancy Rate | | | | N/A |

| Nursing Unit or Swing Beds | | | | |
|---|---|---|---|---|
| Skilled Nursing (SNF) Unit | | | | |
| Nursing (NF) | | | | |
| Swing Beds - SNF | | | | |
| Swing Beds - NF | | | | |
| Total Nursing | 0 | 0 | 0 | 0 | 0 |
| Total Nursing Census Mix | | 0.0% | 0.0% | 0.0% | |
| Total Nursing Average Daily Census | | | | 0.0 |
| Total Nursing Occupancy Rate | | | | N/A |

| Total Hospital Beds | | | | 231 |
|---|---|---|---|---|
| Total Hospital Average Daily Census | | | | 149.5 |
| Total Hospital Occupancy Rate | | | | 64.7% |

Note: Sub-provider Unit, Swing and NF/SNF discharges are not available from the data source: American Hospital Directory

Floyd Memorial Hospital opened in 1953 as a 70-bed facility. In 1961, the hospital initiated its first expansion project, which increased capacity to 210 beds. Since this first expansion, the hospital has undergone numerous renovations, including the addition of a

21-bed skilled nursing unit and an 110,000 square foot outpatient services center. In 2006 the hospital opened a new heart and vascular center, an emergency center, and an expanded womens' imaging center, all as part of a $65 million expansion. In 2007 a new wound healing center and 10-room pediatric unit were added. In 2008 a new 32-bed surgical inpatient unit opened.

In early 2010 Floyd Memorial acquired the operations and physician practice of The Cancer Center of Indiana, located in New Albany. Floyd Memorial owns a one-third interest in the Southern Indiana Rehab Hospital, located in New Albany.

**COMPETITOR NO. FOUR**

Name and Address: **Baptist Hospital East**
4000 Kresge Way
Louisville, KY  40207
Telephone number: (502) 897-8100
Hospital Website: www.baptisteast.com
Provider Number: 180130

Type of Facility: Short Term Acute Care
Type of Control: Voluntary Nonprofit, Other
Health Care System: Baptist Healthcare System
Louisville, KY
System Website: www.bhsi.com

General Med/Surg Beds: 434
Special Care Beds: 34

Total Employees: 2,765
Total Discharges: 27,395
Total Patient Days: 132,742
Total Patient Revenue: $1,138,726,801

County (FIPS code): KY111 - Jefferson, KY
CBSA (formerly MSA): 31140 - Louisville/Jefferson County, KY-IN
Longitude / Latitude:
86° E / 38° N

Fiscal Intermediary: Blue Cross (Kentucky)
Urban / Rural Designation: Urban
Medicare Certified Beds: 519



The following chart, which is based upon Medicare utilization data, helps to demonstrate the primary market area for the Hospital.

76

**Tellatin, Short & Hansen, Inc.**

**Medicare Market Service Area for**
**Baptist Hospital East**

| City of Zip Code | % Admissions | Zip Code |
|---|---|---|
| Louisville, KY | 7.2% | 40220 |
| Louisville, KY | 6.8% | 40207 |
| Louisville, KY | 6.3% | 40299 |
| Louisville, KY | 5.6% | 40291 |
| Louisville, KY | 4.8% | 40222 |
| Louisville, KY | 4.3% | 40218 |
| Louisville, KY | 4.0% | 40241 |
| Louisville, KY | 3.9% | 40223 |
| Louisville, KY | 3.7% | 40205 |
| Louisville, KY | 3.5% | 40219 |
| All Others | 50.2% | |

*For calendar year 2009*

The following chart provides summary information for the hospital's operations.

| Name and Address: | **Baptist Hospital East** | | | |
|---|---|---|---|---|
| | 4000 Kresge Way | | | |
| | Louisville, KY  40207 | | | |
| Telephone number: | (502) 897-8100 | | | |
| Type of Facility: | Short Term Acute Care | | | |

| Acute Care (Sub-provider, Swing Bed, & NF/SNF Excluded) | | Medicare | Medicaid | Other | Total |
|---|---|---|---|---|---|
| Discharges | | 12,635 | 1,430 | 13,330 | 27,395 |
| Discharges to SNFs | | | | | 3,435 |
| Average Length of Stay | | 5.2 | 5.0 | 4.5 | 4.8 |
| Case Mix Index | | 1.639 | N/A | N/A | N/A |
| Acute Care (Swing Bed - SNF Excluded) | # of Beds | Inpatient Days | | | |
| Routine Services | 434 | 60,508 | 5,181 | 47,601 | 113,290 |
| Intensive Care Unit | 18 | 2,626 | 296 | 2,409 | 5,331 |
| Coronary Intensive Care | 16 | 2,742 | 158 | 2,181 | 5,081 |
| Burn Intensive Care | | | | | |
| Surgical Intensive Care | | | | | |
| Other Special Care | | | | | |
| Nursery | 0 | N/A | 1,515 | 7,525 | 9,040 |
| Total Acute Inpatient | 468 | 65,876 | 7,150 | 59,716 | 132,742 |
| Total Acute Inpatient Average Daily Census | | | | | 363.7 |
| Total Acute Inpatient Occupancy Rate | | | | | 77.7% |
| Psychiatric Unit | 22 | 2,795 | 331 | 2,716 | 5,842 |
| Psychiatric Unit Average Daily Census | | | | | 16.0 |
| Psychiatric Unit Occupancy Rate | | | | | 72.8% |
| Rehabilitation Unit | 29 | 3,460 | 168 | 2,547 | 6,175 |
| Rehabilitation Unit Average Daily Census | | | | | 16.9 |
| Rehabilitation Unit Occupancy Rate | | | | | 58.3% |
| Nursing Unit or Swing Beds | | | | | |
| Skilled Nursing (SNF) Unit | | | | | |
| Nursing (NF) | | | | | |
| Swing Beds - SNF | | | | | |
| Swing Beds - NF | | | | | |
| Total Nursing | 0 | 0 | 0 | 0 | 0 |
| Total Nursing Census Mix | | 0.0% | 0.0% | 0.0% | |
| Total Nursing Average Daily Census | | | | | 0.0 |
| Total Nursing Occupancy Rate | | | | | N/A |
| Total Hospital Beds | | | | | 519 |
| Total Hospital Average Daily Census | | | | | 396.6 |
| Total Hospital Occupancy Rate | | | | | 76.4% |

Note:  Sub-provider Unit, Swing and NF/SNF discharges are not available from the data source:  American Hospital Directory

Baptist Healthcare System consists of 519-bed Baptist Hospital East located in Louisville, 371-bed Central Baptist Hospital located in Lexington, 373-bed Western Baptist Hospital located in Paducah, 273-bed Baptist Regional Medical Center located in

77

Corbin, and 120-bed Baptist Hospital Northeast located in LaGrange. Baptist Healthcare System manages 300-bed Hardin Memorial Hospital located in Elizabethtown. The system also owns Bluegrass Family Health, a not-for-profit provider sponsored health plan offering HMO, POS, and PPO plans. In addition, the system owns or has ownership in two surgery centers, occupational medicine clinics, diagnostic centers, urgent care centers, and physician practices.

Baptist East provides specialized services for women's health, cancer, heart, orthopedics, neurosurgery, emergency care, occupational health, and behavioral health, including psychiatric and chemical dependency care.

In January 2009 Baptist Healthcare opened Baptist Eastpoint, located in the fast-growing, far eastern part of Jefferson County. Baptist Eastpoint offers outpatient surgery, radiation, diagnostic services, physical therapy and urgent care. The $63 million building features four surgical suites fitted for a variety of same-day procedures.

In May 2011, Fitch affirmed the 'AA-' rating on outstanding debt issued by the Kentucky Economic Development Finance Authority on behalf of Baptist Healthcare System. The 'AA-' rating was supported by BHS' solid financial profile; characterized by strong liquidity and capital related ratios, and a moderate debt burden in contrast to a historical trend of weak profitability. All of the system's facilities operate in highly competitive service areas, but BHS has been successful in maintaining its regional market positions over the past several years against its strong competitors. As of February 28, 2011, BHS had $962 million in unrestricted cash and investments.

**Tellatin, Short & Hansen, Inc.**

**COMPETITOR NO. FIVE**

| | |
|---|---|
| Name and Address: | **Norton Hospital** |
| | 200 East Chestnut Street |
| | Louisville, KY  40202 |
| Telephone number: | (502) 629-8000 |
| Hospital Website: | www.nortonhealthcare.com/body.... |
| Provider Number: | 180088 |
| | |
| Type of Facility: | Short Term Acute Care |
| Type of Control: | Voluntary Nonprofit, Other |
| Health Care System: | Norton Healthcare |
| | Louisville, KY |
| System Website: | www.nortonhealthcare.com |
| | |
| General Med/Surg Beds: | 953 |
| Special Care Beds: | 264 |
| | |
| Total Employees: | 6,335 |
| Total Discharges: | 56,305 |
| Total Patient Days: | 315,068 |
| Total Patient Revenue: | $3,765,343,423 |
| | |
| County (FIPS code): | KY111 - Jefferson, KY |
| CBSA (formerly MSA): | 31140 - Louisville/Jefferson County, KY-IN |
| Longitude / Latitude: | |
| | 86° E / 38° N |
| | |
| Fiscal Intermediary: | Blue Cross (Kentucky) |
| Urban / Rural Designation: | Urban |
| Medicare Certified Beds: | 1,730 |



Norton Hospital                    Norton Suburban



Norton Brownsboro

The following chart, which is based upon Medicare utilization data, helps to demonstrate the primary market area for the Hospital.

79

**Tellatin, Short & Hansen, Inc.**

**Medicare Market Service Area for Norton Hospital**

| City of Zip Code | % Admissions | Zip Code |
|---|---|---|
| Louisville, KY | 5.0% | 40219 |
| Louisville, KY | 4.0% | 40229 |
| Louisville, KY | 3.5% | 40216 |
| Louisville, KY | 3.4% | 40218 |
| Shepherdsville, KY | 3.3% | 40165 |
| Louisville, KY | 3.2% | 40214 |
| Louisville, KY | 2.9% | 40272 |
| Louisville, KY | 2.9% | 40203 |
| Louisville, KY | 2.7% | 40213 |
| Louisville, KY | 2.7% | 40211 |
| All Others | 66.3% | |

*For calendar year 2009*

The following chart provides summary information for the hospital's operations. Data for this facility includes information for Kosair Children's Hospital, Norton Audubon Hospital (432 beds), Norton Suburban Hospital (373 beds) and Norton Brownsboro Hospital (127 beds).

| Name and Address: | **Norton Hospital** | | | |
|---|---|---|---|---|
| | 200 East Chestnut Street | | | |
| | Louisville, KY  40202 | | | |
| Telephone number: | (502) 629-8000 | | | |
| Type of Facility: | Short Term Acute Care | | | |

| Acute Care (Sub-provider, Swing Bed, & NF/SNF Excluded) | | Medicare | Medicaid | Other | Total |
|---|---|---|---|---|---|
| Discharges | | 14,764 | 2,271 | 39,270 | 56,305 |
| Discharges to SNFs | | | | | 3,191 |
| Average Length of Stay | | 5.7 | 6.5 | 4.6 | 4.9 |
| Case Mix Index | | 1.863 | N/A | N/A | N/A |
| Acute Care (Swing Bed - SNF Excluded) | # of Beds | | Inpatient Days | | |
| Routine Services | 953 | 67,946 | 10,484 | 143,721 | 222,151 |
| Intensive Care Unit | 127 | 15,840 | 4,214 | 16,602 | 36,656 |
| Coronary Intensive Care | | | | | |
| Burn Intensive Care | | | | | |
| Surgical Intensive Care | | | | | |
| Other Special Care | | | | | |
| Nursery | 0 | N/A | 38 | 18,462 | 18,500 |
| Total Acute Inpatient | 1,080 | 83,786 | 14,736 | 178,785 | 277,307 |
| Total Acute Inpatient Average Daily Census | | | | | 759.7 |
| Total Acute Inpatient Occupancy Rate | | | | | 79.9% |
| Psychiatric Unit | 21 | 2,487 | 2,199 | 1,936 | 6,622 |
| Psychiatric Unit Average Daily Census | | | | | 18.1 |
| Psychiatric Unit Occupancy Rate | | | | | 86.4% |
| Rehabilitation Unit | | | | | |
| Rehabilitation Unit Average Daily Census | | | | | 0.0 |
| Rehabilitation Unit Occupancy Rate | | | | | N/A |
| Nursing Unit or Swing Beds | | | | | |
| Skilled Nursing (SNF) Unit | | | | | |
| Nursing (NF) | | | | | |
| Swing Beds - SNF | | | | | |
| Swing Beds - NF | | | | | |
| Total Nursing | 0 | 0 | 0 | 0 | 0 |
| Total Nursing Census Mix | | 0.0% | 0.0% | 0.0% | |
| Total Nursing Average Daily Census | | | | | 0.0 |
| Total Nursing Occupancy Rate | | | | | N/A |
| Total Hospital Beds | | | | | 1,101 |
| Total Hospital Average Daily Census | | | | | 777.9 |
| Total Hospital Occupancy Rate | | | | | 70.7% |
| Note:  Sub-provider Unit, Swing and NF/SNF discharges are not available from the data source:  American Hospital Directory | | | | | |

80

**Tellatin, Short & Hansen, Inc.**

Norton Healthcare is the Louisville area's leading hospital and health care system (44 percent market share) and third largest private employer, providing care at more than 100 locations throughout Greater Louisville and Southern Indiana. The not-for-profit system includes five Louisville hospitals and 12 immediate care centers. Norton has maintained a longstanding trend of profitable operations.

Norton Hospital and Kosair Children's hospitals moved to their current addresses in 1973. Norton Healthcare opened Suburban Hospital in 1972. Norton Brownsboro Hospital opened in 2009. Norton Brownsboro Hospital is located in northeastern Jefferson County. The community hospital, licensed for 127 beds, includes five floors, 298,000 square feet of building area, and was built at a total cost of $146 million. Norton opened the Kosair Children's Medical Center – Brownsboro, a children's outpatient facility located adjacent to Norton Brownsboro Hospital, in 2010. This is a $53.3 million project. In early 2010 Norton broke ground on a treatment center at its Norton Cancer Institute. This is a 65,000 square foot, $27.7 million project in downtown Louisville.

In November 2009, Fitch Ratings affirmed the underlying rating on approximately $827.7 million revenue bonds issued on behalf of Norton Healthcare, Inc. (Norton) at 'A-'. The Rating Outlook was Stable. The 'A-' rating was supported by Norton's leading market share, continued operating profitability, and solid liquidity position. Norton has consistently maintained a leading market share in the competitive Louisville service area, with a 44.1% market share in second quarter ending June 30, 2009. This position is strengthened by the completion of Norton Brownsboro Hospital in the growing northeastern Jefferson County.

In November 2010 Humana Inc. (NYSE: HUM) and Norton Healthcare, both based in Louisville, KY, announced that they have been working together since early 2010 to launch the region's first commercial Accountable Care Organization (ACO). An ACO model establishes incentives for health systems to increase quality and efficiency, better coordinate patient care, eliminate waste, and reduce the overuse and misuse of care. Humana Inc., headquartered in Louisville, Kentucky, is one of the nation's largest publicly traded health and supplemental benefits companies.

Also in November 2010, UK HealthCare (the clinical enterprise of the University of Kentucky) and Norton Healthcare officials announced they signed a Memorandum of Agreement and plan to join forces to improve health care for all Kentuckians. UK HealthCare's leadership team believes Norton Healthcare, Kentucky's largest comprehensive health care system and an existing teaching site for UK's pharmacy and nursing programs, is a natural partner to develop a rational statewide system of care to improve access and quality of medical services.

**Tellatin, Short & Hansen, Inc.**

**COMPETITOR NO. SIX**

Name and Address: **University of Louisville Hospital**
530 South Jackson Street
Louisville, KY  40202
Telephone number: (502) 562-3000
Hospital Website: www.uoflhealthcare.org
Provider Number: 180141

Type of Facility: Short Term Acute Care
Type of Control: Voluntary Nonprofit, Other

General Med/Surg Beds: 250
Special Care Beds: 89

Total Employees: 2,440
Total Discharges: 15,253
Total Patient Days: 96,083
Total Patient Revenue: $1,388,295,594

County (FIPS code): KY111 - Jefferson, KY
CBSA (formerly MSA): 31140 - Louisville/Jefferson County, KY-IN
Longitude / Latitude: 86° E / 38° N

Fiscal Intermediary: Blue Cross (Kentucky)
Urban / Rural Designation:
Urban
Medicare Certified Beds: 404



The following chart, which is based upon Medicare utilization data, helps to demonstrate the primary market area for the Hospital.

**Medicare Market Service Area for**
**University of Louisville Hospital**

| City of Zip Code | % Admissions | Zip Code |
|---|---|---|
| Louisville, KY | 6.2% | 40203 |
| Louisville, KY | 4.8% | 40211 |
| Louisville, KY | 3.2% | 40212 |
| Louisville, KY | 3.0% | 40214 |
| Louisville, KY | 2.6% | 40210 |
| Louisville, KY | 2.6% | 40216 |
| Louisville, KY | 2.5% | 40202 |
| Jeffersonville, IN | 2.4% | 47130 |
| Louisville, KY | 2.3% | 40218 |
| Louisville, KY | 2.2% | 40215 |
| All Others | | |

*For calendar year 2009*

The following chart provides summary information for the hospital's operations.

| Name and Address: | **University of Louisville Hospital**<br>530 South Jackson Street<br>Louisville, KY 40202 | | | |
|---|---|---|---|---|
| Telephone number: | (502) 562-3000 | | | |
| Type of Facility: | Short Term Acute Care | | | |
| Acute Care (Sub-provider, Swing Bed, & NF/SNF Excluded) | Medicare | Medicaid | Other | Total |
| Discharges | 2,941 | 1,113 | 11,199 | 15,253 |
| Discharges to SNFs | | | | 455 |
| Average Length of Stay | 6.4 | 6.7 | 5.6 | 5.8 |
| Case Mix Index | 1.959 | N/A | N/A | N/A |
| Acute Care (Swing Bed - SNF Excluded) | # of Beds | Inpatient Days | | |
| Routine Services | 250 | 14,597 | 6,168 | 45,537 | 66,302 |
| Intensive Care Unit | 50 | 3,288 | 900 | 9,897 | 14,085 |
| Coronary Intensive Care | 10 | 737 | 113 | 2,015 | 2,865 |
| Burn Intensive Care | 5 | 294 | 159 | 1,093 | 1,546 |
| Surgical Intensive Care | | | | | |
| Other Special Care | | | | | |
| Nursery | 0 | N/A | 105 | 3,912 | 4,017 |
| Total Acute Inpatient | 315 | 18,916 | 7,445 | 62,454 | 88,815 |
| Total Acute Inpatient Average Daily Census | | | | 243.3 |
| Total Acute Inpatient Occupancy Rate | | | | 83.6% |
| Psychiatric Unit | | | | |
| Psychiatric Unit Average Daily Census | | | | 0.0 |
| Psychiatric Unit Occupancy Rate | | | | N/A |
| Rehabilitation Unit | | | | |
| Rehabilitation Unit Average Daily Census | | | | 0.0 |
| Rehabilitation Unit Occupancy Rate | | | | N/A |
| Nursing Unit or Swing Beds | | | | |
| Skilled Nursing (SNF) Unit | | | | |
| Nursing (NF) | | | | |
| Swing Beds - SNF | | | | |
| Swing Beds - NF | | | | |
| Total Nursing | 0 | 0 | 0 | 0 | 0 |
| Total Nursing Census Mix | | 0.0% | 0.0% | 0.0% | |
| Total Nursing Average Daily Census | | | | 0.0 |
| Total Nursing Occupancy Rate | | | | N/A |
| Total Hospital Beds | | | | 315 |
| Total Hospital Average Daily Census | | | | 243.3 |
| Total Hospital Occupancy Rate | | | | 77.2% |

Note: Sub-provider Unit, Swing and NF/SNF discharges are not available from the data source: American Hospital Directory

University of Louisville Hospital is the leading academic medical center in the area. This hospital was constructed in the late 1970s. In 1996 the University Medical Center, Inc. partnership (UMC) assumed responsibility for management of the facility. This

partnership exists between the University of Louisville, Jewish Hospital HealthCare Services and Norton Healthcare. Since that time, UMC has invested more than $100 million in facilities improvements and upgrades.

The University of Louisville HealthCare Outpatient Center, located near University Hospital, opened in 2008. This is a $63.0 million project with nearly 200,000 square feet of building area. In addition to specialty medical practices, the facility includes an outpatient surgery center, an imaging center offering a full range of radiological diagnostic testing, a full-service dental practice, primary care, pharmacy, on-site laboratory services, and outpatient rehabilitation center.

Currently, Humana and the University of Louisville Physicians Group are feuding over reimbursement rates, with Humana clients having to request waivers to go to U of L's 500 physicians, currently the largest group of specialists in the state.

In mid 2010 JHSMH and University of Louisville Hospital announced that they were in discussions for the possibility of a merger. Media reports in the latter part of the year reported that negotiations could lead to Jewish Hospital, St. Mary's Healthcare Inc., University Medical Center Inc. and Catholic Health Initiatives (CHI) coming together to form Kentucky's largest healthcare system. CHI already operates in Kentucky as Saint Josephs Health System. Reportedly, the plan is for the three non-profit systems to combine to create an as yet unnamed regional system, with the Jewish Hospital and University Hospital brands remaining. CHI would inject a significant amount of operating capital – at least $200 million – into the new system through what essentially would be an acquisition of Jewish Hospital assets. CHI would have a 70-percent equity stake in the overall company. Currently, CHI operates 73 hospitals in 19 states. The merger, anticipated to conclude in the second half of 2011, would provide a greater than 40% market share in Louisville and create the state's largest health system with 11 acute-care hospitals.

**Tellatin, Short & Hansen, Inc.**

**COMPETITOR NO. SEVEN**

Name and Address: **Jewish Hospital**
200 Abraham Flexner Way
Louisville, KY  40202
Telephone number: (502) 587-4011
Hospital Website: www.jhsmh.org/Locations/Jewish...
Provider Number: 180040

Type of Facility: Short Term Acute Care
Type of Control: Voluntary Nonprofit, Other
Health Care System: Jewish Hospital and Saint Mary's Healthcare
Louisville, KY
System Website: www.jhsmh.org

General Med/Surg Beds: 595
Special Care Beds: 318

Total Employees: 4,694
Total Discharges: 36,517
Total Patient Days: 244,626
Total Patient Revenue: $2,539,022,791

County (FIPS code): KY111 - Jefferson, KY
CBSA (formerly MSA): 31140 - Louisville/Jefferson County, KY-IN
Longitude / Latitude:
86° E / 38° N

Fiscal Intermediary: Blue Cross (Kentucky)
Urban / Rural Designation: Urban
Medicare Certified Beds: 1,261



The following chart, which is based upon Medicare utilization data, helps to demonstrate the primary market area for the Hospital.

85

**Medicare Market Service Area for Jewish Hospital**

| City of Zip Code | % Admissions | Zip Code |
|---|---|---|
| Louisville, KY | 9.2% | 40216 |
| Louisville, KY | 8.2% | 40272 |
| Louisville, KY | 7.0% | 40214 |
| Louisville, KY | 5.5% | 40258 |
| Louisville, KY | 4.2% | 40215 |
| Louisville, KY | 3.9% | 40211 |
| Louisville, KY | 3.3% | 40203 |
| Louisville, KY | 2.7% | 40212 |
| Louisville, KY | 2.5% | 40219 |
| Louisville, KY | 2.4% | 40210 |
| All Others | 51.2% | |

*For calendar year 2009*

The following chart provides summary information for the hospital's operations.

| Name and Address: | **Jewish Hospital** | | | |
| | 200 Abraham Flexner Way | | | |
| | Louisville, KY  40202 | | | |
| Telephone number: | (502) 587-4011 | | | |
| Type of Facility: | Short Term Acute Care | | | |

| Acute Care (Sub-provider, Swing Bed, & NF/SNF Excluded) | Medicare | Medicaid | Other | Total |
|---|---|---|---|---|
| Discharges | 14,971 | 2,068 | 19,478 | 36,517 |
| Discharges to SNFs | | | | 3,140 |
| Average Length of Stay | 5.6 | 1.8 | 4.1 | 4.6 |
| Case Mix Index | 1.844 | N/A | N/A | N/A |

| Acute Care (Swing Bed - SNF Excluded) | # of Beds | Inpatient Days | | |
|---|---|---|---|---|
| Routine Services | 595 | 72,478 | 2,453 | 69,847 | 144,778 |
| Intensive Care Unit | 78 | 11,343 | 1,240 | 10,222 | 22,805 |
| Coronary Intensive Care | | | | | |
| Burn Intensive Care | | | | | |
| Surgical Intensive Care | | | | | |
| Other Special Care | | | | | |
| Nursery | | | | | |
| Total Acute Inpatient | 673 | 83,821 | 3,693 | 80,069 | 167,583 |
| Total Acute Inpatient Average Daily Census | | | | | 459.1 |
| Total Acute Inpatient Occupancy Rate | | | | | 99.6% |

| | | | | |
|---|---|---|---|---|
| Psychiatric Unit | 20 | 4,333 | 97 | 1,301 | 5,731 |
| Psychiatric Unit Average Daily Census | | | | | 15.7 |
| Psychiatric Unit Occupancy Rate | | | | | 78.5% |

| | | | | |
|---|---|---|---|---|
| Rehabilitation Unit | 79 | 11,370 | 1,286 | 12,465 | 25,121 |
| Rehabilitation Unit Average Daily Census | | | | | 68.8 |
| Rehabilitation Unit Occupancy Rate | | | | | 87.1% |

| Nursing Unit or Swing Beds | | | | |
|---|---|---|---|---|
| Skilled Nursing (SNF) Unit | 0 | 4,380 | 0 | 1,151 | 5,531 |
| Nursing (NF) | | | | | |
| Swing Beds - SNF | | | | | |
| Swing Beds - NF | | | | | |
| Total Nursing | 0 | 4,380 | 0 | 1,151 | 5,531 |
| Total Nursing Census Mix | | 79.2% | 0.0% | 20.8% | |
| Total Nursing Average Daily Census | | | | | 15.2 |
| Total Nursing Occupancy Rate | | | | | #DIV/0! |

| | |
|---|---|
| Total Hospital Beds | 772 |
| Total Hospital Average Daily Census | 558.8 |
| Total Hospital Occupancy Rate | 72.4% |

Note:  Sub-provider Unit, Swing and NF/SNF discharges are not available from the data source:  American Hospital Directory

**Tellatin, Short & Hansen, Inc.**

Jewish Hospital & St. Mary's HealthCare (JHSMH) was created when two of the region's health systems – Jewish Hospital HealthCare Services and CARITAS Health Services – joined together in 2005. JHSMH is owned by Jewish Hospital HealthCare Services, Inc. (75% interest), and Denver-based Catholic Health Initiatives (25% interest).

Jewish Hospital, a 462-bed, tertiary referral center located in downtown Louisville, is the flagship facility. Sts. Mary & Elizabeth Hospital is a 298-bed primary care hospital serving the southwest portion of the Louisville metro area.

In 2007, JHSMH opened the Frazier Rehab and Neuroscience Center, a 15-story, 135-bed acute rehab hospital. Jewish Hospital Medical Center Southwest, an outpatient facility, also opened in 2007.

JHSMH opened the 120,000 square-foot Jewish Hospital Medical Center Northeast in August 2009. The focus at this facility is cancer care, but it also provides emergency department and diagnostic services. In February 2011, JHSMH acquired a 40-acre tract of undeveloped land adjacent to this facility. JHSMH has indicated that they are examining their options for the property and do not have firm plans.

In April 2011, JHSMH announced it had begun a joint venture partnership with 30 local physicians and Surgical Care Affiliates to expand its outpatient surgery capabilities and build a surgical network in the Louisville area. An existing downtown center will be replaced by a new free-standing facility on the Jewish Hospital Medical Center Northeast campus.

JHSMH has been struggling financially in recent periods. This is believe to be partly related to heavy reliance on coronary procedures for revenue, which are decreasing in volume due to the increasing use of non-invasive surgery and medically coated stents. The organization hired Wellspring Partners Ltd., a consulting company, to help it with staffing and cost cutting measures that are necessary to bring the system back to profitable operations. The organization made considerable staffing cuts in 2010.

In April 2011, it was reported in the media that JHSMH officials had signed a letter of intent with Total Woman, a 30-doctor obstetrics and gynecology practice, to move from Norton Suburban Hospital to Jewish Hospital Medical Center East.

In June 2011, it was reported that JHSMH had applied for a certificate of need to become a partner in an orthopedic surgery center in Louisville. The ambulatory surgery center is operated by Louisville Orthopedic Clinic and Sports Rehabilitation and is part of the Louisville Orthopedic Clinic. JHSMH indicated that this action represents a continuation of the health system's strategy of expanding services beyond its hospital campuses and finding ways to partner with community physicians.

JHSMH rejected an unsolicited offer in June 2010 to be acquired by Community Health Systems Inc., a for-profit, publicly traded healthcare system based in Brentwood, Tenn.

In mid 2010 JHSMH and University of Louisville Hospital announced that they were in discussions for the possibility of a merger. Media reports in the latter part of the year reported that negotiations could lead to Jewish Hospital, St. Mary's Healthcare Inc., University Medical Center Inc. and Catholic Health Initiatives (CHI) coming together to form Kentucky's largest healthcare system. CHI already operates in Kentucky as Saint Josephs Health System. Reportedly, the plan is for the three non-profit systems to

---

87

combine to create an as yet unnamed regional system, with the Jewish Hospital and University Hospital brands remaining. CHI would inject a significant amount of operating capital – at least $200 million – into the new system through what essentially would be an acquisition of Jewish Hospital assets. CHI would have a 70-percent equity stake in the overall company. Currently, CHI operates 73 hospitals in 19 states. The merger, anticipated to conclude in the second half of 2011, would provide a greater than 40% market share in Louisville and create the state's largest health system with 11 acute-care hospitals.

In early January 2011, Moody's Investors Service downgraded JHSMH's debt to Baa1 from A3 with a negative outlook. Baa1 essentially is two rating levels above a "junk" rating – a rating that indicates increasing risk of default. The downgrade resulted in JHSMH having to pay investors a higher rate of return on $377 million of outstanding 2008 fixed-rate revenue bonds issued by the Louisville Metro government. The rating downgrade was attributed to declining inpatient and outpatient volumes and the continuation of operating losses, resulting in poor operating cash-flow margins and weaker debt metrics. Operating performance declined in fiscal years 2009 and 2010 following two years of improvement. According to Moody's, despite a moderate debt load, the poor performance resulted in debt-to-cash flow of over eight times and peak debt-service coverage of around two times. Unrestricted liquidity benefitted from reduced capital spending but was no longer reflective of a rating in the A category. The negative outlook reflected concerns with continued pressures on volumes in this highly competitive market with two sizable competitors. Moody's suggested that the weaker economy would likely drive continued declines in overall market volumes, which providers will be striving to capture in order to maintain market share. Furthermore, Moody's indicated their belief that the hospital will be challenged to recover from seven straight years of operating losses, including fiscal 2010.

**Tellatin, Short & Hansen, Inc.**

**COMPETITOR NO. EIGHT**

Name and Address: **Saint Catherine Regional Hospital**
2200 Market Street
Charlestown, IN  47111
Telephone number: (812) 256-3301
Hospital Website: www.stchc.com/scrh
Provider Number: 150163

Type of Facility: Short Term Acute Care
Type of Control: Proprietary, Corporation
Health Care System: Saint Catherine Healthcare
Jackson Hole, WY
System Website: www.stchc.com

General Med/Surg Beds: 64
Special Care Beds: 6

Total Employees: 131
Total Discharges: 1,125
Total Patient Days: 3,715
Total Patient Revenue: $39,242,260

County (FIPS code): IN019 - Clark, IN
CBSA (formerly MSA): 31140 - Louisville/Jefferson County, KY-IN
Longitude / Latitude:
86° E / 38° N

Fiscal Intermediary: Blue Cross (Indiana)
Urban / Rural Designation: Urban
Medicare Certified Beds: 67



89

The following chart, which is based upon Medicare utilization data, helps to demonstrate the primary market area for the Hospital.

**Medicare Market Service Area for**
**Saint Catherine Regional Hospital**

| City of Zip Code | % Admissions | Zip Code |
|---|---|---|
| Charlestown, IN | 20.9% | 47111 |
| Madison, IN | 5.3% | 47250 |
| Jeffersonville, IN | 3.4% | 47130 |
| Otisco, IN | 3.2% | 47163 |
| Clarksville, IN | 2.5% | 47129 |
| Frankfort, KY | 2.4% | 40621 |
| Sellersburg, IN | 2.2% | 47172 |
| New Albany, IN | 2.0% | 47150 |
| Hanover, IN | 1.8% | 47243 |
| Marysville, IN | 1.6% | 47141 |
| All Others | | |

*For calendar year 2009*

The following chart provides summary information for the hospital's operations.

| | | | | |
|---|---|---|---|---|
| Name and Address: | **Saint Catherine Regional Hospital** 2200 Market Street Charlestown, IN 47111 | | | |
| Telephone number: | (812) 256-3301 | | | |
| Type of Facility: | Short Term Acute Care | | | |

| Acute Care (Sub-provider, Swing Bed, & NF/SNF Excluded) | | Medicare | Medicaid | Other | Total |
|---|---|---|---|---|---|
| Discharges | | 599 | 114 | 412 | 1,125 |
| Discharges to SNFs | | | | | 510 |
| Average Length of Stay | | 3.7 | 2.7 | 2.8 | 3.3 |
| Case Mix Index | | 0.978 | N/A | N/A | N/A |
| Acute Care (Swing Bed - SNF Excluded) | # of Beds | | Inpatient Days | | |
| Routine Services | 64 | 2,022 | 297 | 929 | 3,248 |
| Intensive Care Unit | 6 | 220 | 12 | 235 | 467 |
| Coronary Intensive Care | | | | | |
| Burn Intensive Care | | | | | |
| Surgical Intensive Care | | | | | |
| Other Special Care | | | | | |
| Nursery | | | | | |
| Total Acute Inpatient | 70 | 2,242 | 309 | 1,164 | 3,715 |
| Total Acute Inpatient Average Daily Census | | | | | 10.2 |
| Total Acute Inpatient Occupancy Rate | | | | | 14.6% |
| Psychiatric Unit | 26 | 6,453 | 429 | 575 | 7,457 |
| Psychiatric Unit Average Daily Census | | | | | 20.4 |
| Psychiatric Unit Occupancy Rate | | | | | 78.6% |
| Rehabilitation Unit | | | | | |
| Rehabilitation Unit Average Daily Census | | | | | 0.0 |
| Rehabilitation Unit Occupancy Rate | | | | | N/A |
| Nursing Unit or Swing Beds | | | | | |
| Skilled Nursing (SNF) Unit | | | | | |
| Nursing (NF) | | | | | |
| Swing Beds - SNF | | | | | |
| Swing Beds - NF | | | | | |
| Total Nursing | 0 | 0 | 0 | 0 | 0 |
| Total Nursing Census Mix | | 0.0% | 0.0% | 0.0% | |
| Total Nursing Average Daily Census | | | | | 0.0 |
| Total Nursing Occupancy Rate | | | | | N/A |
| Total Hospital Beds | | | | | 96 |
| Total Hospital Average Daily Census | | | | | 30.6 |
| Total Hospital Occupancy Rate | | | | | 31.9% |

Note:  Sub-provider Unit, Swing and NF/SNF discharges are not available from the data source:  American Hospital Directory

90

**Tellatin, Short & Hansen, Inc.**

Saint Catherine opened in September 1976 as a 96-bed hospital. This is a community hospital that is situated on the eastern side of the subject's healthcare service area. The hospital struggled financially in its early years of operation. The facility was acquired by Michigan-based Saint Catherine Health Care in May of 2006. The facility was previously known as Medical Center of Southern Indiana. The name was changed when it was purchased from LifePoint Hospitals Inc.

# MAP OF COMPETITOR HOSPITALS

Note: Ring shown at 10-mile radius. **N**↑



**Tellatin, Short & Hansen, Inc.**

## Healthcare Service Area Evaluation

### Base Hospital Service Demand

Demand for general acute care hospital services is need driven. Demand is closely related to population trends within the hospital service area (HSA). There are six ZIP codes that comprise the Jeffersonville HSA: 47126, 47129, 47130, 47143, 47163, and 47172. These ZIP codes comprise Jeffersonville, Clarksville, Sellersburg, and more rural areas in the northern portion of Clark County, mostly along the I-64 corridor. I believe the defined HSA best reflects a reasonable service reach for the Hospital considering its location, size, and the availability of healthcare services in the region.

The following table provides population growth statistics for the hospital service area.

| Table N-2   Neighborhood and Market Service Area, Population Trends By Age Group | | | |
|---|---|---|---|
| | Clark County | 4.0-Mile Radius Neighborhood | Healthcare Service Area |
| **Total Population Ages 25 to 34** | | | |
| 2010 | 14,471 | 12,760 | 11,960 |
| 2015 | 14,254 | 12,817 | 11,953 |
| Annual Change | -0.30% | 0.09% | -0.01% |
| **Total Population Ages 35 to 44** | | | |
| 2010 | 15,348 | 12,557 | 12,321 |
| 2015 | 15,958 | 13,080 | 12,771 |
| Annual Change | 0.78% | 0.82% | 0.72% |
| **Total Population Ages 45 to 54** | | | |
| 2010 | 16,690 | 13,276 | 13,330 |
| 2015 | 16,014 | 12,477 | 12,732 |
| Annual Change | -0.82% | -1.23% | -0.91% |
| **Total Population Ages 55 to 64** | | | |
| 2010 | 14,062 | 11,223 | 11,393 |
| 2015 | 15,717 | 12,207 | 12,552 |
| Annual Change | 2.25% | 1.70% | 1.96% |
| **Total Population Ages 65 to 74** | | | |
| 2010 | 8,140 | 6,600 | 6,657 |
| 2015 | 10,676 | 8,565 | 8,746 |
| Annual Change | 5.57% | 5.35% | 5.61% |
| **Total Population Ages 75 to 84** | | | |
| 2010 | 4,808 | 4,292 | 4,064 |
| 2015 | 5,137 | 4,379 | 4,285 |
| Annual Change | 1.33% | 0.40% | 1.06% |
| **Total Population 85 and Over** | | | |
| 2010 | 1,994 | 1,953 | 1,753 |
| 2015 | 2,148 | 2,054 | 1,887 |
| Annual Change | 1.50% | 1.01% | 1.48% |
| Source: ESRI, 2010 | | | |

The 20-29 age group utilizes obstetrics services, which creates family loyalty to a hospital. The age 50-74 group has the heaviest utilization rate of hospital services. In this case, the population segments that are below retirement age are forecast to grow at a relatively slow rate, while the population segments that are above retirement age are forecast to grow at a moderate rate. The forecasted population change has a significant correlation to the baby boomer phenomenon. On the whole, growth is modest. Since the 50+ population will disproportionately use healthcare services, I do expect to see near to mid-term growth in the demand for healthcare services that will exceed the total

population growth. By itself, the population growth demographic trend should be sufficient to attract the interest of prospective healthcare service providers seeking to extend their area of coverage.

## Certificate of Need (CON) Program

Certificate-of-need programs attempt to curtail the construction of unnecessary healthcare facilities and to limit the acquisition of costly equipment that provides little benefit. In 1974, Congress mandated that states adopt certificate-of-need laws and required states to establish comprehensive health plans. This mandate was repealed effective January 1, 1987. Today, 36 states operate certificate-of-need programs. There is considerable debate about the effect of those programs on the availability, access, and cost of healthcare.

Indiana terminated its CON program in July 1998 and there are no plans to reinstate one. Without a CON program, competitive market forces determine supply and demand in the market.

Based on our research, I am not aware of any additional development of hospitals or freestanding outpatient surgical centers within the hospital service area of the subject.

## Bed Supply

The following table provides a comparison of bed supply ratios for the subject hospital's service area and state and national figures.

| Acute Care Hospital Beds per 1,000 Residents | |
| --- | --- |
| Jurisdiction | Beds per 1,000 Residents |
| Jeffersonville HSA | 2.3 |
| Indiana | 2.7 |
| Kentucky | 3.3 |
| National Average | 2.6 |
| Data sources include ESRI and Kaiser Health Facts. | |

As evidenced in the table above, the Jeffersonville HSA has a moderately low hospital bed rate in relation to state and national rates. However, considering the large volume of beds that exists in the downtown area of Louisville, which lies immediately south of the HSA, I do not believe that the bed ratio comparison provides a meaningful indication of supply and demand equilibrium. There are over 2,000 general acute care hospital beds located in the downtown area of Louisville, just six miles south of the subject property, and conveniently accessed by residents living in the Jeffersonville HSA.

Reflecting this bed proximity situation, I believe it is also important to review occupancy rates for hospitals to help gauge the potential interest that may exist for the subject facility based upon healthcare service business opportunities.

According to 2010 version of the American Hospital Association's Annual Survey of Hospitals, the national occupancy rate for all community hospitals was estimated to be approximately 68.2 percent in 2008.

The following table provides occupancy rate information for the hospitals and/or systems that represent direct and indirect competition for the subject facility. This data is obtained from the American Hospital Directory, and is sourced from Medicare cost reports. I did

94

not identify a cost report for the subject property during this period of operation, nor do I have internal operating statistics covering this period. Therefore, no occupancy data is shown for the subject property.

| | Hospital / Competitor | Location | Acute Beds | Acute Occupancy | Combined Acute/Swing Occupancy |
|---|---|---|---|---|---|
| | **Inpatient Market Occupancy** | | | | |
| | SUBJECT - Kentuckiana Medical Center | Clarksville, IN | 34 | N/A | N/A |
| 1 | Physicians Medical Center | New Albany, IN | 12 | 11.9% | 11.9% |
| 2 | Clark Memorial Hospital | Jeffersonville, IN | 169 | 82.5% | 82.5% |
| 3 | Floyd Memorial Hospital and Health Services | New Albany, IN | 231 | 64.7% | 64.7% |
| 4 | Baptist Hospital East | Louisville, KY | 468 | 77.7% | 77.7% |
| 5 | Norton Hospital | Louisville, KY | 1080 | 70.3% | 70.3% |
| 6 | University of Louisville Hospital | Louisville, KY | 315 | 77.2% | 77.2% |
| 7 | Jewish Hospital | Louisville, KY | 673 | 68.2% | 68.2% |
| 8 | Saint Catherine Regional Hospital | Charlestown, IN | 70 | 14.5% | 14.5% |
| | Total Beds | | 3052 | | |
| | Average Occupancy Rate w/o SUBJECT | | | 58.4% | 58.4% |
| | Weighted Average Occupancy Rate w/o SUBJECT | | | 69.7% | 69.7% |

Note:  For facilities with swing beds, total bed occupancy will exceed acute IP occupancy.
Note:  Periods for data may represent more than one specific fiscal year.

*Source: American Hospital Directory*

As is evidenced in preceding table, occupancy rates based solely upon acute inpatient care are in a wide range, but generally reflect a moderate rate of utilization. Competitor #1 is principally an outpatient facility; thus, its low rate of inpatient utilization is not of great significance. Competitor #8 also has a low rate of inpatient utilization. Here, such a low rate of inpatient utilization could bode poorly for the viability of that hospital, which may compel it to seek out an affiliation, merger or other working arrangement with a stronger regional partner.

Occupancy rates at the other competitors are sufficiently high to potentially have viable business operations. Clark Memorial Hospital, which is the only other hospital located in the subject's hospital service area, has the highest occupancy rate. This hospital is also in closest proximity to the subject property. The first three competitors, which are Indiana based, seemingly represent the most direct competition for the subject. Among them, however, Clark Memorial Hospital may truly be the most direct competitor.

While occupancy rates are an important gauge of competition and business opportunity, payer mix is just as important, and potentially more so, when evaluating a market for healthcare service business opportunity.

**Tellatin, Short & Hansen, Inc.**

**Payer Mix**

The following table is from the 2010 HCUP report titled: HCUP Facts and Figures: Statistics on Hospital-based Care in the United States, 2008.



Number and Distribution of Discharges by Expected Primary Payer, 1997-2008

\* Includes other payers such as Workers' Compensation, TRICARE, CHAMPUS, CHAMPVA, Title V, and other government programs.
\*\* Includes discharges classified as self-pay or no charge.
Note: Excludes a small number of discharges (68,000 or 0.2 percent) with missing payer.
Note: Bar segments representing 4 percent or less have not been labeled.
Source: AHRQ, Center for Delivery, Organization, and Markets, Healthcare Cost and Utilization Project, Nationwide Inpatient Sample, 1997-2008.

In the HCUP data Medicare includes fee-for-service and managed care Medicare (Medicare Advantage). Similarly, Medicaid includes fee-for-service and managed care Medicaid.

The following table provides a comparative analysis for discharges by payer source for hospitals included as competitors. This information is obtained from American Hospital Directory (AHD), which provides online data for over 6,000 hospitals. Their database of information about hospitals is built from both public and private sources including Medicare claims data (MedPAR and OPPS), hospital cost reports, and other files obtained from the federal Centers for Medicare and Medicaid Services (CMS). "Other" includes insurance companies (including Medicare Advantage and HMOs and PPOs) and private payers.

Tellatin, Short & Hansen, Inc.

| Market Area Acute Inpatient Payer Mix by Discharge | | | |
| Hospital / Competitor | Medicare | Medicaid | Other Census |
| --- | --- | --- | --- |
| SUBJECT -- Kentuckiana Medical Center | N/A | N/A | N/A |
| 1  Physicians Medical Center | 36.1% | 1.4% | 62.6% |
| 2  Clark Memorial Hospital | 39.3% | 26.7% | 34.0% |
| 3  Floyd Memorial Hospital and Health Services | 41.1% | 3.4% | 55.5% |
| 4  Baptist Hospital East | 46.1% | 5.2% | 48.7% |
| 5  Norton Hospital | 26.2% | 4.0% | 69.7% |
| 6  University of Louisville Hospital | 19.3% | 7.3% | 73.4% |
| 7  Jewish Hospital | 41.0% | 5.7% | 53.3% |
| 8  Saint Catherine Regional Hospital | 53.2% | 10.1% | 36.6% |
| Average | 39.9% | 11.7% | 48.5% |

Note: Medicare Advantage is included in the Other category.
Note:  Periods for data may represent more than one specific fiscal year.

*Source: American Hospital Directory*

The potential profitability of patients varies widely across the payer spectrum. The "other" census category is mostly comprised of commercial payers, with a majority of that business being managed care. That census will typically be the most profitable for a provider. Medicare is typically less profitable than the commercial segment, but it remains sufficiently profitable for most operators such that it is a desirable source of business. Medicaid is typically the least profitable source of business, and serving an overly large Medicaid population can make it difficult for a hospital to remain profitable.

On the whole, Medicaid utilization in the market is modest. However, Medicaid utilization at Clark Memorial Hospital, which is located in the subject healthcare service area, is notably high. There is a significant concentration of lower-income population located in close proximity to that hospital. Floyd Memorial Hospital, which is the other main hospital serving the Indiana-based portion of the Louisville metro area, has a low rate of Medicaid utilization. The unweighted average Medicaid payer mix for Clark Memorial and Floyd Memorial is approximately 15 percent, which is still higher than the unweighted average for the group.

On the whole, the payer mix that an operator might expect to achieve at the subject property is reasonably typical for the hospital industry as a whole, but certainly inferior to the Louisville metro average. As such, this market location may be acceptable to one of the Kentucky-based healthcare systems in Louisville, but it does not present an overly compelling situation.

## Conclusion

The Indiana-based portion of the Louisville metro area is served by two community hospitals geared to providing basic healthcare services. They are county owned and operated facilities, both of which have good community support. Floyd Memorial made significant capital improvements a few years ago, and Clark Memorial is in the process of making significant capital improvements. They achieve roughly 50/50 inpatient and outpatient revenue ratios. Their Medicare inpatient acuity levels are in the 1.5 to 1.6 range, suggesting that they are serving all but the most complex cases, which are presumably going to the tertiary providers in downtown Louisville. Inpatient occupancy levels at those facilities are reasonably strong. Clark Memorial, which has revenues about two-thirds of those of Floyd Memorial, serves a disproportionately large Medicaid population.

97

There is a physician owned surgical hospital in New Albany that mostly competes for outpatient surgical business. Outpatient to inpatient revenue is about a 3-to-1 ratio. That facility has approximately 30 physician owners which account for virtually all of the facility's business. Ownership is concentrated among urologists, OBGYNs, and orthopedic practitioners. This facility opened in 2008 and did not achieve stabilized operations as quickly as expected by the developers of the property, but it is operating profitability and is expected to operate indefinitely.

I am unaware of any planned development in the healthcare service area that would materially impact the competitive landscape for healthcare service delivery. The HSA has a modest population growth forecast, a seemingly reasonable supply of beds, and above-average dependency on Medicaid census in comparison to the Louisville metro area.

The Louisville healthcare service market is highly competitive, with four Kentucky-based hospitals and/or systems competing for the biggest majority of business. Their business operations are principally concentrated in the Kentucky portion of the metro area. The three systems have invested a great deal of capital in new projects over the last decade in an effort to expand or keep market share. Much of that investment has been made in the southeast section of the metropolitan area (Jefferson County, KY). All of these competitors have limited direct presence in the Jeffersonville HSA. The most significant presence had been Jewish Hospital & St. Mary's HealthCare, Inc's. 18-year tenure as manager for Clark Memorial, but that arrangement ceased at the beginning of 2011. On the whole, however, the Kentucky-based operators have not put a great deal of resources on the Indiana side of the metro area.

Presently, there is a great deal of jockeying taking place among the four Kentucky-based operators. Norton Healthcare is attempting to solidify its future by creating an accountable care organization with Humana, one of the nation's largest health insurance companies. Additionally, they are aligning with UK HealthCare to expand their presence throughout the state. Jewish Hospital and University of Louisville Hospital are poised to merge with Catholic Health Initiatives and become the largest healthcare system in Kentucky. Baptist Healthcare is not undertaking any monumental changes. In the Louisville market, Baptist continues to entrench itself in its market area comfort zone, which has been and continues to be profitable.

The three large healthcare systems that seem likely to exist will all have the financial resources to pursue service activity in the Indiana portion of the Louisville metro should they elect to do so in the future. However, only one operator among the existing four has struggled financially over the last decade, leaving one to believe that if the business opportunities in the subject market service area were perceived as good, that greater capital commitments would have already been made by at least one of the profitable operators.

The two full-service acute care operators operating in the Indiana portion of the metro area are owned and operated by county governments. As such, their mission will generally be to provide healthcare services to residents of their respective counties. That would seem to exclude Floyd Memorial as a likely candidate to acquire the subject property to extend their service reach. Therefore, Clark Memorial, which probably stands to lose the most business (at least in relation to its scale of business operations) should the subject property be operated as a hospital, would seem to be among the most likely candidates to express an interest in acquiring the subject property. As noted in the

98

competitor profile, Clark Memorial has not expressed any significant interest in acquiring the subject property to date. I noted that some discussions between owners of the subject and Clark Memorial were reportedly made, but pricing and terms are unknown and they may simply have been unrealistic to Clark Memorial.

One possible scenario would be that Clark Memorial and Floyd Memorial could share in the acquisition via a joint venture in order to protect their respective business interests. In such a scenario, however, it seems likely that utilization of the facility would be more for outpatient activity than inpatient type.

On a regional basis, the other provider that the Hospital's current CRO indicated might be a potential suitor would be Indiana University Health. IUH is Indiana's most comprehensive healthcare system, comprising more than 20 hospitals and health centers statewide (2,900+/- staffed hospital beds). IUH is in partnership with Indiana University School of Medicine, one of the nation's leading medical schools. Their existing hospitals are scattered throughout much of the state, with a significant concentration in Indianapolis (100 miles N). The Indiana University School of Medicine is located in Bloomington (75 miles NW). Their hospital in closest proximity to the subject is in Paoli, which is about 45 miles northwest of the subject.

## Highest and Best Use Analysis

Highest and best use is defined as:

> The reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, and financially feasible and that results in the highest value. The four criteria the highest and best must meet are:  legally permissible, physically possible, financially feasible, and maximally productive.

Highest and best use may be either that of the land alone (assuming the improvements are demolished) or that of the land as presently improved.

### Highest and Best Use - As If Vacant

The 10.03-acre subject site has an irregular configuration and level topography. There are no significant physical limitations for improvements that can be contained within the dimensions of the site. The site frontage and access are suitable for a variety of uses. The subject site has excellent access to an important highway for the metropolitan area, I-65.

The site is located within a mixed-use neighborhood that is currently transitioning towards greater commercial use. Substantial retail development took place in the neighborhood, on the west side of I-65, during the last decade. Infrastructure improvements and undeveloped land availability are currently giving rise to a large mixed-use development just to the east of the subject property. A significant amount of that project (Jeffersonville Town Center) is scheduled to be retail type. A discussion with the broker for the project leads us to believe that significant land sales for retail development could occur within 12 to 18 months.

The "VPCZ, Veterans Parkway Corridor Zone" zoning permits a broad range of uses, including residential, commercial, civic, entertainment, park, business and office uses. The site's zoning is consistent with the location and surrounding property uses. Reportedly, the City of Clarksville is currently in the process of attempting to rezone some portions of the city. The subject property lays within an area (represented by Veteran's Village subdivision) that city officials would like to rezone to a medical district. The rezoning proposal has not yet been brought before the Planning & Zoning Commission.

Considering the size of the subject site, along with its exposure and access from I-65, commercial use of the property represents the most reasonable highest and best use conclusion for the subject site. I believe retail uses would be among the most probable. As a vacant site, if it were zoned for medical use only, the potential pool of buyers would be reduced and the potential for a diminution of value would exist.

### Highest and Best Use - As Improved

The subject site is improved with a 46-bed (only finished for 34 beds), surgical hospital facility that was developed approximately two years ago. Approximately ten percent of the building remains unfinished "shell" space. Developed as a physician owned hospital, it presently competes with other short term acute care hospitals in and near the market service area. The building design is weighted heavily towards serving inpatient business rather than outpatient type.

_____    100

I believe the improvements suffer from functional obsolescence as a result of below-average functionality of the floor plan. To a significant degree, certain functional aspects of the building, such as the amount of space devoted to inpatient and outpatient services, will be buyer specific with respect to suitability. The fact that there is significant shell space in the building does lend to greater flexibility of use for that building area. Prospective buyers that envision more outpatient business activity than the current operator could utilize it for outpatient services instead of completing the inpatient build-out. I believe it is reasonable to believe that most prospective future users of the building for hospital or related healthcare use would identify some floor plan modifications that they deemed necessary in order for the building to better serve their specific program of use of the facility.

The Louisville metro healthcare service market is very competitive. However, to a significant degree, the Kentucky-based operators have not elected to compete with the Indiana-based hospitals for patients originating from Indiana. This has benefited the Indiana hospitals, but it does not lend itself to the probability of those Kentucky-based operators expressing great interest in the subject property as an outreach facility. If they did, it seems more likely that their business focus would be more outpatient type than inpatient type, which is in conflict with the basic design of the subject facility.

The potential for out-of-market acute care hospital operators to have an interest in the subject facility seems rather limited. The hospital is not of sufficient size/scale to attract much interest from national operators. Indiana University Health may be a potential buyer, but it is difficult to say with any degree of certainty that a single operator without a market presence would be interested, or just how discounted the price may need to be to attract their interest.

Kentuckiana Medical Center presently has physician ownership interest in the operating entity and real estate. Under the Affordable Care Act, changes to the Stark Law were made whereby physicians may make self-referrals to hospitals only if those hospitals (operating entity, not real estate) have physician ownership as of March 23, 2010. Additionally, those hospitals must have a Medicare provider agreement in effect on December 31, 2010. The operating entity of the subject hospital presently meets these criteria; thus, the physician investors may make self-referrals subject to restrictions in place prior to the Affordable Care Act going into effect. The physician ownership interest of the operating entity is potentially transferable to other physician investors. An expansion of the physician ownership interest in the operating entity is not allowed.

Physician investors are not restricted by Stark Law or the Affordable Care Act from investing in hospital real estate. However, prior to the Affordable Care Act, the primary motivation for physicians to invest in hospital real estate was to facilitate their ownership of the hospital operating entity. Ownership in the operating entity allows them to participate in business profits, which is a function of patient cases generated by self-referral activity to the hospital.

As a hospital operating entity, other physician investors desiring to have ownership in a business of this type represent potential buyers for the subject real estate; again, as the real estate ownership would facilitate their business interest. If the hospital operating entity were to cease operating or otherwise lose its Medicare provider agreement, then the opportunity for physician self-referral activity would be lost, along with the principal motivation for other physicians to acquire the hospital real estate.

**Tellatin, Short & Hansen, Inc.**

Loss of the Medicare provider agreement would effectively eliminate one source of prospective buyers for the property; specifically, physicians that desire to own and operate a hospital business. However, the current industry trend is towards more direct employment of specialty physicians by hospitals. Additionally, with the history of bankruptcy for the operating entity that presently occupies the subject property, there is likely to be stigma associated with the property. Hospitals and/or health systems with an existing presence in the Louisville metro area will have more resources and confidence in their ability to overcome any such stigma than would a new group of physician investors. Effectively, I believe the stigma of a failed business in the subject property would be a material deterrent to another group of physician investors making a financial commitment to acquire and operate the facility as a physician owned hospital. In this case, I believe that stigma fully negates the impact of the loss of a source of prospective buyers should the Medicare provider agreement be lost.

As is seems likely that there will be a limited market for the property for its inpatient surgical design, the opportunity for other healthcare use possibilities is pertinent to the highest and best use discussion. As mentioned, I believe it is likely that most prospective buyers would reduce the building area devoted to inpatient use and increase the building area devoted to outpatient use. An ambulatory surgery center (ASC) would be among the more likely alternative uses.

For physician-owned hospitals, the Affordable Care Act's impact is both clear and negative. For ASCs, there is much less direct impact and the long-term impact is much less clear. As to physician-owned hospitals, the Affordable Care Act precludes new facilities which were not Medicare-certified by December 31, 2010. The Act did not include any similar provision for ASCs. The Act avoided an impact on the pricing of ASC services and the ASC payment system. It also avoided a requirement for ASCs to file Medicare cost reports. A large proportion of ASC users and owners come from small to midsize independent group physician practices. Congress began a six-year rate freeze for ASCs under Medicare in 2004. The new health care reform law mandated a "productivity adjustment." Intended to control cost growth, the "productivity adjustment" will reduce annual payment updates for most healthcare providers. This adjustment goes into effect for ASCs in 2011. Due to the productivity adjustment for 2011, no reimbursement rate changes will be made for this year. This means ASC payments will have been frozen for seven of the past eight years. Reflecting these changes and the trend toward greater physician employment by hospitals, there are uphill issues for future ASC use of the subject facility. Nevertheless, ASCs continue to grow in number across the country and I believe this use is among the more probable future uses for at least a portion of the subject property.

Aside from the ASC use, there are other types of specialty hospitals worth mentioning, such as psychiatric, long-term acute care, and rehabilitation. I note that Clark Memorial and Floyd Memorial are already partners in a rehab hospital in New Albany; thus, it seems unlikely that a second rehab hospital would be opened in the Indiana portion of the metro area. The Affordable Care Act extended an already-in-place moratorium on new LTAC development to December 29, 2012. Whether or not the moratorium will be extended beyond 2010 is unknown. The moratorium began following a period of rapid growth of LTACs and the desire for more accountability and control over future growth. Another alternative use is for skilled nursing with a strong emphasis on rehabilitation.

In conclusion, the highest and best use of the subject property for medical use; short-term acute care use being a possibility but not a certainty. Given the size of the subject facility, a combination of healthcare uses is a distinct possibility. For various reasons that

have been discussed, I do not see the subject property as being a compelling acquisition for most potential buyers. Based upon that view, I believe the market value of the real estate is likely to suffer considerably in relation to its physically depreciated replacement cost.

As an improved property, I doubt that the potential for rezoning of the property to "medical use only" would be of any detriment to the property's value; however, this is not the focus of this appraisal assignment.

**Tellatin, Short & Hansen, Inc.**

## Valuation Procedures

The appraisal problem is defined and relevant data are collected in order to understand the forces and influences affecting the value of the subject property. Typically, three appraisal approaches are used to derive separate indications of value. These three perspectives incorporate fundamental concepts and principles in the estimation of the market value of the going concern for the subject property.

### The Cost Approach

The cost approach relies on the basic principles of substitution, supply and demand, balance, and externalities. The current replacement or reproduction cost of the improvements is estimated, and the accrued depreciation is deducted. Depreciation results from three sources: physical deterioration, functional obsolescence, and external obsolescence. A summation of the market value of the land, assumed vacant, along with the depreciated cost of the improvements, provides an indication of the total value of the property.

### The Income Capitalization Approach

The income capitalization approach utilizes a set of procedures to derive a value indication for an income-producing property by converting its anticipated benefits (cash flow and reversion) into property value.

The income capitalization approach is ill suited to a property which has so much uncertainty regarding probable users, and its ultimate configuration and highest and best use. As discussed in the Hospital Industry Trends section of the appraisal, hospital operators are commonly using third parties to develop and own new medical real estate projects. However, these properties are almost always built-to-suit for the specific requirements of the hospital/tenant and their intended use. Those third parties rely heavily upon the credit worthiness of the specific tenant and their ability to operate the occupying business successfully and profitability. In this instance, there is no lease or certainty of future property use. Reflecting these considerations, I have not utilized the income approach for this appraisal.

### The Sales Comparison Approach

The fundamental principle of the sales comparison approach is substitution, which states that property values tend to be set by the cost of acquiring an equally desirable substitute property. The sales comparison approach produces an opinion of value by comparing the subject property to recent sales of similar properties. The comparison process analyzes differences in location, physical qualities, and perceived market influences. Often, the adjustments are based on qualitative interpretations of the collective sale data, along with the appraisers' experience with the property type.

## Cost Approach

The cost approach method values a property by (1) estimating the reproduction or replacement cost new of the improvements, (2) deducting the estimated depreciation, and (3) adding the market value of the land to arrive at a value indication for the real estate. Steps (1) and (2) are also applicable to the personal property (furniture, fixtures and equipment, or FF&E). The steps in the cost approach are summarized as follows.

1. Determine the value of the land as if vacant and available to be developed to its highest and best use.

2. Estimate the reproduction or replacement cost of the improvements as of the effective date of the appraisal.

3. Estimate and deduct the amount of accrued depreciation in the improvements to arrive at a value indication for the tangible assets.

4. Add the depreciated cost of the improvements to the land value to arrive at a total indicated value of the tangible assets.

## Land Valuation

The valuation perspective is for the market value of the site fully improved as if vacant and available to be developed to its highest and best use. The most common and usually the most accurate method of land valuation is based on a comparison of the value characteristics of the subject site with those value characteristics of land parcels that have recently been sold. The prices paid for the comparable properties are reduced to a unit price, such as price per acre or square foot, and are adjusted for the following elements of comparability:

### Elements of Comparison

Property Rights Conveyed:  The subject land is valued on the basis of an unencumbered fee simple interest. If necessary, the sales are adjusted to reflect any deviation from full property rights. In this instance, all the land sales were conveyed as unencumbered fee simple interests.

Financing Adjustments:  Properties occasionally sell whereby the seller provides financing in order to facilitate the transaction. In some instances the interest rate will be lower than those available via commercial or government lenders. In instances where sellers finance the sale at interest rates below market levels, prices are usually somewhat inflated to compensate for the lower interest rate. In order to adjust favorably financed transactions, the mortgaged amount is discounted at an appropriate market mortgage rate to reflect a cash equivalent price. To our knowledge, none of the sales in this analysis involved seller financing.

Conditions of the Sale:  This adjustment considers any abnormal circumstances in the sale, such as if the buyer or seller is unusually compelled or motivated to make the transaction or if other conditions deviate from those outlined in the definition of market value of this report. If relevant, the comments section for each of the respective sales discusses the specific conditions.

_____   105

Market Conditions:  Comparable sales that occurred under market conditions different from those applicable to the subject on the effective date of value require adjustment to reflect whatever appreciation or depreciation that has occurred since their respective transaction dates. As best as possible I have focused on recent sales activity that will reflect current market conditions (no market condition adjustments are required for comparison).The land sales used in this analysis occurred between February 6, 2007 and January 19, 2011.

Land sales activity in the subject neighborhood has been slow for a couple of years now due to the economic downturn and financial crisis that began in the latter part of 2008. Those turn of events rather abruptly shut down real estate development and land sales activity. Based upon a discussion I had with a real estate broker for the nearby Jeffersonville Town Center development, there is renewing interest developing in land for retail development. The prices quoted by that broker for letters of intent suggest that commercial land values in the immediate neighborhood have held up well.

Location:  Adjustments are applied to each sale to compensate for significant location differences between the subject and the land sales. Relative desirability of neighborhoods is considered in this adjustment.

Zoning and Legal Restrictions:  Zoning differences can influence values because certain uses can support higher land values than others. In some cases there may be the potential to up zone a site or a portion thereof, which can make it more valuable than it otherwise would be if the rezoning opportunity Were improbable or nonexistent. Some rezoning risk may remain in these cases; thus, an adjustment may be necessary to reflect the upside but with recognition of any risks and costs associated with the rezoning. Other legal restrictions that may impact value include the prohibition of certain uses and other atypical deed restrictions, planned use development conditions, or other municipally imposed requirements or limitations.

Size:  Normally, larger parcels command lower unit prices than smaller but otherwise comparable parcels. This relationship is similar to a quantity discount typically found in most other transactions. This aspect has been isolated from the other physical adjustments.

Physical Characteristics:  Adjustments are made for differences in shape, topography, access and exposure. Sites with very irregular configurations or ones with narrow shapes have less utility and are more difficult to develop to full potential; consequently, they possess less value. Terrain, degree of slope, soil conditions and drainage qualities play significant parts in the cost of developing a site. Similarly, sites with wetlands have additional regulatory burdens that may impose added costs or otherwise restrict useable site area. Those sites with fewer physical problems command higher unit values. Sites with two street frontages often command a premium in comparison to those that only offer single street frontages. Similarly, sites with good exposure to thoroughfares that carry high volumes of traffic will often command a premium.

106

<u>Off Sites – Utilities & Infrastructure</u>:  The costs to extend or otherwise provide utilities and street infrastructure necessary to develop a property and meet applicable municipal requirements can be significant. As such, sales that are substantially different from the subject property with respect to size-proportionate cash outlays that will be incurred for the extension of utilities and/or infrastructure have been adjusted.

<u>Other</u>:  Adjustments are made for extraordinary factors such as the cost of demolition of existing improvements, mitigation of environmental conditions, or other extraordinary factors that might require curing.

The following land sales were identified during our investigation of the local market area. The sale prices have been confirmed through government records and/or other primary and secondary sources. These comparable sales are summarized and described as follows.

| **Land Sale One** | |
|---|---|
| Intended Use | Church |
| Location/Address | 2519 Veterans Parkway |
| | |
| City, ST | Jeffersonville, IN |
| Date of Sale | 6-Feb-07 |
| Sale Price | $800,000 |
| Seller | Robert Morrison Trust |
| Buyer | St. Stephen Baptist Church |
| Confirmation Contact Name | Public Records |
| Relationship to the Transaction | 0 |
| Confirmation Contact Phone Number | 0 |
| Physical Description | |
| Size | |
| Acres | 4.88 |
| Square Feet | 212,573 |
| Shape of Site | Rectangular, Deep |
| Topography of Site | Rolling |
| Drainage of Site | Adequate |
| Zoning of Site | I-S, Institutional |
| Accessibility of Site | Average |
| Visibility of Site | Average |
| Utilities Available to Site | All |
| Location of Site | Average |
| Unit Price Per Acre | $163,934 |
| Unit Price Per Square Foot | $3.76 |

Additional Comments:  This site is located at the northeast corner of Veterans Parkway and Scott Morrison Road.  A railroad track forms the rear property line.  Veterans Parkway is an arterial street.  The neighborhood is mixed use with moderately good land availability, but this would be a fringe location for any commercial use.

107

**Land Sale Two**

| | |
|---|---|
| Intended Use | Tire Center |
| Location/Address | 1453 Veterans Parkway |
| City, ST | Jeffersonville, IN |
| Date of Sale | 19-Jan-11 |
| Sale Price | $600,000 |
| Seller | Koettner Five Star Properties |
| Buyer | State Ridge Holdings |
| Confirmation Contact Name | Agent for Seller |
| Relationship to the Transaction | 0 |
| Confirmation Contact Phone Number | 0 |
| Physical Description | |
| Size | |
|   Acres | 0.72 |
|   Square Feet | 31,360 |
| Shape of Site | Rectangular |
| Topography of Site | Level |
| Drainage of Site | Adequate |
| Zoning of Site | VPCZ |
| Accessibility of Site | Good |
| Visibility of Site | Good |
| Utilities Available to Site | All |
| Location of Site | Good |
| Unit Price Per Acre | $833,418 |
| Unit Price Per Square Foot | $19.13 |

Additional Comments:  This site is located in the NE quadrant of Town Center Blvd. and Veterans Parkway.  This site is part of the Jeffersonville Town Center development.  The site was sold as part of a build-to-suit development for the tire center facility.  Access is via another street that connects to Town Center Blvd.

**Land Sale Three**

| | |
|---|---|
| Intended Use | |
| Location/Address | 1600 block of East 10th Street |
| City, ST | Jeffersonville, IN |
| Date of Sale | 13-Jul-09 |
| Sale Price | $556,119 |
| Seller | Coutar Remainder I |
| Buyer | Macs Convenience Stores |
| Confirmation Contact Name | Public Records |
| Relationship to the Transaction | 0 |
| Confirmation Contact Phone Number | 0 |
| Physical Description | |
| Size | |
|   Acres | 2.95 |
|   Square Feet | 128,563 |
| Shape of Site | Irregular, Deep |
| Topography of Site | Level |
| Drainage of Site | Adequate |
| Zoning of Site | C-2, General Business |
| Accessibility of Site | Average |
| Visibility of Site | Average |
| Utilities Available to Site | All |
| Location of Site | Average |
| Unit Price Per Acre | $188,425 |
| Unit Price Per Square Foot | $4.33 |

Additional Comments:  This property is located on the west side of 10th Street (aka SR 62), just a few blocks nort of the original town.  East 10th Street is a commercial strip with numerous small retail businesses.  A railroad forms the north property line of the site.  This property is improved with old convenience store improvements that will need to be razed.

**Tellatin, Short & Hansen, Inc.**

# LAND SALES MAP



Note:  Ring shown at 3-mile radius.

**Tellatin, Short & Hansen, Inc.**

**Table L-1   Land Sale Summary and Analysis Grid**

| Description/Characteristics | Sale One | Sale Two | Sale Three | Averages | Subject Property |
|---|---|---|---|---|---|
| Intended Use | Church | Tire Center | | --- | |
| Location/Address | 2519 Veterans Parkway | 1453 Veterans Parkway | 1600 block of East 10th Street | --- | 4601 Medical Plaza Way |
| City | Jeffersonville | Jeffersonville | Jeffersonville | --- | Clarksville |
| Date of Sale | 6-Feb-07 | 19-Jan-11 | 13-Jul-09 | --- | 11-May-11 |
| Sale Price | $800,000 | $600,000 | $556,119 | --- | $3,930,000 |
| Seller | Robert Morrison Trust | Koettner Five Star Properties | Coutar Remainder I | --- | |
| Buyer | St. Stephen Baptist Church | State Ridge Holdings | Macs Convenience Stores | --- | --- |
| Confirmation Contact Name | Public Records | Agent for Seller | Public Records | --- | --- |
| | | | | | |
| Physical Description | | | | | |
| Size | | | | | |
| Acres | 4.88 | 0.72 | 2.95 | 2.85 | 10.03 |
| Square Feet | 212,573 | 31,360 | 128,563 | 124,165 | 437,023 |
| Shape of Site | Rectangular, Deep | Rectangular | Irregular, Deep | --- | Irregular |
| Topography of Site | Rolling | Level | Level | --- | Level |
| Drainage of Site | Adequate | Adequate | Adequate | --- | Adequate |
| Zoning of Site | I-S, Institutional | VPCZ | C-2, General Business | --- | "VPCZ, Veterans Parkway Corridor Zone" |
| Accessibility of Site | Average | Good | Average | --- | Good |
| Visibility of Site | Average | Good | Average | --- | Good |
| Utilities Available to Site | All | All | All | --- | All Utilities |
| Location of Site | Average | Good | Average | --- | Good |
| Unit Price Per Acre | $163,934 | $833,418 | $188,425 | $395,259 | $392,040 |
| Unit Price Per Square Foot | $3.76 | $19.13 | $4.33 | $9.07 | $9.00 |
| Elements of Comparison | | | | | |
| Real Property Rights Conveyed | 0% | 0% | 0% | --- | --- |
| Financing | 0% | 0% | 0% | --- | --- |
| Conditions of the Sale | 0% | 0% | 0% | --- | --- |
| Time and Market Conditions | 0% | 0% | 0% | --- | --- |
| Net Adjusted Sale Price Per Acre | $163,934 | $833,418 | $188,425 | --- | --- |
| Net Adjusted Sale Price Per Sq Ft | $3.76 | $19.13 | $4.33 | --- | --- |
| Location | 100% | 0% | 100% | --- | --- |
| Zoning | 0% | 0% | 0% | --- | --- |
| Size | -20% | -50% | -25% | --- | --- |
| Physical Qualities | 40% | 0% | 40% | --- | --- |
| Off Sites -- Utilities & Infrastructure | 0% | 0% | 0% | --- | --- |
| Other | 0% | 0% | 0% | --- | --- |
| Total Adjustments | 120% | -50% | 115% | --- | --- |
| Adjusted Price Per Acre | $360,656 | $416,709 | $405,115 | $394,160 | --- |
| Adjusted Price Per Square Foot | $8.28 | $9.57 | $9.30 | $9.05 | --- |
| | | | | | |
| Selected Price Per Square Foot | | | | | $9.00 |

**Site Value Conclusion**

Table L-1 on the preceding page summarizes the salient land sale data and the price adjustments applied to each sale. Some of these adjustments are not supportable by direct market evidence; instead, I have employed basic rationale and experience-based appraisal judgment. The following reconciliation chart is presented as a synopsis of the analysis.

| Table L-2  Land Sale Reconciliation | | | |
|---|---|---|---|
| | Sale One | Sale Two | Sale Three |
| Net Adjusted Sale Price Per Square Foot | $3.76 | $19.13 | $4.33 |
| Net Adjustment Percentage | 120% | -50% | 115% |
| Absolute Adjustment Percentage | 160% | 50% | 165% |
| Adjusted Sale Price Per Square Foot | $8.28 | $9.57 | $9.30 |
| Adjusted Sale Price Range Per Square Foot | | | |
| Maximum | $9.57 | | |
| Minimum | $8.28 | | |
| Average | $9.05 | | |

In general, there has been very little commercial land sale activity in the neighborhood during the last couple of years. Sale Two is the most current and similar sale to the subject property, but it is a much smaller site and required a significant adjustment for that difference. Sales Two and Three are too dissimilar in location to be good indicators of value for the site.

Because there are so few sales to consider, I have also looked at current listings for other sites that offer characteristics reasonably similar to those of the subject property. These listings are noted on the Land Sales Map.

Listing #1 is a 10.22-acre tract of land located in the northwest quadrant of the I-265 and Highway 62 interchange in the northeast portion of the neighborhood. This property is located in a mixed-use neighborhood with retail, residential and light-industrial uses. Access is via a service road which connects with Highway 62. The site terrain is gently rolling and mostly wooded, and the configuration is slightly irregular. The zoning is INAAP Redevelopment, which permits office, retail and industrial uses. The listing does not note the availability of sanitary sewer. The asking price is $7.46 per square foot. This property is inferior to the subject with respect to location, access, utilities and topography.

Listing #2 is a 4.68-acre tract of land located at 920 Woodstock Drive in Clarksville, which is about one block east of where Woodstock Drive intersects with Greentree Blvd. The immediate neighborhood offers a large concentration of retail properties. This site backs up to the Bass Pro Shops facility, but Woodstock Drive is a low traffic volume street. The site terrain is level and open, and the configuration is rectangular. The zoning is B-2, a commercial district. All utilities exist at the site. The asking price is $5.89 per square foot. This property is inferior to the subject with respect to location (exposure and access).

Listing #3 is a 9-acre tract of land located at 1001 Old Highway 31 in Clarksville. This site is further south of the subject property, but also along the I-65 corridor and with good exposure to the highway. The site is adjacent to a motor sports speedway, which I believe detracts from its overall appeal. Access is via a service road that does not have a northern outlet. The site terrain is near level and open. The site configuration is

**Tellatin, Short & Hansen, Inc.**

irregular, lending some inutility to the property. The zoning is B-3 and M-1, a mix of commercial and industrial districts. All utilities are available. The asking price is $9.06 per square foot. This property is inferior to the subject with respect to location, access and configuration.

As part of our research I also spoke with Ryan Pennington, the real estate broker for Seven Development, LLC that is handling the marketing for Jeffersonville Town Center, a 153-acre mixed-use development located just east of the subject property. Mr. Pennington indicated that a price list for lots did not exist; however, there are currently three letters of intent (LOIs) for retail use parcels in the development. Two are 1-acre parcels with frontage along arterial streets, both of which are priced at about $23 per square foot. The other LOI is for a 15.1-acre parcel without arterial road frontage, which would be used for an anchor type retail use. That parcel is priced at $6.31 per square foot.

Based on a comparative analysis of the data discussed, I have formulated the following opinion of market value for the subject site (assumed vacant and available for development to its highest and best use).

| Land Value Conclusion (Hospital Parcel) | |
|---|---|
| Concluded Value Per Square Foot | $9.00 |
| Concluded Value | $3,933,207 |
| Rounded | $3,930,000 |

## Improvement Valuation

The next step in the cost approach is to estimate the Reproduction or Replacement Cost New (RCN) of the improvements. For this appraisal I have elected to develop a Replacement cost estimate.

Replacement cost is defined as the cost to construct, at current prices, a building with utility equivalent to the building being appraised, using modern materials and current standards, design, and layout. In the development of a replacement cost estimate, any building component deemed to be a superadequacy is eliminated from the RCN. A superadequacy is defined as something which exceeds market requirements and does not add to value an amount equal to its cost.

Building costs are usually derived from nationally recognized providers of construction cost data such as Marshall & Swift and RSMeans. Cost data may also be obtained from construction projects whereby the actual costs of similar buildings are known.

The actual development costs for the facility were not supplied to the appraisers. Total project costs have been reported as $43.8 million in the media, but I assume that this figure represented an estimate that would have included the build-out and equipment for the entire facility. According to information supplied to the appraisers via an appraisal performed by Cushman Wakefield in early 2007, a "cursory budget" for the development of the real estate was as follows:

| General Conditions: | $21,180,000 |
|---|---|
| Development Fees: | 3,328,000 |
| Contingencies: | 3,000,000 |
| Total: | $27,508,000 |

**Tellatin, Short & Hansen, Inc.**

Using the total amount noted, which includes a sizable development fee, amounts to $357.58 per square foot of building area. Without the development fee, the adjusted amount would be $24,180,000, or $314.32 per square foot. The general conditions amount equates to $275.32 per square foot.

The following hospital construction cost data is derived from new hospitals that our firm (Tellatin, Short and Hansen, Inc.) has appraised. The costs are updated for changes in market conditions (inflation) and adjusted for geographic location to yield a unit cost that is applicable to the subject market. It is important to note that these unit costs include all construction costs for the respective projects, including those for site improvements.

| Construction Costs for Specialty and Acute Care Hospitals Appraised by TSH, Inc. | | | | | | | |
|---|---|---|---|---|---|---|---|
| Hospital | Total Cost of Improvements | Building Area | RCN/SF | Date Opened | Current Multiplier | Time Updated RCN/SF | RCN/SF Adjusted to Louisville, KY Index |
| Greater Peoria LTAC, Peoria, IL | $17,828,000 | 56,350 | $316.38 | 5/1/2010 | 0.9720 | $307.52 | $276.49 |
| St. John's Rehab, Chesterfield, MO | 28,650,000 | 111,000 | 258.11 | 7/1/2007 | 1.1300 | 291.66 | 255.20 |
| Zeeland Community, Zeeland MI | 30,850,055 | 148,929 | 207.15 | 8/1/2005 | 1.1690 | 242.15 | 239.71 |
| Houston Orthopedic Hospital | 28,975,000 | 126,000 | 229.96 | 10/1/2005 | 1.1970 | 275.26 | 306.54 |
| Select Specialty LTAC, Omaha, NE | 12,813,000 | 41,113 | 311.65 | 7/1/2008 | 1.0860 | 338.46 | 338.46 |
| Harrison Community, Corydon IN | 37,040,000 | 140,725 | 263.21 | 12/1/2006 | 1.1430 | 300.85 | 303.95 |
| Michiana Rehabilitation, Mishawaka, IN | 12,400,000 | 46,286 | 267.90 | 3/1/2010 | 0.9520 | 255.04 | 249.94 |
| Amery Regional Med Ctr, Amery, WI | 32,338,000 | 119,845 | 269.83 | 10/1/2007 | 1.1170 | 301.40 | 273.49 |
| Averages | | | $265.52 | | | $289.04 | $280.47 |

Considerable variation in unit costs can exist in hospitals due to specific design elements and finishes. The subject facility has a more basic finish package than some of the comparables. Based upon the comparables cited, the aforementioned development costs for the subject facility appear rather high. Again, the noted "cursory budget" is an unverified figure, and it is unknown if the contingency amount was spent, if the general conditions amount included complete finish-out of the interior space, or what the development fees represented and to whom they were paid.

The RCN estimates for the subject property improvements were obtained from Marshall Valuation Service, a cost manual published by Marshall & Swift, a nationally recognized provider of building cost data. The RCN estimates are based upon the comparative-unit method. The comparative-unit method utilizes known costs of similar structures, which are adjusted for market conditions and physical differences. These costs are expressed on a per-unit basis, such as price-per-square-foot of building area. In Marshall Valuation Service, these unit costs are referred to as *Calculator Costs*. They represent final costs to the owner, including all direct costs and most indirect costs. They do not include entrepreneurial profit and overhead.

Calculator Costs include:

- Average architect's and engineer's fees, including plans, building permits and surveys
- Normal interest on building funds during construction plus processing fees and service charges
- Sales tax on materials
- Normal site preparation costs, including finish grading and excavation for foundations and backfill
- Utilities from structure to lot line figured for typical setback

- Contractor's overhead and profit, including job supervision, workers' compensation insurance, fire and liability insurance, employment insurance, equipment, temporary facilities, and security

Calculator Costs do not include:

- Costs associated with the site acquisition, including demolition and rough grading
- Pilings, hillside foundations, and soil compaction
- Planning and concept costs, such as interest and taxes on the land, feasibility studies, certificate of need, environmental impact reports, hazardous material testing, and consulting fees
- Costs associated with permanent financing for the project
- Yard improvements such as signs, landscaping, paving walls, etc. – these can be priced separately using Marshall Valuation Service
- Furniture, fixtures and equipment
- Marketing costs to create first occupancy
- Developer's overhead and profit

Marshall Valuation Service (MVS) classifies buildings by occupancy (e.g., hotel, office, hospital, warehouse, etc.). Additionally, MVS utilizes a Class of Construction system to divide buildings into five basic cost groups by type of framing, walls, floors and roof structures, and fireproofing. The Class of Construction system is summarized as follows.

- **Class A** buildings have fireproofed structural steel frames with reinforced concrete or masonry floors and roofs.
- **Class B** buildings have reinforced concrete frames and concrete or masonry floors and roofs.
- **Class C** buildings have masonry or concrete exterior walls, and wood or steel roof and floor structures, except for concrete slab on grade.
- **Class D** buildings generally have wood frame, floor and roof structure. They are considered combustible construction.
- **Class S** buildings have frames, roof and walls of incombustible metal. This class includes pre-engineered metal buildings.

According to MVS (Section 15, General Hospitals) the unit construction cost for a class "C", average-quality hospital building, after adjustments and refinements, is $242.02 per square foot. The subject's type of construction is categorized by MVS as Class C, which is lower cost than Class A. However, there are variations in construction that lend to classification difficulty. In this case, I believe the use of average quality Class A figures yields a more representative unit cost than Class C figures.

## Entrepreneurial Profit

Entrepreneurial Profit represents the amount an entrepreneur expects to receive as repayment for his expenditure (direct and indirect costs) and as compensation for providing coordination and expertise and assuming the risks associated with the development of a project. Entrepreneurial profit is the difference between total cost of development and marketing and the market value of a property after completion and achievement of stabilized occupancy. In our analysis, entrepreneurial profit is treated distinct from developer's overhead, which I consider to be an indirect cost that represents payment for overseeing the development of a project.

114

When developing the Cost Approach, the appraiser must recognize the contribution of the entrepreneur and consider the inclusion of entrepreneurial profit in addition to direct and indirect costs. Entrepreneurial profit is typically expressed as a percentage of other development costs. The applicable margin of entrepreneurial profit is best derived through market analysis and interviews with developers to determine the expectations of profit required as motivation to undertake a development.

In surveying developers it has been the appraisers' experience that they typically require a profit of margin between five and 15 percent to undertake a new development project. The more speculative the project, such as if the project type is unique, without significant pre-leasing, or dependent upon conditions that cannot be controlled with good certainty, lends to a greater percentage expectation. For the subject property, which represents a management intensive going concern that has non-traditional investment characteristics, a higher profit of margin may seem intuitive. However, in an industry that is strongly influenced by the actions of non-profit players and is otherwise subject to government payment systems and on-going negotiations with payers trying to control their own costs, I are inclined to believe that entrepreneurial incentives for new development are modest.

In conclusion, based upon our valuation analyses, I have not added an entrepreneurial profit margin to the cost approach. This property suffers from sufficient obsolescence to effectively negate any earning of entrepreneurial profit.

## Replacement Cost Summary

The RCN of the subject improvements is summarized in the following tables.

| Replacement Cost New -- Calculator Cost Method | | |
| --- | --- | --- |
| **Hospital** | | |
| Base Unit Cost From Marshall & Swift | | $242.99 |
| | | |
| HVAC | | 0.00 |
| Unfinished "Shell" Space ([Shell Cost - Base Unit Cost] x [Shell Area / Total Building Area]) | | (10.75) |
| Fire Sprinklers | | 5.21 |
| Other | | 0.00 |
| Sub Total | | $237.46 |
| | | |
| Height and Story Multipliers | | |
| Number of Stories Multiplier (If Applicable) | | 1.000 |
| Height Per Story | | 1.000 |
| Floor Area Perimeter Multiplier | | 1.000 |
| Sub Total | | $237.46 |
| | | |
| Current Cost Multiplier | | 1.04 |
| Local Cost Multiplier | | 0.98 |
| Refined Base Square Foot Cost | | $242.02 |
| Building Area (Square Feet) | | 76,929 |
| Base Improvement RCN | | $18,618,069 |
| | | |
| **Site Improvements** | | |
| Parking and Drives/Receiving Areas | $412,000 | |
| Concrete Walks, Service Pads, Other | 100,000 | |
| Landscaping | 100,000 | |
| Other | - | |
| Other | - | |
| Other | - | |
| Other | - | |
| Misc. Other Site Improvements | 100,000 | |
| Site Improvements Total | | 712,000 |
| | | |
| **Total Construction Cost** | | $19,330,069 |

| Replacement Cost New -- Calculator Cost Method, Continued | | |
|---|---|---|
| Total Construction Cost | | $19,330,069 |
| | | |
| Developer's General Overhead (5.00%) | $966,503 | |
| Developer's Profit (0.00%) | 0 | |
| Architect Fee - Design (5.00%) | In Base Cost | |
| Architect Fee - Supervision (2.00%) | In Base Cost | |
| Bond Premium (1.00%) | In Base Cost | |
| Other Fees (1.00%) | In Base Cost | |
| Total Developer's and Architects Fees | | 966,503 |
| | | |
| Subtotal | | $20,296,573 |
| | | |
| Interest on Construction Loan | In Base Cost | |
| Taxes on the Land | 128,160 | |
| Property Insurance | 50,741 | |
| Financing Fees ($23,265,703 @ 5.30%) | 1,233,082 | |
| Title and Recording | 152,224 | |
| Legal | 25,000 | |
| Organizational | 25,000 | |
| Cost Certification Audit Fee and Title | 10,000 | |
| Total Financing, Legal and Organizational Costs | | 1,624,208 |
| | | |
| Total Replacement Cost New (RCN) for the Building and Site Improvements | | $21,920,781 |
| | | |
| Allocation (rounded figures) | | |
| Building Improvements | | $21,110,000 |
| Site Improvements | | $810,000 |

## Accrued Depreciation

Accrued depreciation is a loss in value from the replacement cost of the improvements due to any cause as of the date of the appraisal. The three principal methods for estimating depreciation are: the market extraction method; the economic age-life method; and, the breakdown method.

The economic age-life method has been utilized for this appraisal. In the economic age-life method, total depreciation is estimated by calculating the ratio of the effective age of the property to its economic life expectancy and applying this ratio to the property's total cost. The formula is: (Effective Age / Total Economic Life) x Total Cost = Depreciation.

Loss in value results from one or more of three sources: physical deterioration, functional obsolescence and external obsolescence.

Physical deterioration includes curable and incurable physical deterioration.

Curable deterioration, aka deferred maintenance, refers to components in need of repair on the date of the appraisal. This category is measured as the cost of restoring an item to new or reasonably new condition. Only routine capital improvements for the replacement of short-lived building and site improvement components should be necessary in the near future. Thus, there is no deferred maintenance.

Incurable physical deterioration reflects items of deterioration that cannot be practically or economically corrected at the effective date of the appraisal. If the cost to cure is more than the anticipated increase in value that would result from curing the condition, then the item is incurable.

**Tellatin, Short & Hansen, Inc.**

Incurable items are classified as short-lived and long-lived. Short-lived components have an economic life that is shorter than the remaining economic life of the structure.

Our depreciation calculations utilize the effective age and economic life concept and thereby include physical deterioration, functional obsolescence and external obsolescence.

The subject improvements are relatively new and physical deterioration is very limited.

Functional obsolescence is caused by a flaw in the structure, materials, or design of the improvement when compared with the highest and best use and most cost-effective functional design requirements at the time of appraisal. Functional obsolescence is attributable to defects within the property; as opposed to external obsolescence, which is caused by factors outside the property.

Functional obsolescence can be curable or incurable, and is either caused by a deficiency or superadequacy. If the cost to cure the item will not result in a value increment greater than the loss in value caused by the item or building component, then the item is considered incurable. Curable functional obsolescence is measured as the cost to correct the condition through addition, substitution or modernization.

Based upon our inspection of the subject facility and a review of the floor plan, I believe there is considerable incurable functional obsolescence present. That obsolescence stems from a rather disjointed footprint that does not lend itself to efficient and logical workflow. Additionally, there are size/space allocation issues, with the heavy concentration of space for inpatient use being the most significant. Reflecting market issues discussed in other sections of the report, I believe the facility may ultimately be used in a significantly different way than the purpose (inpatient surgical hospital) for which it was designed. Multiple medical uses/users could prove to be the most reasonable program of use for the building. In my opinion, most prospective buyers of the property will likely envision incurring substantial costs to reconfigure the building in a way that accommodates their own specific use needs, or to otherwise accommodate tenant needs for some of the building area. Without a significant incentive (price discount) to deal with the design and reconfiguration issues and costs, it would be easier and less costly to simply build a facility that suits their specific needs.

Our depreciation calculations utilize the effective age and economic life concept and thereby include physical deterioration, functional obsolescence and external obsolescence.

External obsolescence is a loss in value caused by factors outside a property. Examples include changes in neighborhoods, traffic flow, governmental regulations, reimbursement policies, and economic events. External obsolescence can be either temporary or permanent. External obsolescence may affect a single property when its cause is location, but

117

typically has a market wide effect and influences a whole class of properties.

There are three methods used to measure external obsolescence. The net income loss attributable to the negative influence can be capitalized at an appropriate rate to quantify the amount of obsolescence. Another method is to use paired data analysis whereby sales of similar properties that are subject to the negative influence are compared with others that are not. This comparison indicates the amount of obsolescence. Finally, an allocation of market-extracted depreciation can be utilized, whereby a comparable sale is analyzed for total depreciation, and then adjusted for physical deterioration and functional obsolescence to establish an external obsolescence ratio.

In a complex going concern like a hospital, quantifying external obsolescence can be quite difficult because matching paired sales is basically impossible due the complexity of variables that can influence sales. Quantifying the net income loss may be possible to a certain degree, but there will likely be a significant amount of conjecture in the development process.

In this instance, I believe there is external obsolescence that results from various overlapping matters. The market service area and broader metropolitan area are served by well established healthcare providers. The only other provider located in the subject HSA has a notably high Medicaid census mix, particularly in comparison to the other providers serving the metro area. Reflecting the historical actions of those other providers (limited capital commitment to the Indiana side of the metro), I do not foresee the subject property being viewed as a strategically important investment for them. That is not to say they wouldn't be interested as some price, but simply that I don't believe their interest will be keen. The stigma associated with the subject hospital operator's bankruptcy lends to doubt about the financial viability of providing healthcare services at this location.

Again, our depreciation calculations utilize the effective age and economic life concept and thereby include physical deterioration, functional obsolescence and external obsolescence.

As noted in the property description, the effective age and remaining economic life of the hospital building improvements are summarized in the following table.

| | |
|---|---|
| Economic Life | 55 |
| Effective Age | <u>25</u> |
| Remaining Economic Life | 30 |

The effective age and remaining economic life of the other site improvements are summarized in the following table.

| | |
|---|---|
| Economic Life | 15 |
| Effective Age | 7.0 |
| Remaining Economic Life | 8.0 |

**Tellatin, Short & Hansen, Inc.**

Based on the foregoing conclusions, accrued depreciation is summarized as follows.

| Accrued Depreciation for Building and Site Improvements | | | |
|---|---|---|---|
| **Building Improvements** | | | |
| Replacement Cost New | | $21,110,000 | |
| Effective Age | 25 | | |
| Economic Life | 55 | | |
| Depreciation (rounded) | 45.5% | 9,600,000 | |
| Depreciated Value of Building Improvements | | | $11,510,000 |
| **Site Improvements** | | | |
| Replacement Cost New | | $810,000 | |
| Effective Age | 7.0 | | |
| Economic Life | 15 | | |
| Depreciation (rounded) | 46.7% | 380,000 | |
| Depreciated Value of Site Improvements | | | $430,000 |

## Summation

The final step in the cost approach is the summation of the various components estimated. Thus, a value summary and conclusion for the subject property is presented as follows.

| Summary of the Cost Approach | | | |
|---|---|---|---|
| **Building Improvements** | | | |
| Replacement Cost New | | $21,110,000 | |
| Less Curable Depreciation | | - | |
| Remaining Replacement Cost New | | $21,110,000 | |
| Effective Age | 25 | | |
| Economic Life | 55 | | |
| Depreciation (rounded) | 45.5% | 9,600,000 | |
| Depreciated Value of Building Improvements | | | $11,510,000 |
| **Site Improvements** | | | |
| Replacement Cost New | | $810,000 | |
| Less Curable Depreciation | | - | |
| Remaining Replacement Cost New | | $810,000 | |
| Effective Age | 7 | | |
| Economic Life | 15 | | |
| Depreciation (rounded) | 46.7% | 380,000 | |
| Depreciated Value of Site Improvements | | | $430,000 |
| Land Value Estimate | | | 3,930,000 |
| Total Indicated Value of Real Property (rounded) | | | $15,900,000 |

119

## <u>Direct Sales Comparison Approach</u>

The next step in the appraisal process is to develop a sales comparison profile for the subject property. The sales comparison approach is an appraisal technique used to estimate value based on prices paid in actual market transactions and on current listings. The process is one of analyzing recently sold properties considered similar to the subject. The reliability of this technique depends upon (1) the comparability of the property appraised with each sale or listing, (2) the length of time since the sale, (3) the accuracy of the sale data and (4) the absence of unusual conditions affecting the sale.

### Sale Data Information

Our research of recent hospital sale data included the utilization of CoStar Comps service, the utilization of LoopNet, Inc. service, reviewing transaction notes in Modern Healthcare magazine, reviewing the Health Care M & A Report published by Irving Levin Associates, Inc., on-line research in Bizjournals and other business trade publications, and the review of in-house information from prior appraisal assignments. Sales of hospitals that qualify as suitable comparables for this appraisal are very limited. A description and comparative analysis of the market data are presented on the following pages.

Public records typically provide the names of the parties and contacts in each transaction. Additionally, as best as possible, the purchase price and financing terms are verified from the buyer, the seller, a broker or public records. Specific physical property data and other facts are gathered through interviews with a principal party and/or local property assessing officials, plus through web sites and new articles.

**Sale No. One**

| | |
|---|---|
| Name | Louisiana Hospital Center |
| Address | 42570 South Airport Road |
| | Hammond, Louisiana |

Sale Data

| | |
|---|---|
| Grantor | GE Commercial Finance |
| Grantee | Hostate LLC |
| Date of Sale | August 26, 2010 |
| Recording Information | Book 1221, Page 572 |
| Terms of Sale | Cash to Seller |
| Total Sale Price | $12,850,000 |
| Real Estate (RE) Allocation | $12,850,000 |
| RE Price per Bed | $428,333 |
| RE Price per Square Foot | $203.97 |

Property Data

| | |
|---|---|
| Number of Beds | 30 |
| Building Area (Sq.Ft.) | 63,000 |
| All Years Built | 2006 |
| Age at the Time of Sale | 5 |
| Overall Building Condition | Average |
| Land Area (Acres) | 11.91 |
| Building Design Use(s) | Surgical Hospital |
| Functional Design / Utility | Average |
| Quality | Average |

Comments

Hammond is a rural Louisiana town of 20,000 located about 60 miles northwest of New Orleans. This hospital was developed as a physician owned surgical hospital. The partnership included St. Tammany and Tangipahoa parish physicians, private investors, and Cardiovascular Hospitals of America, a Wichita, Kansas based organization that partners with local physician investors to develop and operate hospitals.

Construction of the hospital was enabled through $15 million in bond financing and tax incentives. The Hammond Area Economic and Industrial Development District, a government agency, sponsored the bonds. G.E. Commercial Finance purchased the bonds that were sold.

This hospital was never opened or fully completed due to financial problems and disputes between the owners as to operation of the hospital. In addition, it was sued by a local hospital, North Oaks Health System, a 259-bed facility and network of clinics that is the only hospital in the area. The lawsuit argued that a private, for-profit institution shouldn't be allowed to use public financing. North Oaks lost the case, but by then Louisiana Hospital Center had run out of money. The hospital owners stopped making debt payments in 2007, and GE Commercial sued in 2008 for nonpayment. The ownership entity filed for Chapter 11 bankruptcy in 2009. The property was sold in auction to GE Commercial Finance.

The physician investors of Hostate LLC are veterans of the earlier attempt to open Louisiana Hospital Center. In January 2010, they formed a new company to buy or lease the vacant facility from GE Commercial. As a result of changes to the Stark Law under the Affordable Care Act, the new owner was compelled to have a Medicare provider agreement for the hospital by December 31, 2011.

The new ownership entity has changed the name of the facility to Cypress Pointe Surgical Hospital. The investors have suggested in media reports that their total investment is in the $30 to $35 million dollar range. The building had never been completed, plus it sat vacant for an extended period of time. The buyers incurred significant costs for refurbishment of interior finishes and the completion of some mechanical components. Additionally, the parking lots had never been paved. The hospital has six operating rooms, two procedure rooms and a 16-bed pre-op and post-op unit.

The buyers paid $12,500,000 for property, but also agreed to pay the City of Hammond back for a $350,000 grant that the city was liable to the state due to the previous developers default on the project and the jobs tied to the site.

Photograph Unavailable

Tellatin, Short & Hansen, Inc.

**Sale No. Two**

| | |
|---|---|
| Name | Columbus Hospital |
| Address | 438-440 North 12th Street |
| | Newark, New Jersey |

Sale Data

| | |
|---|---|
| Grantor | Columbus Acquisition Corp. |
| Grantee | Columbus Medrealty, LLC |
| Date of Sale | November 4, 2008 |
| Recording Information | 12167-2282 |
| Terms of Sale | Cash to Seller |
| Total Sale Price | $18,000,000 |
| Real Estate (RE) Allocation | $18,000,000 |
| RE Price per Bed | $87,379 |
| RE Price per Square Foot | $120.99 |

Property Data

| | |
|---|---|
| Number of Beds | 206 |
| Building Area (Sq.Ft.) | 148,768 |
| All Years Built | 1934, others |
| Age at the Time of Sale | 35 |
| Overall Building Condition | Below Average |
| Land Area (Acres) | 3.3 |
| Building Design Use(s) | Hospital |
| Functional Design / Utility | Below Average |
| Quality | Average |

Comments

This community hospital is located in the North Ward area of Newark, which is characterized as a working-class neighborhood.  This hospital and two sister facilities in Newark (St. Joseph's and St. Michaels) had been operated by Cathedral Healthcare System, which is sponsored by the Archdiocese of Newark. The three hospitals were financially struggling and were seeking a partnership with a larger, financially sound healthcare system to avoid closing all three hospitals.  Catholic Health East, one of the nation's leading Catholic health care systems, eventually agreed to acquire the assets of Cathedral HCS. Per that agreement, Cathedral HCS would close Columbus Hospital and St. Joseph's, and Catholic Health East would invest in excess of $100MM in St. Michael's. Columbus Hospital ceased operating in June 2008.  Catholic Health East acquired the assets in July 2008.

In November 2008, sub-entities of Catholic Health East sold the two hospitals to sub-entities of MedRealty, Inc., which is based in Fort Lee, New Jersey. The total price for the two hospitals was $24MM.  The allocated price for Columbus Hospital was $18MM. A principal of MedRealty is Richard Lipsky, a Bergen County anesthesiologist.

Catholic Healthcare continues to operate an emergency department at Columbus Hospital. MedRealty successfully procured a 66-bed LTAC tenant for the facility, which opened in late 2010. Reportedly, $10 million in renovation was spent to accommodate the LTAC.

**Tellatin, Short & Hansen, Inc.**



Photograph of Sale Two

**Tellatin, Short & Hansen, Inc.**

**Sale No. Three**

| | |
|---|---|
| Name | Physicians' Metroplex Hospital |
| Address | 4400 New York Avenue |
| | Arlington, Texas |

Sale Data

| | |
|---|---|
| Grantor | PMH Development L.P. |
| Grantee | Tarrant County Hospital District |
| Date of Sale | November 30, 2004 |
| Recording Information | Instrument # D204369824 |
| Terms of Sale | Cash to Seller |
| Total Sale Price | $14,700,000 |
| Real Estate (RE) Allocation | $11,760,000 |
| RE Price per Bed | $392,000 |
| RE Price per Square Foot | $233.89 |

Property Data

| | |
|---|---|
| Number of Beds | 30 |
| Building Area (Sq.Ft.) | 50,281 |
| All Years Built | 2002 |
| Age at the Time of Sale | 2 |
| Overall Building Condition | Good |
| Land Area (Acres) | 7.6878 |
| Building Design Use(s) | Hospital |
| Functional Design / Utility | Good |
| Quality | Average |

Comments

Arlington is located between Ft. Worth and Dallas. This property is well located within the Arlington community, being along the I-20 corridor, just west of Highway 360. The immediate neighborhood is a mix of commercial and residential development, including a large corporate office occupied by J.P. Morgan Chase  that is immediately to the east of the hospital building. Most of the commercial development is business center type.

The seller was a partnership of Leland Medical Centers, Inc. and 65+/- physicial investors. Leland is a privately held hospital operating company based in Plano, TX. They operate Garland Community Hospital in the northeast part of the Dallas MSA.

The buyer is an integrated health system based in the Ft. Worth (Tarrant County) market. They have been aggressively pursuing growth opportunities. They were already operating a primary health center and a health center for women in Arlington at the time of this acquisition, and had plans to open an ambulatory care center in 2005. They viewed the purchase of this facility as opportunistic because the ratio of hospital beds to residents was much lower in Arliington than in their core Ft. Worth market. This acquisition represented their first inpatient facility in the Arlington market.

The facility was built as a short-stay, medical / surgical hospital with six operating suites. It opened early in 2003, but the operations were reduced to emergency room services only after just twelve months of operation due to financial problems. At the time of sale, the buyer was unsure as to exactly what services would be offered at the facility. Ultimately, they chose to focus on specialty services such as surgery for ear, nose and throat, pain management, reconstructive, and gynecology (known as JPS Diagnostic & Surgery Hospital).

Texas does not have a CON process to regulate the supply of new hospital beds.

124



Photograph of Sale Three

**Tellatin, Short & Hansen, Inc.**

**Sale No. Four**

| | |
|---|---|
| Name | Pascack Valley Hospital |
| Address | 250-270 Old Hook Road |
| | Westwood, New Jersey |

Sale Data

| | |
|---|---|
| Grantor | Life Key Ventures, Inc. |
| Grantee | Humc of Touro, LLC |
| Date of Sale | May 14, 2008 |
| Recording Information | 9542-0277 |
| Terms of Sale | Cash to Seller |
| Total Sale Price | $45,850,000 |
| Real Estate (RE) Allocation | $45,850,000 |
| RE Price per Bed | $163,750 |
| RE Price per Square Foot | $101.89 |

Property Data

| | |
|---|---|
| Number of Beds | 280 |
| Building Area (Sq.Ft.) | 450,000 |
| All Years Built | 1959, others |
| Effective Age at the Time of Sale | 30 |
| Overall Building Condition | Average |
| Land Area (Acres) | 20.42 |
| Building Design Use(s) | Hospital |
| Functional Design / Utility | Below Average |
| Quality | Average |

Comments

This hospital is located in the Borough of Westwood, in the northeastern part of the state. This is a suburban neighborhood with predominately single-family housing development. Westwood has approximately 11,000 residents.

Pasack Valley Hospital went into bankruptcy in September 2007 and closed in November 2007. Via an auction through the U.S. Bankruptcy Court, the hospital was purchased by a joint venture between Hackensack University Medical Center and Touro University College of Medicine. The buyer plans to operate the property as a community hospital and to open a medical school at the facility. This will be a 128-bed, full-service community hospital to be known as Hackensack University Medical Center North at Pascack Valley. The hospital will be managed by Legacy Hospital Partners, Inc., a venture capital firm that has committed to invest $80MM in the facility.

The purchase price for the tangible assets was $45MM. The buyer subsequently purchased the CON/license from the former operator for $850,000. Legal challenges to the CON have prevented the hospital from opening.



Photograph of Sale Four

126

**Sale No. Five**

| | |
|---|---|
| Name | Northwest Suburban Community Hospital |
| Address | 1625 South State Street |
| | Belvidere, Illinois |

<u>Sale Data</u>

| | |
|---|---|
| Grantor | Highland Hospital, Inc. |
| Grantee | Swedish American Hospital |
| Date of Sale | January 10, 2008 |
| Recording Information | N/A |
| Terms of Sale | Cash to Seller |
| Total Sale Price | $15,000,000 |
| Real Estate (RE) Allocation | $15,000,000 |
| RE Price per Bed | $272,727 |
| RE Price per Square Foot | $258.62 |

<u>Property Data</u>

| | |
|---|---|
| Number of Beds | 55 |
| Building Area (Sq.Ft.) | 58,000 |
| All Years Built | 1967 |
| Effective Age at the Time of Sale | 20 |
| Overall Building Condition | Average-Plus |
| Land Area (Acres) | 3.6 |
| Building Design Use(s) | Hospital |
| Functional Design / Utility | Average |
| Quality | Average |

<u>Comments</u>

This hospital is located in northern Illinois, being approximately seven miles east of Rockford (pop. = 160,000+/-). Belvidere has a population of approximately 26,000. The greater Chicago metropolitan area begins about 30 miles to the east of Belvidere.

Originally built as a general acute care hospital, the seller (a subsidary of Chatham Capital Corp., operating as Barix Clinics) converted the hospital to a bariatric specialty hospital in 1997. In 2007 Chatham closed the hospital due to underperformance and then filed a petition for relief under Chapter 11 of the Bankruptcy Code. The hospital was then sold in a bankruptcy auction to Swedish American Hospital. Swedish AH is one of the three acute care hospitals operating in Rockford.

Swedish AH completed a $7.0MM renovation of the facility and now uses it for emergency, surgery, diagnostics and imaging services.



Photograph of Sale Five

**Tellatin, Short & Hansen, Inc.**

**Table S-1  Direct Sales Comparison Summary and Adjustment Grid**

| | One | Two | Three | Four | Five | | |
|---|---|---|---|---|---|---|---|
| Sale Number | | | | | | | |
| Facility Name | Louisiana Hospital Center | Columbus Hospital | Physicians' Metroplex Hospital | Pascack Valley Hospital | Northwest Suburban Community Hospital | | |
| City, State | Hammond, Louisiana | Newark, New Jersey | Arlington, Texas | Westwood, New Jersey | Belvidere, Illinois | Averages | Subject |
| **Sale Data:** | | | | | | | |
| Sale Date | Aug-10 | Nov-08 | Nov-04 | May-08 | Jan-08 | | May-11 |
| Total Sale Price | $12,850,000 | $18,000,000 | $14,700,000 | $45,850,000 | $15,000,000 | $21,280,000 | N/A |
| *Net Adjusted Price* | $14,850,000 | $18,000,000 | $11,760,000 | $45,850,000 | $15,000,000 | $21,092,000 | |
| **Property Data:** | | | | | | | |
| Number of Beds | 30 | 206 | 30 | 280 | 55 | 120 | 46 |
| Gross Building Area | 63,000 | 148,768 | 50,281 | 450,000 | 58,000 | 154,010 | 76,929 |
| Effective Age at the Time of Sale | 5 | 35 | 2 | 30 | 20 | 18 | 25 |
| Overall Building Condition | Average | Below Average | Good | Average | Average-Plus | | Good |
| Land Area (Acres) | 11.91 | 3.30 | 7.69 | 20.42 | 3.60 | 9.38 | 10.03 |
| Building Uses | Surgical Hospital | Hospital | Hospital | Hospital | Hospital | | Hospital |
| Functional Design / Utility | Average | Below Average | Good | Below Average | Average | | Below Average |
| Quality | Average | Average | Average | Average | Average | | Average |
| **Price Indicators (*Net Adjusted Price*):** | | | | | | | |
| Price Per Bed | $495,000 | $87,379 | $392,000 | $163,750 | $272,727 | $282,171 | |
| Price Per Square Foot | $235.71 | $120.99 | $233.89 | $101.89 | $258.62 | $190.22 | |
| **Elements of Comparison & Adjustments:** | | | | | | | |
| Total Price Per Square Foot | $203.97 | $120.99 | $292.36 | $101.89 | $258.62 | $195.57 | --- |
| Property Rights Conveyed | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | --- | --- |
| Financing | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | --- | --- |
| Conditions of the Sale | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | --- | --- |
| Expenditures After Purchase | 15.6% | 0.0% | 0.0% | 0.0% | 0.0% | --- | --- |
| Excess Land | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | --- | --- |
| Non Real Estate | 0.0% | 0.0% | -20.0% | 0.0% | 0.0% | --- | --- |
| Adjustment Factor | 15.6% | 0.0% | -20.0% | 0.0% | 0.0% | --- | --- |
| *Net Adjusted Price* | $235.71 | $120.99 | $233.89 | $101.89 | $258.62 | $190.22 | --- |
| Time and Market Conditions | 0.0% | 0.0% | 10.0% | 0.0% | 0.0% | --- | --- |
| *Net Adj Price* + Time/Mkt Conditions Adj | $235.71 | $120.99 | $257.27 | $101.89 | $258.62 | $194.90 | --- |
| Location | Equal | Equal | Superior | Equal | Superior | --- | --- |
| Age and Condition | Equal | Inferior | Equal | Inferior | Slightly Inferior | --- | --- |
| Functional Design / Utility | Superior | Inferior | Superior | Inferior | Slightly Superior | --- | --- |
| Quality | Equal | Equal | Equal | Equal | Equal | | |
| Overall Comparability - Comparable is: | Superior | Inferior | Superior | Inferior | Superior | --- | --- |

128

**Tellatin, Short & Hansen, Inc.**

## Elements of Comparison - Quantitative

Consideration is given to the following characteristics and elements of comparison.

**Property Rights Conveyed**:  Adjustments are applied to sales that involve different rights than the rights appraised for the subject. In this instance, the interest appraised in the subject is the fee simple interest in the real estate. The property rights acquired in the comparable transactions are, to our knowledge, all fee simple. Therefore, no adjustments for property rights conveyed were necessary.

**Financing**: Occasionally, real estate is sold with seller financing. Sellers often provide substantially lower interest rates than commercial or governmental lenders. In instances where sellers finance the sale at interest rates below market levels, prices are usually somewhat inflated to compensate for the lower interest rate. In order to adjust favorably financed transactions, the mortgaged amount is discounted at an appropriate market mortgage rate to reflect a cash equivalent price. In this instance, seller financing was not provided in any of the comparables considered.

**Conditions of the Sale**:  This adjustment considers any abnormal circumstances in the sale. If the buyer or seller is unusually compelled or motivated to make the transaction, then an adjustment is required. If relevant, the comments section for each of the respective sales discusses the specific conditions.

Sales Four and Five were sold out of bankruptcy court; however, there is no appearance of distress in the sales.

**Expenditures After Purchase**:  A knowledgeable buyer considers expenditures that will have to be made upon purchase of a property because these costs affect the price the buyer agrees to pay. Adjustments for expenditures after the purchase can be complex to reconcile because it is difficult to separate what is made based upon physical or functional need-based conversion and that which is made for image. Additionally, I anticipate that the subject will need capital improvements if acquired by another buyer and those are very difficult to quantify in monetary terms because they could vary depending upon any specific buyer's planned use for the building.

Reflecting these considerations, only Sale One has been adjusted for expenditures after purchase. In that case, the improvements were not fully completed; thus, some of the expenditures made by the buyer of that property are of a different nature than expenditures incurred for user-specific modifications or décor updates. I was not able to verify the actual expenditures incurred by the buyer. Even if those figures were available, the adjustment to apply would still be a subjective matter. Based upon improvements made per discussions in the media, I believe a $2 million dollar adjustment reflects a reasonable amount for the adjustment.

129

**Excess Land**:  Since it is the intent of the appraisal to net the purchase price of the comparable property to that which is directly related to the hospital improvements and the land required to support the use(s), any sale with significant excess land has been adjusted for its estimated contributory value to the sale price.

In this instance, I do not consider any of the comparables to have excess land. If anything, Sale Two is rather land constrained, and I have given consideration to that consideration in the functional category of the analysis.

**Non Real Estate**:   Operating hospitals are business entities that comprise: real estate; furnishing, fixtures and equipment (FF&E); and intangible assets. The intangible assets value of a hospital encompasses the Certificate of Need (if applicable), assembled workforce, licenses and permits, inventory, working capital, and going concern. In this appraisal, whereby only the real estate is being appraised, I have attempted to identify and compare sales of non-operating hospitals to eliminate the need for adjustments related to the FF&E and intangible assets. However, as exclusive real estate sales of hospitals are scarce, particularly for newer properties, I am compelled to analyze sales of hospitals that included non-realty assets.

Sale Three included the FF&E that had been in use by the former operator. This is a modern facility and the FF&E was modern and valuable to the buyer. The adjustment made is based upon an approximate ratio of the purchase price.

**Time and Market Conditions**:  Although market condition adjustments are extremely difficult to support for this type of property, Sales Three transpired roughly six years ago and I believe there has been enough change in construction costs to warrant a time adjustment to this comparables. Based upon Marshall Valuation Service comparative cost multipliers, construction costs for Class A buildings have increased approximately 22 percent since that sale transpired. Considering the sustained weakness in the nation's economy and physician hospital ownership changes made under the Affordable Care Act, I have elected to limit our market condition adjustments to Sale Three to positive 10 percent.

## Elements of Comparison - Qualitative

Because there are so few transactions to consider for this analysis, deriving quantitative adjustments for basic elements of comparison is virtually impossible. Therefore, I have utilized a qualitative analysis for this segment of the comparison process.

**Location**:  The location of a hospital building greatly impacts its ability to attract profitable patients, in addition to facilitating the staffing of the facility. Moreover, the location directly affects the remaining economic life of the improvements. Consideration is given to the neighborhood surroundings and to the income level and economic growth trends of the

primary market area. Regional differences in replacement costs are also weighted.

Sale One is located in a smaller community whose healthcare delivery is dominated by one competitor, which is owned by a governmental hospital district. The Medicaid discharge payer mix for the competitor was about 36 percent in 2009. That mix is relatively high and it lends to the potential for lean operating margins for healthcare providers serving the service area.

Sale Two is located in an overly competitive healthcare market and within a neighborhood area that serves a disproportionate share of poor and working class people, which translates to less reimbursement for services delivered and the likelihood for below-average profitability if the facility is to be operated in the future.

Sale Three is located in an area of growth that is situated between two major metropolitan areas. The hospital is sited in a commercial area near a major highway. The healthcare market in the Dallas/Ft. Worth area is competitive, but there is a great deal of interest in new medical related development, as is evidenced by projects that have occurred all across the region.

Sale Four is located in New Jersey, which is an over bedded state with hospitals that typically achieve below-average performance. There are two other nearby hospitals that put up a significant effort to prevent the buyer of this facility from getting its license, providing evidence of the competitive landscape.

Sale Five is the only hospital in Belvidere; thus, I consider the location to have reasonably good appeal.

In comparison, the subject property is deemed to have a reasonably similar location to Sales One, Two and Four. Sale Three and Five and deemed to be superior in location.

**Age and Condition**:  The age and condition of a hospital building typically has a significant impact upon the price it will command in the marketplace. There is currently a strong trend in new hospital development, which is influenced by a variety of factors. Among the most significant are the evolving design standards that enhance the patient, visitor and staff experience, and which facilitate better outcomes and help to control labor costs. Until the economic downturn that began in 2008, there was also good availability of low-cost financing for new development.

Sales One and Three are newer buildings with very little physical deterioration (as adjusted for expenditures after the sale). Sales Two, Four and Five are older than the subject structure and need more age-based capital improvement to be perceived as modern and appealing.

131

**Functional Design, Utility and Building Size**:  Various considerations come into play when evaluating the functional utility of hospital improvements.  Newer buildings will tend to have modern, functional designs with good aesthetics.  Older buildings are more inclined to have less functional footprints and more dated aesthetics.  As expressed in the age and condition comments, these considerations are some of the driving factors in the current phase of new hospital development.  Consequently, these considerations can dramatically impact the utility and value of the improvements to prospective buyers.

Another consideration can be the inclusion of medical office space in the sale of a hospital.  Whether or not this enhances or diminishes the unit price ($/SF) achieved in the sale will depend upon the relative age, quality, condition and functional utility of the respective building areas.

Furthermore, building size can be a relevant consideration.  There are fewer prospective users for larger buildings due to the sheer capital investment that is required to make them operational.  Additionally, the larger a building is the greater chance there is that some portion of the building will be surplus to the needs of prospective buyers.

Site size limitations may also result in a functional-based price penalty.  Hospitals have a great need for adequate and convenient parking.  They also prefer to have room to expand because changes that occur in the delivery of healthcare will typically compel a hospital to modernize in order to avoid becoming a weak player in the marketplace.

Sale One is perceived as being reasonably well designed for the buyer's intended use.  The buyer is the original intended user.

Sale Two is an older building that undoubtedly has a less-than-ideal functional design.  This property also has a small site, and I suspect that its parking capacity is inadequate for the healthcare use.

Sale Three is a well-designed, modern hospital building with six operating suites, an emergency room, and private patient rooms.

Sale Four is a very large building.  This is also an older structure that will have more design faults than a modern facility.

Sale Five is an older building but it was substantially modernized in 1997.

The subject facility is newer, but, as discussed in other sections of the report, I believe there are dysfunctional aspects of the design.  I believe there is a good likelihood that a buyer of the facility will incur significant costs to convert it to their specific program of intended use.

Sales One and Three are deemed superior to the subject facility, while Sale Five is slightly superior.  Sales Two and Four are considered inferior to the subject facility.

132

**Quality**:   The quality issue is closely related to the functional design issue. Still, construction type and finishes used are material to the analysis.

The quality of construction for the comparables sales are all considered to be reasonably similar to the subject property.

## Sales Comparison Approach Conclusion

Based upon the quantitative and qualitative analyses presented, I believe that Sales One, Three and Five are more comparable to the subject than Sales Two and Four. The average unit price, prior to qualitative adjustments, is $194.90 per square foot.

Sale One is the most similar overall, but it must be recognized that the buyers of that property include physicians that intend to operate the hospital with self-referral activity.

Sale Three required an adjustment for FF&E included in the sale, plus an adjustment for a change in market conditions. These adjustments are difficult to support with a high degree of confidence. Aside from those considerations, the comparable is deemed superior with respect to location and functional utility.

Sale Five is a situation whereby a community hospital from a nearby city purchased the comparable for the opportunity to extend its outreach. This property was a reasonably good fit for that buyer, despite the fact that the buyer made significant capital improvements to the property. I believe the buyer paid a price for this property that is at the upper end of its market value range.

In conclusion, I have adopted a unit value conclusion of $210.00 per square foot for the subject property. This unit value yields the following indication of market value.

| Sales Comparison Approach | |
|---|---|
| Value Estimate Per Square Foot | $210 |
| Building Area | 76,929 |
| Preliminary Value Estimate | $16,155,090 |
| Less:  Deferred Maintenance | 0 |
| Concluded Value Estimate | $16,155,090 |
| Rounded | $16,200,000 |

**Tellatin, Short & Hansen, Inc.**

## <u>Reconciliation and Final Conclusion of Market Value</u>

The cost approach is most effective when the improvements are new, or nearly new, and are fully utilized for their designed purpose. The improvement cost estimates are based on Marshall & Swift cost figures and the actual costs of other recently constructed hospitals appraised by TSH, Inc. - trended for inflation and adjusted for geographic location. Accrued depreciation is estimated in an age-life method. The effective age of the improvements is difficult to estimate. In this instance, the physician age of the improvements is only two years, but functional and external obsolescence considerations are of far greater consequence in adopting an effective age estimate. Land sale activity is limited; however, there are listings and negotiated prices for other properties to help establish the value.

The sales comparison approach reflects prices paid for other hospital facilities. The availability of comparable sales for this assignment is notably limited. Despite substantial efforts to find comparable sales that are truly suitable for comparison (without business / goodwill components), very few sales were identified. Still, the comparables presented are satisfactory to develop a credible opinion of market value. The adjustments are largely based on qualitative interpretations of the collective sale data, along with the appraiser's experience with the property type. Sales of hospitals occur on an infrequent basis, and the unique motivations of the buyers of these properties make comparisons difficult. Nonetheless, this is the most applicable approach to the market valuation of hospital properties, particularly for real-estate-only analyses.

Based on the foregoing considerations, it is our opinion that the "as is" market value of the fee simple interest in the real property, as of May 11, 2011, is as follows.

**$16,000,000**

**Tellatin, Short & Hansen, Inc.**

## Certification

I certify that, except as otherwise noted in this appraisal report, to the best of my knowledge and belief:

The statements of fact contained in this report are true and correct.

The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, impartial, unbiased professional analyses, opinions, and conclusions.

I have no present or prospective interest in the property that is the subject of this report, and I have no personal interest with respect to the parties involved.

I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

The racial/ethnic composition of the neighborhood surrounding the property in no way affected the appraisal determination.

My engagement in this assignment was not contingent upon developing or reporting predetermined results.

My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute, which include the Uniform Standards of Professional Appraisal Practice.

The subject facility was inspected by Victor D. Cremeens, MAI on May 11, 2011. No one provided significant real property appraisal assistance, personal property appraisal assistance, or business valuation assistance to the persons signing this report.

The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

As of the effective date of the appraisal, Victor D. Cremeens, MAI,  has completed the continuing education program of the Appraisal Institute.

Victor D. Cremeens, MAI
Principal
Indiana Certified General Real Estate Appraiser
# CG40300285